NO. 11-50200

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT
____
____

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**THANH VIET CAO,**

Defendant-Appellant.

____
____

Appeal from the United States District Court
for the Southern District of California
Honorable Larry A. Burns, District Judge Presiding

____
____

**DEFENDANT-APPELLANT'S OPENING BRIEF**
____

JAMES FIFE
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467

Attorneys for Defendant-Appellant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATUTORY PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Bail Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    Proceedings and Disposition in the District Court . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Background to the Charged Offenses . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Investor Meetings and Representations Underlying the Charges . . . 6

      C.    The Wire Fraud Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      D.    The Investigation and Initiation of Prosecution . . . . . . . . . . . . . . . 15

      E.    Testimony on the Bank Guarantees . . . . . . . . . . . . . . . . . . . . . . . . 20

      F.    Testimony on Mr. Cao's Luxury Purchases . . . . . . . . . . . . . . . . . . 21

      G.    Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I     THE DISTRICT COURT ERRED IN DENYING MR. CAO'S MOTION
      TO RECUSE THE DISTRICT JUDGES AND THE UNITED STATES
      ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF
      CALIFORNIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     A.    <u>Introduction</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     B.    <u>The District Court's Denial of the Motion to Recuse Judges Was</u>
          <u>Based on an Incorrect Legal Standard</u> . . . . . . . . . . . . . . . . . . . . . 30

     C.    <u>The Motion to Recuse the USAO Was Erroneously Denied</u> . . . . . 34

II    THE CUMULATIVE PREJUDICE OF MULTIPLE FAILURES TO
      EXCLUDE IRRELEVANT OR IMPROBATIVE EVIDENCE
      WARRANTS REVERSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     A.    <u>Standard of Review</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     B.    <u>A District Court Abuses Its Discretion, When It Admits</u>
          <u>Evidence Whose Tendency to Prejudice the Defense</u>
          <u>Substantially Outweighs Its Probative Value to the Issues at</u>
          <u>Trial</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

     C.    <u>The District Court Admitted Multiple Instances of</u>
          <u>Prejudicial Evidence That Was Irrelevant or Lacked</u>
          <u>Sufficient Probativeness to  Satisfy the Requirement of</u>
          <u>Fed R. Evid. 403</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

          *1. The Goldman-Sachs Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . 43

          *2. The spending in Las Vegas* . . . . . . . . . . . . . . . . . . . . . . . . . . 49

          *3. The luxury goods purchases* . . . . . . . . . . . . . . . . . . . . . . . . . 51

      4. *The Bentley automobile* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      5. *The acrimonious e-mail exchanges* . . . . . . . . . . . . . . . . . . . . . . . 55

D.    The Cumulative Prejudice from These Erroneous Admissions
     of Evidence Warrants Reversal . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

III    THE DISTRICT COURT ERRED IN DENYING THE MOTION
      FOR ACQUITTAL AS TO ALL THE WIRE FRAUD COUNTS . . . . . . 57

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.    No Reasonable Juror Could Find the Proffered Wire
     Communications Were an Essential Element of the
     Charged Fraud Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

      1. *The wire transfers between the hotel and the credit*
        *card company were not shown to be essential to the*
        *alleged, fraudulent, investment scheme* . . . . . . . . . . . . . . . . . . . . . 59

      2. *The celebration party for investors at the Hyatt Hotel*
        *was not essential to the alleged fraudulent scheme, as*
        *the jury discerned in acquitting on the February counts.* . . . . . . . . 63

IV    MR. CAO'S SENTENCE WAS PROCEDURALLY
      UNREASONABLE BECAUSE THE DISTRICT COURT
      IMPROPERLY RELIED ON MR. CAO'S FAILURE TO DISCLOSE
      TO DISCLOSE THE LOCATION OF CERTAIN LOST FUNDS AS
      AN AGGRAVATING FACTOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

B.    The District Court Erred by Imposing a Longer Sentence
     Than Otherwise Sufficient on the Improper Basis of
     Mr.Cao's Intransigence in Refusing to Disclose
     Supposed Missing Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

V      THE SENTENCE WAS SUBSTANTIVELY UNREASONABLE AS BASED ON UNSUPPORTED PREMISES AND FAILING TO AVOID UNWARRANTED DISPARITY . . . . . . . . . . . . . . . . . . . . . . . . . 77

     A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

     B.    The Fraud Guidelines Produce Unreasonably Elevated Sentence Recommendations Which Are Unsuppported or Contradicted by Empirical Evidence . . . . . . . . . . . . . . . . . . . . . 78

     C.    The Sentence Creates Unwarranted Disparities . . . . . . . . . . . . . . 86

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

CERTIFICATE OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

APPENDIX

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Clearwater-Thompson v. Michael A. Grassmueck, Inc.*,
    160 F.3d 1236 (9th Cir. 1998) ......................................................... 34,37

*Gall v. United States*,
    552 U.S. 38 (2007) .......................................................................... 78,86

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ............................................................................ 57

*Kann v. United States*,
    323 U.S. 88 (1944) ......................................................................... 58,60

*Kimbrough v. United States*,
    552 U.S. 85 (2007) ................................................................. 77,79,85,89

*Koon v. United States*,
    518 U.S. 81 (1996) ............................................................................ 30

*Michelson v. United States*,
    335 U.S. 469 (1948) .......................................................................... 39

*Mitchell v. United States*,
    526 U.S. 314 (1999) ................................................................. 71,74,75

*In re Nettles*,
    394 F.3d 1001 (7th Cir. 2005) ......................................................... 31.32

*Old Chief v. United States*,
    519 U.S. 172 (1997) ................................................................. 37-41,56

*Pepper v. United States*,
    131 S. Ct. 1229 (2011) ......................................................... 77,79,85,86

*Pereira v. United States*,
    347 U.S. 1 (1954) .............................................................................. 59

*Rita v. United States*,
    551 U.S. 338 (2007) ...................................................................... 78,79

*Schmuck v. United States*,
    489 U.S. 705 (1989) ................................................................. 60,67,68

*Spears v. United States*,
    555 U.S. 261 (2009) .................................................................... 77,79,85

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ........................................................ 70,71,86

*United States v. Crowe*,
    563 F.3d 969 (9th Cir. 2009) .............................................................. 89

*United States v. Frederick*,
    78 F.3d 1370 (9th Cir.1996) ......................................................... 42,56

v

*United States v. Garlick,*
240 F.3d 789 (9th Cir. 2001) .......................................... 60
*United States v. Gonzalez-Flores,*
418 F.3d 1093 (9th Cir. 2005) ........................................ 41-43,46,48,57
*United States v. Hinkson,*
585 F.3d 1247 (9th Cir. 2009) ......................................... 30,71
*United States v. Hitt,*
981 F.2d 422 (9th Cir. 1992) .................................................. 41
*United States v. Inzunza,*
638 F.3d 1006 (9th Cir. 2011) ................................................ 42
*United States v. Jenkins,*
633 F.3d 788 (9th Cir. 2011) ............................................ 71,73
*United States v. Lazaraneko,*
564 F.3d 1026 (9th Cir. 2009) ......................................... 60,61
*United States v. Lo,*
231 F.3d 471 (9th Cir. 2000) ................................................ 59
*United States v. Manarite,*
44 F.3d 1407 (9th Cir. 1995) ................................................ 60
*United States v. Martinez-Barragan,*
545 F.3d 894 (10th Cir. 2008) .............................................. 89
*United States v. Maze,*
414 U.S. 395 (1974) .................................................... 60-63
*United States v. Ministro-Tapia,*
470 F.3d 137 (2d Cir. 2006) ................................................ 89
*United States v. Mocia,*
681 F.2d 61 (1st Cir. 1982) ................................................. 39
*United States v. Morales,*
108 F.3d 1031 (9th Cir. 1997) ............................................... 43
*United States v. Parr,*
363 U.S. 370 (1960) ......................................................... 60
*United States v. Parris,*
573 F. Supp. 2d 744 (E.D.N.Y. 2008) ................................... 87
*United States v. Paul,*
561 F.3d 970 (9th Cir. 2009) ............................................... 71
*United States v. Payne,*
944 F.2d 1458 (9th Cir. 1991) ......................................... 30,31
*United States v. Rizk,*
660 F.3d 1125 (9th Cir. 2011) .............................................. 57
*United States v. Shipsey,*
363 F.3d 92 (9th Cir. 2004) ............................................ 58,59

*United States v. Shortt*,
485 F.3d 243 (4th Cir. 2007) ............................................... 89
*United States v. Tocco*,
200 F.3d 401 (6th Cir. 2000) ............................................... 40
*United States v. Treadwell*,
593 F.3d 990 (9th Cir. 2010) .......................................... 47,48
*United States v. Waknine*,
543 F.3d 546 (9th Cir. 2008) ............................................... 86
*United States v. Wallace*,
848 F.2d 1464 (9th Cir. 1988) ............................................. 56
*United States v. Waters*,
627 F.3d 345 (9th Cir. 2010) ............................................... 38
*United States v. Wilson*,
659 F.3d 947 (9th Cir. 2011) ............................................... 47
*Young v. United States ex rel. Vuitton et Fils*,
481 U.S. 787 (1987) .......................................................... 35

## DOCKETED CASES

*United States v. Loughner*,
Case No. 11-MJ-00035-MHB (D. Ariz. Jan. 10, 2011) .................. 32,34
*United States v. Ovid*,
No. 09-CR-216 (JG), 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) ..... 84

## U.S. CONSTITUTION

Fifth Amendment ........................................................ 74

## FEDERAL STATUTES

18 U.S.C. § 2 ........................................................... 2,3
18 U.S.C. § 981(a)(1) ................................................... 3
18 U.S.C. § 1341 ....................................................... 2,3
18 U.S.C. § 1342 ....................................................... 3
18 U.S.C. § 1343 ....................................................... 2,3,58
18 U.S.C. § 1349 ....................................................... 2,3
18 U.S.C. § 3553 .................................... 29,71,77-79,85,86,88,89
18 U.S.C. § 3742(a) .................................................... 1
28 U.S.C. § 455(a) ..................................................... 30-32
28 U.S.C. § 1291 ....................................................... 1

28 U.S.C. § 1294(1) ..................................................................... 1
28 U.S.C. § 2461(c) ..................................................................... 3
28 U.S.C. § 3231 .......................................................................... 1

## FEDERAL RULES

Fed. R. App. P. 4(b)(1) .............................................................. 1
Fed. R. Crim. P. 29 ............................................. 3,22,28,53,69
Fed. R. Crim. P. 35 .................................................................. 26
Fed. R. Evid. 401 ................................................................ 38,43
Fed. R. Evid. 402 ...................................................................... 38
Fed. R. Evid. 403 ............................................. 21,38,40,42,49,54
Fed. R. Evid. 404 ............................................................ 39,40,49
9th Cir. R. 28-2.7 ....................................................................... 2
9th Cir. R. 30-1.10 ..................................................................... 4

## U.S. SENTENCING GUIDELINES

2A1.3 (2001) ............................................................................. 82
2A2.1 (2001) ............................................................................. 81
2A4.1 (2001) ............................................................................. 81
2B1.1 (2010) ................................................................ 23,79,82-84
2B1.1 (2001) ............................................................................. 81
2D1.1 (2001) ............................................................................. 81
2F1.1 (1987) ............................................................................. 80
2K1.4 (2001) ............................................................................. 81
Ch. 1 pt. 4(d) (1987) ................................................................ 80
Amendment 653 (2003) ......................................................... 82

## MISCELLANEOUS

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1 (1988) ....... 80
Frank Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167 (Feb. 2008) ....................................... 83,85
Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611 (2007) .................................................................................... 83
Alan Ellis et al., *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34 (2011) ................................................... 83,84

Zvi Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:*
    *Restorative Justice and White Collar Crime,*
    8 Cardozo J. Conflict Resol. 421 (2007). ........................................... 80,84
Sarbanes-Oxley Act, Pub. L. No. 107-204 (2002) ...................................... 82
Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1,
    28 (2006) ................................................................................................ 84
United States Attorney's Manual (2005) .................................................... 35
U.S.S.C., *Supplementary Report on the Initial Sentencing Guidelines and*
    *Policy Statements* (1987) ...................................................................... 79
U.S.S.C., *Fifteen Years of Guidelines Sentencing* (2004) ........................... 84
U.S.S.C., *Preliminary Quarterly Data Report, Fourth Quarter FY 2010* .. 85

ix

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | U.S.C.A. NO. 11-50200 |
| | ) | U.S.D.C. NO. 10CR2217-LAB |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THANH VIET CAO, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| ─────────────────────── | ) | |

**STATEMENT OF JURISDICTION**

Thanh Cao appeals his conviction and sentence after a jury trial for conspiracy and wire fraud in the U.S. District Court for the Southern District of California. The district court had original subject matter jurisdiction. 28 U.S.C. § 3231.

The district court entered a final judgment on May 19, 2011. ER1-15; CR81.[1] Mr. Cao filed a timely notice of appeal on the same day. Fed. R. App. P. 4(b)(1). ER221; CR82.

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §§ 1291 & 1294(1) and 18 U.S.C. § 3742(a)

---

[1] "ER" refers to the Appellant's Excerpts of Record. "CR" refers to the Clerk's Record for this case, ER980-93.

## ISSUES PRESENTED FOR REVIEW

**1.**     **Whether the district court erred in failing to order a recusal of the judges of the Southern District of California and of the U.S. Attorney's office for the Southern District due to the objective appearance of likely bias.**

**2.**     **Whether the district court erred in admitting multiple items of prejudicial, immaterial evidence at trial.**

**3.**     **Whether it was error to deny the motion for acquittal, because of a lack of a material link between the wire action and the alleged fraudulent activity.**

**4.**     **Whether the district court erred at sentencing by treating as an aggravating factor Mr. Cao's refusal, out of a fear of retaliation, to name the transferees of allegedly missing funds.**

**5.**     **Whether the sentence imposed was substantively unreasonable, because it was based on empirically deficient assumptions and failed to avoid unwarranted disparity with other white-collar fraud sentences.**

## STATUTORY PROVISIONS

Pursuant to 9th Cir. R. 28-2.7, copies of pertinent statutes, etc., appear in the attached Addendum.

## STATEMENT OF THE CASE

### A.     <u>Nature of the Case</u>

Thanh Viet Cao appeals his conviction and sentence following a jury trial where he was found guilty of conspiracy to commit wire/mail fraud in violation of 18 U.S.C. §§ 1341, 1343, & 1349, and wire fraud and aiding and abetting in violation of 18

U.S.C. §§ 2 & 1343.[2]

## B.     Bail Status

Mr. Cao is currently serving a 360-month sentence at FCI Victorville.  His

projected release date is December 8, 2036.

## C.     Proceedings and Disposition in the District Court

A grand jury sitting in the Southern District of California issued an indictment

on June 4, 2010, charging Mr. Cao with one count of conspiracy to commit mail and

wire fraud, a violation of 18 U.S.C. §§ 1341, 1343,  & 1349, and six counts of wire

fraud under 18 U.S.C. § 1343 and aiding and abetting under 18 U.S.C. § 2.  The

indictment also included a forfeiture allegation under 18 U.S.C. § 981(a)(1)(c) and 28

U.S.C. § 2461(c).  ER1-15; CR5.  Mr. Cao was arrested on June 9 in the Central

District of California and removed to the Southern District for prosecution.  He was

later released on bond pending trial.  CR23, 35.

On August 23, 2010, Mr. Cao moved to recuse the judges and the U.S.

Attorney's Office for the Southern District.  ER927-42; CR39.  The Government

opposed the motion.  ER943-943-47; CR41.  On September 13, 2010, the district

court held a hearing and denied recusals.  ER60-64.

---

[2] The judgment incorrectly lists convictions for 18 U.S.C. § 1342.  ER1.  A
motion to correct the record filed on November 23, 2011, has not been ruled upon.

Trial began on December 7, 2010, and continued for three days. After the close of the prosecution case, Mr. Cao brought a motion for acquittal under Fed. R. Crim. P. 29 as to all counts and elements. ER32. The district court denied the motion. ER33-34. The prosecution dismissed the forfeiture allegation. ER731.

Following instruction and argument, the jury returned a verdict of guilty on the conspiracy count and three wire fraud counts, but acquitted Mr. Cao of three of the wire fraud counts. ER819, 845; CR61. Mr. Cao was remanded into custody. ER822.

A pre-sentence report (PSR) was ordered.[3] The prosecution filed a sentencing summary chart and memorandum. ER93-168; CR68, 69. Mr. Cao filed a sentencing memorandum. ER66-92; CR75.

On May 16, 2011, the district court held a sentencing hearing and imposed a total custodial sentence of 360 months—240 months on the conspiracy count and three concurrent, 120-month sentences on the three wire fraud convictions to run consecutive to the conspiracy sentence. ER1-3, 26; CR81. The court also imposed concurrent terms of three years of supervised release on each count, no fine, and a $400 dollar special assessment. ER26-27. The court ordered restitution in the amount of $12,408,172.01, to be paid at the rate of $25 a quarter while in custody and $250 a month upon release. ER27-25. A final judgment was entered on May 19, 2011.

---

[3] Four copies of the PSR have been filed under seal per 9th Cir. R. 30-1.10.

ER1-15; CR81.

Mr. Cao filed a timely notice of appeal the same day. ER221; CR82.

## STATEMENT OF FACTS

**A.** **Background to the Charged Offenses**

Starting in 2004, Thanh Viet Cao, also known as Jeremy Cao, was a licensed investment representative with Ameriprise Financial Services, formerly called American Express Financial Advisors, in Irvine, California. ER559; PSR1. While employed at Ameriprise, Mr. Cao presented Ameriprise clients outside investment opportunities in a real estate company called Lakeview Estates LLC. ER273, 389-90, 561, 563. Mr. Cao was a manager and the accountant for Lakeview, which fact he failed to disclose to Ameriprise. ER560, 562. The Lakeview investments were not approved for offer to Ameriprise customers. ER564.

The failure to disclose and the offering of unapproved investments are violations of Ameriprise policy and the regulatory rules of the investment licensing organization, FINRA (formerly called NASD). ER556-57. Suspecting irregularities occurring at the Irvine office, Ameriprise retained an outside investigator in 2005. ER554-55. Mr. Cao was one of the people investigated and interviewed. ER555, 559, 569. In his interview, Mr. Cao admitted his involvement with Lakeview and his offering the investment to Ameriprise customers. ER560-61, 568. Mr. Cao was

suspended by Ameriprise on July 27, 2005, and terminated on September 29.  ER566-67.

An investigation by FINRA resulted in charges alleged against Mr. Cao that he had failed to disclose his connection to outside companies and had engaged in sales of Lakeview without Ameriprise's consent from April to July 2005.  ER578-80.  In 2006, Mr. Cao accepted discipline without admitting or denying the allegations.  ER578, 580-81.  By signing the discipline letter, he consented to a one-year suspension and a $10,000 fine, payable on re-registration.  ER581.  The suspension became effective February 20, 2007.  ER584.

## B.   Investor Meetings and Representations Underlying the Charges

The conspiracy and wire fraud counts relate to a group of investments involving principally three entities: TG Capital LLC, Northpoint Ventures, and Think! Financiers.  Several investors in one or more of these companies testified how they came to learn of these investments and decided to invest (or not to invest) and their experiences with those investments up until June 2008, when a receiver was appointed for TG Capital and eventually other entities.

Most of the investors testified to having learned about the investments through friends or relatives who had previously invested and to having attended meetings of investors and potential investors, usually at the house of Ness Averion.  ER270, 304-

05, 330-31, 371, 375, 388, 434, 444, 604-05, 623. At these meetings, dividends to active investors were distributed and information on investment disseminated. ER435.

The presentations were sometimes given by Ludy Grosnickle or Doug Lorenzen and sometimes by Mr. Cao, who was not always present.[4] ER271, 352-53, 403, 445. Investors described Ludy or Doug as giving an introduction while Mr. Cao was out of the room or outside. ER434. 451, 605. Ludy, Doug, or others were described as at times either conducting the meetings or giving substantive information about investment topics. ER271, 306, 311, 352, 403, 624. Mr. Cao was identified to the attendees as the leader of the meetings and as head of the companies that were being promoted. ER286, 290, 333, 337, 400, 434. Mr. Cao was identified as an officer of the promoted companies on subscription documents and receipts, and his signature appeared on dividend checks. ER287, 298, 335, 395, 436, 439. However, others, such as Ludy, also signed checks. ER391.

Besides the meetings at Ness's, a meeting to discuss TG Capital was conducted by Mr. Cao and Ludy at the Aurora Café in Colton. ER612-14. A meeting was held

---

[4] Thus, Cynthia Biggs testified, though she had invested in Lakeview and other businesses since 2005, she never met Mr. Cao before she had made two of her three investments and heard everything about Mr. Cao from Ludy. ER309-10. Her decisions to invest were based on representations from Ludy and Ness and on others' reports of their returns. ER311.

in northern California in 2006 or 2007, conducted by Andy Suth, to discuss investment in AK Tiger. ER417-18. A subsequent meeting of about a 100 people at a restaurant was conducted by Mr. Cao to discuss TG Capital. ER420, 424. Andy Suth distributed dividends for AK Tiger at the meeting. ER422.

The investors testified to attending multiple such meetings, at which different investments were discussed. ER306, 352, 372, 445. Some, like Cynthia Biggs and Pat Ellis, had invested in Lakeview while Mr. Cao was still employed at Ameriprise in 2005.[5] ER270, 273, 304, 388-89. They and others attended meetings over the course of 2006 and 2007 and heard about investments in a casino-financing plan (Northpoint Ventures), a mortgage-based investment (Think! Financiers), and eventually about TG Capital. ER275, 278, 284, 333, 337, 341, 372, 392, 397, 399, 436, 442, 612. Some investors subscribed to more than one of these offerings, while others declined to invest after hearing presentations and reading the written information. ER426, 614.

Those that invested reported doing so on the basis of the returns they and other investors had received and the information provided at the meetings orally and in

---

[5] For instance, at her second meeting, Mr. Cao gave Ms. Ellis his Ameriprise business card, and she called him there to discuss investment plans. ER389. Later, Mr. Cao informed the group he had left Ameriprise to devote more time to the group's investments. ER390.

written documents.[6]

Ms. Biggs stated she invested $17,500 in Lakeview, and after receiving information on Northpoint at a meeting, invested $25,000 in that business. ER272, 275, 278. She received a $512 dividend check in the mail, which made her more confident in her investments. ER279-80. At a later meeting, Mr. Cao told about TG Capital and stated the investments in that entity were guaranteed by Wells Fargo Bank and backed by gold. ER284. She viewed the TG Capital website, where a private placement memorandum (PPM) listed Mr. Cao as president and indicated returns of 28% annually. ER287-88, 847-85. The PPM also indicated there was a strategic alliance with Wells Fargo and UBS to guarantee the investments. ER289, 860. A letter was appended purporting to be from Wells Fargo to Mr. Cao confirming the guarantee (Wells Fargo Letter). ER289, 885. The PPM stated Mr. Cao was a NASD-registered representative and had worked for American Express Financial Advisors/Ameriprise. ER291, 863. Ms. Biggs invested $100,000 in TG Capital in March 2007. ER292, 294. Later, she received a letter from Mr. Cao informing that Wells Fargo was no longer guaranteeing the investments, but instead there was a $3 million guarantee from Bank Negara Indonesia (BNI). ER296-98, 887-88. She

---

[6] Three witnesses testified to seeing and admiring Mr. Cao's Bentley at meetings, one adding it made her feel her investments were working and another stating it made her think Mr. Cao was doing well. ER347, 396-97, 442.

received two dividend checks of $2,000, which made her feel more confident.[7] ER298-99.

Ryan Callo heard about the investment group from Ness and his niece, who said they were making money on their investments. ER330, 353. He attended a meeting at Ness's where Mr. Cao spoke about Northpoint, which he said had a guaranteed return. ER331-33. Mr. Callo invested $30,000 in Northpoint in May 2006 and subsequently received dividends. ER334, 336, 354. He also heard Mr. Cao speak about Think! as having a guaranteed return, and Mr. Callo invested $30,000 in that business in June 2006. ER336-37, 354. He also received information from others at the meeting and a form to rollover his IRA into Think!. ER338-40, 364. Another time, Mr. Cao described TG Capital as guaranteed by Wells Fargo and backed by gold, with a 20% return. ER341-42. The gold and bank guarantee induced Mr. Callo to invest in TG Capital in March 2007. ER343, 354. Like Ms. Biggs, he received a copy of a BNI bank guarantee certificate at the meeting. ER294, 343, 886. He transferred his Think! investment to TG Capital; his total investments were more than $100,000. ER344-45. Mr. Callo received dividends of $600 for TG Capital, which made him feel the investment was legitimate, as did the bank guarantee and gold backing. ER346.

---

[7] Ms. Biggs was never asked to identify Mr. Cao in court. Neither were investor-witnesses Baladad, Ellis, Quinn, Summitt, or Emmanuel Cruz. The only investor who identified Mr. Cao was Mr. Callo. ER332. The Ameriprise investigator also identified Mr. Cao as the person he interviewed in 2005. ER564.

Amado Baladad was told about TG Capital by a friend and attended a meeting at Ness's house. ER371. Mr. Cao spoke and said that TG Capital was backed by Wells Fargo and had a 20% return. ER371-72. After his second meeting, Mr. Baladad invested $10,000 in TG Capital. ER372-73. He received three $200 dividend checks, but they did not cause him to feel more confident in the investment. ER374.

Patricia Ellis invested $35,000 in Lakeview after two meetings at Ness's. ER388-90. At other meetings, she got details about Northpoint from Mr. Cao, who said the principal was 100% guaranteed, with a 10-day return of investment and no penalty. ER392-94. Mr. Cao also talked about Think!, in which she invested $10,000. ER397. He also spoke about TG Capital, which he said was guaranteed by Wells Fargo and showed her the Wells Fargo Letter from the PPM confirming the guarantee. ER397-98, 885. She received Northpoint dividend checks before she decided to invest in Think! or TG Capital. ER411.

James Quinn invested $100,000 in AK Tiger after the presentation by Andy Suth. ER417, 419. After that investment, he heard Mr. Cao speak about TG Capital and saw a prospectus. ER420, 424. Mr. Cao said the return was 1.8-2% per month and was fully guaranteed by Wells Fargo or UBS. ER423-24. He did not invest in TG Capital. ER426.

Kimberly Summitt attended meetings at Ness's house where Mr. Cao distributed

cash dividends of $3,000 or $24,000 from Northpoint investments. ER434-35. This gave her confidence to invest in Northpoint for $20,000 and in Think! for the same amount. ER435-36. She received receipts and a dividend check in the mail. ER438-39. She read the TG Capital website, which indicated it was backed by Wells Fargo with 18-24% returns. ER440-41. She transferred her Think! investment to TG Capital. ER442.

A friend of Emanuel Cruz invited him to attend a meeting in Chula Vista, where Mr. Cao, Ludy, and Doug were present. ER604-05. Doug gave an extensive description of Think! Financiers, and Mr. Cao said the principal was guaranteed, with a 10-day return policy. ER606-07, 624. After research, Mr. Cruz invested $20,000 in Think!. ER607-08. He also attended a meeting at the Aurora Café where Mr. Cao discussed TG Capital. ER612. Mr. Cao said the investment was guaranteed by Wells Fargo with an above-market return. ER612-13. Mr. Cruz decided not to invest in TG Capital, but the guarantee gave him hope that the Think! investment was alright. ER614. The Wells Fargo Letter on the TG Capital guarantee was one of the reasons he kept his money in Think!. ER631.

All the investors testified to receiving documents, like the PPM for TG Capital or handouts on Northpoint, during the meetings; to viewing/downloading the information on the TG Capital website; or receiving and signing subscription and

purchase agreements for the investments.  ER275, 285, 322, 355-56, 359, 362, 365, 377, 393, 400-01, 405-10, 424, 429, 440, 446-47, 607, 625-26.  However, some stated they only scanned the documents or did not read them at all.  ER312, 319, 362, 377. Likewise, some testified they did not seek outside advice on whether to invest, even when readily available to them.  ER320-21, 378, 452.  The purchase agreements and other documents notified investors that managers would be compensated out of investor funds, regardless of the enterprise's success.  ER312, 361, 867.

## C. <u>The Wire Fraud Counts</u>

The six wire fraud counts stem from American Express charges made in payment for  two meetings for investors held at the Manchester Grand Hyatt Hotel in San Diego in December 2006 and February 2007.  Two of the seven investors who testified attended the holiday party in December; none testified to attending the February party.

Ms. Biggs stated she and her husband attended the December party hosted by Mr. Cao at the Hyatt Hotel.  ER282-84, 306-09.  It was the first time she met Mr. Cao. ER309.  There was free food and people were socializing in a holiday atmosphere. ER308.  She thought the hotel setting was  wonderful, the party great, and it made her feel more confident in her investments.  ER282-83.  Mr. Cao and a couple other people spoke.  ER308.  As part of the festivities, Mr. Cao was asking questions and awarding

13

$100 for the right answers; Ms. Biggs's husband won $100. ER283.

Mr. Cruz also attended the party at the Hyatt in 2006. ER610. Ludy was present, and Mr. Cao was one of the hosts. *Id.* There were lots of people in a big ballroom, with lots of food, icebreaking, and a raffle.[8] *Id.* Mr. Cao was giving away $100 bills just for fun for answering questions. ER610, 628. The setting and food made the impression that everything was doing fine. ER612. Mr. Cruz received a certificate for his earlier investment in Think! at the party. ER608, 611, 628. When Mr. Cao spoke at the meeting, he said he did not like what was going on with Think! and had moved his money out, but he did not mention incurring losses. ER611. Mr. Cruz was scared when he heard this, but he had hope when he heard about new opportunities. *Id.* Mr. Cao gave brief information about the new opportunities, but there were no details and no documents about them. ER627-28. Mr. Cruz could not remember if Mr. Cao mentioned TG Capital at the party. ER627.

The party was paid for with an American Express card ending in -2008 in Mr. Cao's name in three installments on December 4 (deposit), 5 (initial payment), and 15 (final payment), totaling about $10,500. ER536-37. The February meeting was likewise paid in three charges, totaling about $6,500. ER539.

---

[8] An e-mailed invitation to investors in Northpoint, Think!, Lakeview, and Shadow Lane Estates was sent to 42 e-mail addresses, excluding e-mails to Ludy, Doug, Mr. Cao, and Ness (who signed and forwarded the invitation attachment). ER897-98.

14

The charges were billed from the Hyatt's San Diego office. ER538, 539. All authorizations for American Express charges are electronically routed through a processing center in Phoenix, Arizona. ER544.

## D.  **The Investigation and Initiation of Prosecution**

Sometime in November or December 2006, Think! Financiers, the mortgage-based investment Mr. Cao promoted, closed down. ER706. Robert Ericson, a partner of the law firm eventually appointed as receiver for TG Capital and other entities, testified that Think! had raised about $2.8 million from investors and took another $2.2 million from Eastpoint Management. ER695, 706. From this fund, about $3 million was invested in Think! Mortgage and $2 million in Invest America, two companies independent of Mr. Cao. ER706, 722. Mr. Ericson stated that the first of these had failed before it started at the end of 2006, which he agreed was a pretty bad time for mortgage companies. ER722. When those two investments by Think! Financiers were closed, Mr. Cao and Doug Lorenzen recovered about $2.8 million, which was deposited in an account with Eastpoint Management. ER706, 709. At that stage, Think! Financiers had lost about 40% of its capital, or about $2.2 million. ER706.

Two months later, on February 12, 2007, Mr. Cao was arrested by the Orange County Sheriff.[9] ER456. Incident to the arrest, the sheriff seized a leather bag, wallet,

---

[9] That case related to threats demanding return of the Think! Financiers
(continued...)

watch, Bentley car keys, and a laptop computer. ER457-61. A sheriff's investigator extracted the files from the hard-drive of the laptop and a copy was provided to the U.S. Secret Service. ER467, 477. Secret Service computer forensics investigators determined Mr. Cao was the registered owner of the laptop. ER483. Among the files located on the hard-disk was a Wells Fargo logo stored in the "My Pictures" directory; a copy of the Wells Fargo Letter in a directory called "TG Capital LLC"; versions of a letter purporting to be from different officials with Goldman-Sachs (Goldman-Sachs Letter); and the PPM for TG Capital. ER484-90, 904-12.

The San Diego Regional Fraud Task Force received information about the Wells Fargo Letter and interviewed Mr. Cao in April 2007. ER650. Mr. Cao stated he was the head of TG Capital and that he had lost his laptop. ER651-52. He later admitted that the computer had been seized by the Orange County Sheriff. ER653. When asked about the Wells Fargo Letter, Mr. Cao stated that Wells Fargo was not backing the investments and that he and a secretary had put the letter together. ER654. He said he put the Wells Fargo information in the letter to make it "look good." ER655. The same logo appeared on a website, but Mr. Cao said it was there by mistake, mixed up

---

[9](...continued)
investment that Mr. Cao made against a business partner in Think! Mortgage, one of the companies that failed and caused the demise of Think! Financiers. PSR10. Mr. Cao was eventually convicted of those charges and sentenced to three years' probation and 180 days in jail. *Id.*

with the use of the logo in a college project. *Id.*

Around April 2007, some investors asked for return of their Think! investments. ER399-402, 616. Pat Ellis asked for her investment back, and Mr. Cao responded that there was a partner dispute and that she could get her money back by rolling it over into TG Capital. ER399. She moved $10,000 into TG Capital. *Id.* Although she sent letters of demand per Mr. Cao's instructions, she never received any money back. ER402. Mr. Cruz sent e-mails to Ludy and Mr. Cao asking for return of his full investment principal and interest. ER615, 899-902. Mr. Cao responded that he would receive a refund in 10 days, but he never did, despite repeated follow-up requests and being told to provide the same information twice. ER617-20.

In a letter to TG Capital investors dated April 15, 2007, Mr. Cao wrote that Wells Fargo was not guaranteeing the investments, but there was a guarantee from BNI that could now be cashed at "any bank, not just Wells Fargo." ER395-97, 887. The letter and a guarantee certificate (BNI Certificate) were distributed at an investor meeting. ER294-95, 297, 887. The letter also stated that the Secret Service and Homeland Security were investigating whether the managers and members of TG Capital had a legal source of funding. ER296, 887.

In May 2007, the Securities and Exchange Commission initiated a suit against Mr. Cao, and a federal district judge ordered the assets of TG Capital frozen. ER700-

17

01. The order covered the assets and accounts of TG Capital and all the defendants in the suit, including Mr. Cao and Ludy Grosnickle. ER701. On June 5, 2007, Mr. Cao sent a letter to investors informing them of an investigation of TG Capital and "a preliminary hold on all asserts." ER350, 891. Nonetheless, during 2007 and 2008, investors made demands for return of investments which were not fulfilled, despite following instructions given for a refund.[10] ER299-303, 347-51, 374, 399, 402, 426-28, 443, 615-23. The e-mail exchanges between Mr. Cao and some investors got increasingly acrimonious during this period, although Mr. Cao's messages promised to return what everyone was owed, when possible. ER3438-51, 368, 426-27, 429, 619-23, 892-94, 901-03. Research by the receiver disclosed checks written out of frozen accounts after the court's order to Doug Lorenzen's father, AK Tiger, Ludy, Ness, and Mr. Cao's parents. ER701-04.

TG Capital was put into receivership in June 2008 and additional, affiliated entities controlled by Mr. Cao were added in November 2008, totaling nine in all. ER695-96. Mr. Ericson testified that six of the entities raised money directly for specific investments, but the money flowed between them through the hub of Eastpoint Management. ER698-99. There were no general ledgers, and he had to reconstruct events from bank statements and other SEC-seized records. ER700. There was no

---

[10] Ms. Summit reported she once got an investment check from Ness, "because one of Jeremy's bank's were [sic] closed." ER439; *see also* ER846.

evidence that any of the investments turned a profit or that there was any income apart from investment capital. ER707. There was no evidence that any amount like the $2.8 million dollars remaining from the demise of Think! was rolled over into TG Capital; the remaining assets were transferred to Eastpoint. ER709. Money from Eastpoint also went into Mr. Cao's account with Bank of America and was used to pay the American Express bill for the card ending in -2008. ER708-09.

There was no evidence of any gold held as a reserve or purchases of gold; no evidence of a 28% return on any entity's activities; no evidence of a bank guarantee from Wells Fargo or UBS; and no evidence of a credit line from Goldman-Sachs. ER710-11. The checks that went to investors came from funds provided by other investors, as there was no evidence of cash flow income matching those payments. ER718.

Prior to the freeze order, on April 4, 2007, a wire transfer from the TG Capital account for $1.78 million went to a Hong Kong bank to the account of Diah Agustina; these funds were unrecoverable. ER712. On the same day, there was an attempted transfer to a Citibank account in San Francisco in the name of Jose Ronald Macutay for $720,000. ER713. Nothing in the PPM for TG Capital mentioned funds going to Hong Kong or San Francisco. *Id.*

Out of all nine entities, about $19.4 million was taken in. About $4.2 million

was paid to investors before the receivership. There was $4.7 million in the frozen accounts. That left a loss of about $10 million to the investors. ER719-20. The companies also owned two parcels of land in San Diego County and one in Arizona. ER723.

While the investigation of TG Capital was pending and before the indictment in this case was issued, Mr. Cao filed liens in Nevada against Judges Sabraw and Battaglia of the Southern District of California, as well as one of the prosecutors in this case. ER930, 964-65, 971; CR39. Charges were later brought against Mr. Cao for filing false liens against federal employees. PSR5-6, 11.

## E.    **Testimony on the Bank Guarantees**

Testimony from bank officials confirmed that the bank guarantees never existed. Neither Wells Fargo nor UBS guarantees outside or third-party investments. ER505, 637.[11] Likewise, BNI never guarantees United States companies and the BNI Certificate was not genuine (wrong border, wrong official and signature, omissions, and misspellings). ER512-17.

An official with Goldman-Sachs testified that the company never issues letters of credit and did not make individual loans in September 2006. ER500. Mr. Cao was

---

[11] Moreover, the Wells Fargo official stated that the Wells Fargo Letter was not a genuine Wells Fargo document, as the logo was not in the correct color or location. ER637.

never a client of Goldman-Sachs and had no line of credit with them. ER500-02. The Colin King listed on the Goldman-Sachs Letter is in the management division, not investment banking. ER501.

Mr. Cao objected to admission of testimony on the Goldman-Sachs Letter, since no evidence indicated the letter had ever been shown to anyone, and so was irrelevant and more prejudicial than probative under Fed. R. Evid. 403. ER37-38. The Government argued the evolution of the letter was relevant as "evidence for the Commerce Casino," which "we've heard a number of witnesses testify about." ER39-40. The district court held the testimony and the letter admissible as showing "fraud and [Mr. Cao's] frame of mind," whether anyone else saw it. ER39. Because the Goldman-Sachs Letter was "on the same computer with all these other documents that do have to do with the scheme I find to be relevant. The jury could find that maybe he was up to something else." ER40.

## F.    **Testimony on Mr. Cao's Luxury Purchases**

The prosecution elicited testimony that Mr. Cao stayed in a Las Vegas hotel one night in 2006 and paid $650 for the room, charged to the American Express card ending in -2008. ER592-94. The defense objected on relevance, and the district court reserved ruling, pending a showing the money to pay for this came from investors.[12]

---

[12] The court also noted that, "because the subscription statements say they can

(continued...)

ER591, 598-600.

It also introduced evidence that Mr Cao bought a bag and wallet from Louis Vuitton and had a history of purchases totaling $15,000.[13] ER642-44. Records showed the bag was purchased on September 14, 2004; there was no unique identity number associated with the items and there was nothing showing how the items were paid for. ER646-47. Similarly, witnesses testified that Mr. Cao bought a Breitling Bentley watch for $7,000 in March 2006, using the American Express card in -2008 (ER678) and ordered a 2006 Bentley Flying Spur in June 2005, paying the $5,000 deposit with an American Express card ending in -1002 and the remainder ($197,769.48) by a cashier's check dated March 7, 2006. ER682-83, 687.

At the close of evidence, Mr. Cao moved for acquittal on all counts and elements under Fed. R. Crim. P. 29. ER726. The district court held that a rational juror could find a conspiracy and that the Hyatt expenses had sufficient connection to fraud to find the wire counts, denying the motion. ER32-34. The prosecution thereupon dismissed the forfeiture allegation. ER731.

After instruction and argument, the jury retired to deliberate. The district court

---

[12](...continued)
bill for expenses and they get paid for the investment advice," this was arguable "either way." ER600.

[13] The district court reserved ruling on a similar objection, subject to linking up with investor money. ER643.

denied the defense motion for a special verdict form as to the basis of the conspiracy count. ER816. The jury requested transcripts of Cynthia Biggs's and Kimberly Summitt's testimony. ER818, 844. The district court told the jurors to rely on their memory, as there were no transcripts available. *Id.* The jury returned verdicts of guilty as to Counts 1 to 4 and not guilty to Counts 5 through 7. ER819, 845.

## G.    Sentencing

The PSR calculated the Guidelines recommendation on the basis of a $10-12 million loss under U.S.S.G. § 2B1.1(b)(1)(K) for a 20-level increase to the Base Offense Level of 7. PSR16. It cited Mr. Ericson's trial testimony and spreadsheet.

Mr. Cao filed a sentencing memorandum in which he challenged the fraud Guidelines as unreasonable and not empirically based. ER66-92; CR75. Moreover, he provided the court with extensive data on comparison of sentences for white-collar fraud convictions, the amounts of loss, and other characteristics of those offenses. ER72-77. The Government filed its own comparative data. ER165; CR69.

At the sentencing hearing, the district court started out addressing, and repeatedly emphasized, what it called the "elephant in the room," namely the whereabouts of the missing funds from the total investments, which it estimated to be $10-12 million. ER171-73. Thus, when the defense urged a ten-year sentence, stating that the Guideline's total offense level of 41 lacked an empirical basis and was not

23

reflective of the harm, the district court again asked, "What happened to the rest of the money?" ER174-75. Counsel pointed to $2-3 million lost when Invest America failed. ER175. But the court calculated that $18 million was taken in, $6 million paid out, and the rest was not accounted for by Mr. Cao's spending. ER176. Counsel noted that other hands were in the pot and that $1.7 million was known to have gone to Hong Kong. *Id.*

Still, the district court was unconvinced and stated that, though the sentence was very harsh, it would be different if Mr. Cao returned some of the missing money. ER179. It specifically invited Mr. Cao to talk about where the money was. ER180. While acknowledging "he retains some 5th Amendment protection here," the district court nevertheless insisted that willingness to pay back the money—as reflected by revealing the whereabouts of the missing funds—affected the sentence. *Id.*

After the defense noted other mitigating facts about Mr. Cao's role and the effect of a long sentence personally on him, ER181-85, the district court again returned to its refrain of "I want to—I'm really interested in what he has to say about the 10 to 11.5 million that's unaccounted for." ER185. After consulting with counsel and unsuccessfully requesting the district court to clear the courtroom, ER185-86, Mr. Cao personally addressed the court. He noted that some purchases were made out of cash profits not reflected in the accounts. ER187. In the middle of 2006, business worsened

and all the profits and principal were gone in two to three months. ER188. He was uncomfortable naming names out of concern for personal safety, but $9-11 million was lost from being scammed and his being deceived by others, so that he got into a hole he could not get out of. ER188-89. All of that is reflected in the account statements. ER189. When the district court stated that the receiver was unable to trace the money through the statements, Mr. Cao stated that there were no hidden accounts and everything went through the ones listed in the report, and he could have pointed out the accounts, if the receiver had talked with him. ER189-90. The district court said it would help with the sentence if he sat down with the Government and named who got what. ER191. Mr. Cao said he could not consent to that, that he could not trust the Government to recover the money, and that he would have to set it straight himself. ER192-93.

Citing the nuisance of the liens against the judges and noting, "I've been through it," the district court stated Mr. Cao showed a pattern of belligerency and obstruction, mocking the victims, and evading court orders. ER194-95. It could not understand his refusal to disclose who had the missing funds: "So I'm trying to give him a carrot, and he's not taking it. Frankly, it's head-scratching to me. It's bizarre for him to say, 'Well, I'm going to do this myself. I don't trust the government to do it.' " ER196.

The prosecution too argued this attitude was a part of a pattern of obstruction.

ER198. There were no profits and only about $6 million is accounted for. ER198-200. Mr. Cao only paid back his own henchmen, and the prosecution was unaware of who the people are that Mr. Cao suggests took the money. E199, 200. The receiver's accounts were in discovery and online, so Mr. Cao has access to them. ER203. If he brings forward information on the missing money, the Government would consider a motion under Fed. R. Crim. P. 35. ER201. The Government summarized the figures as: $19-20 million taken in, $6-7 million repaid, $1 million in land, $3 million lost in Think!, $1.78 million sent to Hong Kong, and "a couple million dollars" that Mr. Cao had in cash, payment of the American Express card, and money to remodel his parents' house (which was consistent with the defense claim of $4-5 million dollars unaccounted for). ER204-05.

The district court calculated a total offense level of 41, yielding a sentencing range of 360 months to life. ER18. Considering the other statutory sentencing factors, it found the offense serious. *Id.* It mentioned briefly the comparative data supplied by the defense, but said it was hard to compare cases except on pure loss amounts and did not know what other factors affected those snetences. ER19. It had two concerns here. First, the inexplicable refusal to cooperate in getting the money back. ER20-21. Second, it considered the incremental increase in white-collar crime punishment in the last 20-30 years. ER22. It noted the victims' emotional loss and the court's desire to

26

send a message about fraud. ER23. But it thought 40 years was too much here, given Mr. Cao's age. ER23-24. Although more suspicious now that Mr. Cao knew the location of the missing money, the court left that as an incentive and set the sentence at 360 months. ER24-25. It ordered restitution of $12.4 million. ER28.

Counsel objected to the substantive and procedural reasonableness of the sentence. ER29. Mr. Cao stated for the record, "I have already declined all offers." *Id.*

## SUMMARY OF THE ARGUMENT

From start to finish, this case of alleged investor fraud was fraught with latent and overt animus, which blossomed into demonstrable prejudice against Mr. Cao at all phases of the proceedings. This necessitates reversal.

Before trial, the district court erroneously denied a motion to recuse the judges of the district court and the attorneys of the prosecuting agency due to the objective appearance of partiality. The district court applied legally incorrect standards and both the court and the prosecutors failed to place on the record at the time of the hearing on the motion material evidence that would have prompted an objective person to question impartiality. The failures to disclose demonstrated the subtle effect of self-proclaimed lack of latent bias. The correct, objective view would have favored the need to recuse.

At trial, the district court erred in two crucial regards: it admitted a welter of

27

evidence whose prejudice heavily outweighed its non-existent or minimal probative value, and it denied the motion to acquit on the wire fraud counts, when no reasonable juror could find an essential role in the overall investment scheme for the two wire-paid get-togethers.

Reflecting the latent animus against Mr. Cao that the recusal motion meant to allay, the prosecution here proffered multiple items of evidence calculated to portray Mr. Cao negatively, as high-rolling, manipulative, and callous. The testimony and real evidence submitted on the Goldman-Sachs Letter, the spending on luxuries (including the Bentley), and the post-freeze string of acrimonious e-mail demands for money had no or very little tendency to prove any question at issue, but they all cast Mr. Cao in an inflammatory light.

The similar attempt to pile-on prejudicial associations extended to the evidence of the meetings underlying the six wire fraud counts. But the evidence showing an essential role in the alleged fraud for these meetings was lacking, and the wire communications were wholly tangential to any material issue. This is reflected by the jury's acquittal on three of the counts, but the same reasoning extends equally to the other three. The district court's failure to grant the Rule 29 motion kept these unsupported counts in place and invited a compromise verdict, in light of the evidence of other wrong-doing.

28

The sentence here must be vacated in any event. The district court improperly elevated the sentence based on its unsupported perception that Mr. Cao was hiding money. There was no evidence for this, and the district court's inflated loss amount exaggerated its obsession in asking "Where's the money?" Moreover, the sentence was based on Guidelines calculations that lack an empirical basis and double count central factors already accounted for in the general loss amount. In comparison with sentences imposed in other fraud cases where the seriousness of the offense (gauged by loss amount) was far greater than here, the thirty-year sentence was substantively unreasonable and violates the mandatory parsimony provision of 18 U.S.C. § 3553(a).

## ARGUMENT

## I

## THE DISTRICT COURT ERRED IN DENYING MR. CAO'S MOTION TO RECUSE THE DISTRICT JUDGES AND THE UNITED STATES ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**A.**     **Introduction**

Mr. Cao moved to recuse the judges of the Southern District of California, as well as the United States Attorney's Office ("USAO") for the Southern District of California. ER927-34; CR39. Mr. Cao based his motion on the appearance of impartiality created by the prosecution of Mr. Cao in the District of Nevada for the filing of allegedly false liens against judges and prosecutors in the Southern District.

29

The targets of the liens were two district judges in the Southern District and Assistant United States Attorney ("AUSA") John Owens, the Chief of the Criminal Division at the USAO, and one of the prosecutors who tried the case against Mr. Cao. ER930, 933. The district court denied both motions. ER61, 64.

In denying the motion for the recusal of the judges in the Southern District, the district court erred by failing to apply the proper, objective, legal standard. The district court also erred in refusing to disqualify the USAO for the Southern District—and Mr. Owens in particular—because no prosecutor in that office was objectively impartial and disinterested in Mr. Cao's prosecution. Each of these errors alone warrants reversal of Mr. Cao's conviction.

## B.     The District Court's Denial of the Motion to Recuse Judges Was Based on an Incorrect Legal Standard

The provisions of 28 U.S.C. § 455(a) mandate that a judge "*shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned" (emphasis added). "The test for disqualification under § 455(a) is an objective one: whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Payne*, 944 F.2d 1458, 1476 (9th Cir. 1991). This Court reviews a denial of a motion to recuse for abuse of discretion. *Id.* A court commits an abuse of discretion when it starts its inquiry with the wrong legal standard; that is the first step in appellate review. *See United States*

*v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).  That is because "[a] district court by definition abuses its discretion when it makes an error of law."  *Koon v. United States*, 518 U.S. 81, 100 (1996).

Here the district court cited two iterations of the standard it proposed to apply to the § 455 motion.  Both were legally incorrect.  First, the court stated,  "I don't think a reasonable person looking at all the circumstances would say 'we better drag somebody in from Hawaii or Idaho to try this case, because otherwise Mr. Cao is going to get the shaft.'" ER952.  Later, the court stated, "I just don't see a reasonable person would say, 'Mr. Cao can't possibly get a fair trial in this court.' " ER60.  Each of these statements improperly frames the relevant question under § 455(a), which is whether the judge's impartiality "*might* reasonably be questioned."  *See Payne*, 944 at 1476 (emphasis added).  Mr. Cao did not have a burden to show that he would "get the shaft" or that he could not possibly get a fair trial.  Adopting this insurmountable burden proposed by the district court would effectively eviscerate the need for recusal, and holding Mr. Cao to that burden in this case was an abuse of discretion.

Moreover, the district court also improperly relied on its own subjective beliefs about whether it could offer a fair trial rather than the view of an objective, reasonable person.  The district judge stated that he did not socialize with the judges against whom the liens had been taken out, ER952, and that he "had no agenda" against Mr. Cao.  *Id.*

The question was not, however, whether the district court believed it had a relationship with the other judges that would affect its impartiality; the only issue was whether a reasonable person might reasonably question his impartiality.

For example, in *In re Nettles*, 394 F.3d 1001 (7th Cir. 2005), the Seventh Circuit recused all of the district judges in the Northern District of Illinois from a case involving an attempt to destroy the federal courthouse in Chicago. The Seventh Circuit stated, "We do not suggest that [the district judge] would in fact be prejudiced against Nettles. The issue is appearances." *Id.* at 1003. The court thus concluded that recusal was appropriate despite the assigned district judge's assertion that she had no actual fear of harm that would affect her rulings. *See id.* at 1002. The court went on to reason:

> [I]t might appear to the reasonable, but outside, observer of the judicial system [that] a judge might be convinced of Nettles' guilt yet concerned that a jury might acquit him, and might therefore rule against him on evidentiary and procedural issues, regardless of the merits. And innocence is not the only question in a criminal trial; the length of the sentence is another, and it is a question on which the judge retained significant discretion[.]

*Id.* at 1003. In other words, the issue of recusal must be viewed from the perspective of an objective, outside observer, even where the district judge is convinced that she is capable of providing a fair trial.

An instructive comparison here is the action of the district court bench in response to the shooting of Judge Roll in Tucson in 2011. Just two days after the

32

shooting, the entire federal bench in Tucson recused itself *nunc pro tunc* under § 455(b). *See* Order *Nunc Pro Tunc, United States v. Loughner*, Case No. 11-MJ-00035-MHB (D. Ariz. Jan. 10, 2011). Although the death of Judge Roll resulted from his being one of the attendees in the line of fire at an event where Representative Giffords was the apparent target, and there was no basis to believe that a federal judge had been deliberately targeted, the recusal was proper. An objective person would suspect the inability of judges to remain impartial when one of their own is the victim, even if not deliberately so and even if Judge Roll was not a specific, social intimate to all the recused judges. Here, the district court's citing a lack of actual intimacy with the two judges deliberately targeted by the false liens does not eliminate how that targeting would appear to an objective witness. The district court's standards for recusal are far different from the Tucson bench's, even as relates to similar violent and generalized victimizing of the Southern District judges. *See* ER60 (district court describing how it approved of non-recusal in two prior bombing incidents against the Southern District courthouse).

Here, the district court's belief in its own complete impartiality proved incorrect. While the district court claimed before trial that its impartiality was unaffected by the liens filed against other judges in the Southern District, the district court failed to disclose the fact that it had been the subject of a false lien at the hearing on Mr. Cao's

motion for recusal. At sentencing, however, the court admitted that it had previously been under a lien and called it a "nuisance." ER189, 194. The district court alluded to the liens filed by Mr. Cao as part of a pattern of intransigence and counted the liens as an aggravating factor. ER194-95. The district court's late disclosure of this highly pertinent fact supports a finding that a biasing effect was objectively likely. The allegations of false liens thus undeniably affected the court's exercise of discretion.

Aside from the district court's subjective views, the facts of the case are such that recusal was necessary. First, Mr. Cao had allegedly filed false, vindictive liens against the district judge's colleagues. Second, the district judge had himself been the victim of false liens. Based on these facts, any reasonable person would be compelled to question the impartiality of the court. The existence *vel non* of an individual, personal relationship with the fellow judge is not dispositive, as in the *Loughner* case. This would be true no matter how strong the court's subjective belief in its own impartiality, but it was proven to be a valid question when the court's personal experiences demonstrably affected its exercise of discretion at sentencing. Accordingly, this Court must reverse the conviction and remand for trial before a judge from a different district.

## C.   **The Motion to Recuse the USAO Was Erroneously Denied**

The district court also abused its discretion in denying Mr. Cao's motion to

34

recuse the USAO for the Southern District and, in particular, AUSA Owens. It is fundamental that the prosecutor of a criminal charge be disinterested, and where that is not the case, a conviction must be reversed. *See Clearwater-Thompson v. Michael A. Grassmueck, Inc.,* 160 F.3d 1236, 1237 (9th Cir. 1998). The requirement that a prosecutor be unbiased is acknowledged in the U.S. Attorney's Manual, which requires disqualification where, "as a result of a personal interest or professional relationship with parties involved in the matter, . . . a conflict of interest exists or there is an appearance of a conflict of interest or loss of impartiality." *See* United States Attorney's Manual § 3-2.170 (2005).

For instance, in *Young v. United States ex rel. Vuitton et Fils*, 481 U.S. 787, 802-09 (1987), the Supreme Court held that the appointment of a civil party's attorney to prosecute a criminal contempt arising out of the civil action deprived the defendant of his right to a "disinterested prosecutor." The Court ruled that the appointment at issue "created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety." *Id*. at 806 (emphasis in original). Given the "considerable discretion" exercised by a prosecutor in all matters related to a criminal case, "appointment of an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." *Id*. at 807, 811. "A concern for actual prejudice in such circumstances misses the point, for what is at stake is the public

35

perception of the integrity of our criminal justice system." *Id*. at 811. Again, it is how an objective person acquainted with the facts would perceive the threat of bias that controls.

Here, AUSA Owens was the target of a false lien filed by Mr. Cao. ER934. This fact alone is enough to create opportunities for conflict and the appearance of impropriety, because AUSA Owens could reasonably be viewed by an objective observer to have a personal interest in the conviction and harsh punishment of Mr. Cao. This appearance of impropriety extended to the entire USAO for the Southern District where AUSA Owens was a colleague of all the prosecutors at the office. In addition, AUSA Owens was the Chief of the Criminal Division and therefore the superior to anyone else selected to prosecute the case against Mr. Cao. ER934.

The appearance of impropriety in this case, however, is not merely the result of reasonable inferences from the fact that AUSA Owens was allegedly the target of false liens. Instead, the bias of the prosecutors in this case was expressly borne out in statements they made to United States Probation during the preparation of the presentence report. Both prosecutors in this case reported to the probation officer that they were concerned for their safety and well-being, in part due to Mr. Cao's filing of false liens against government officials. PSR5. They accused Mr. Cao of being a "highly dangerous individual" who had "attempt[ed] to bring financial ruin to anyone

36

involved in the prosecution of this matter." PSR5. That these prosecutors failed to disclose an actual fear of retaliation at the hearing of the recusal motion, like the district judge's own silence on being a lien victim himself, speaks volumes on the potential for latent bias and its subtle skewing effects. The non-disclosure demonstrates the objective likelihood of bias that supports the motion to recuse.

As this Court has stated, where a prosecutor is not disinterested, "a judgment of conviction is to be reversed without the need of showing prejudice." *Clearwater Thompson*, 160 F.3d at 1237. The prosecutors showed actual animus towards Mr. Cao, and any reasonable person would question whether Mr. Cao could receive fair treatment from individuals who felt victimized by and were fearful of him. Mr. Cao's conviction must be reversed and the case must be remanded for prosecution by officials outside of the USAO for the Southern District.

## II

## THE CUMULATIVE PREJUDICE OF MULTIPLE FAILURES TO EXCLUDE IRRELEVANT OR IMPROBATIVE EVIDENCE WARRANTS REVERSAL

### A.    <u>Standard of Review</u>

"The standard of review applicable to the evidentiary rulings of the district court is abuse of discretion." *Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997). However, the Court reviews *de novo* "whether a district court's evidentiary rulings

37

violated a defendant's constitutional rights." *United States v. Waters*, 627 F.3d 345, 351-52 (9th Cir. 2010).

**B.** **A District Court Abuses Its Discretion, When It Admits Evidence Whose Tendency to Prejudice the Defense Substantially Outweighs Its Probative Value to the Issues at Trial**

To be admissible at trial, evidence must be "relevant"; evidence that is not, must be excluded. Fed. R. Evid. 402. Although relevance is defined broadly to include any evidence that has "any tendency" to prove or disprove "any fact that is of consequence" in the litigation, Fed. R. Evid 401, even evidence meeting this generous standard must be excluded, if required by another rule. *See* Fed. R. Evid. 402. Relevant evidence should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury , or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. This rule codifies case law recognition "that certain circumstances call for the exclusion of evidence which is of unquestioned relevance" and "call for balancing the probative value of and need for the evidence against the harm likely to result from its admission." *Id.* advisory committee's note.

In this context, " 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S.

at 180. Excludable evidence has " 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' " *Id.* (quoting Fed R. Evid. 403 advisory committee's note). Thus, "[s]uch improper grounds certainly include" evidence whose principal force is to cast the defendant in a negative light due to some unrelated, bad acts, "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." *Id.* at 180-81. In other words, although evidence suggesting a propensity to do wrong " 'is relevant, the risk . . . that, uncertain of guilt, [the jury] will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.' " *Id.* at 181 (quoting *United States v. Mocia*, 681 F.2d 61, 63 (1st Cir. 1982)). Indeed, *Old Chief* quotes Justice Jackson's famous paradox about general evidence of bad character and its tendency to skew the rational determination of issues at trial (*see id.*):

> The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a gad general record and deny him a fair opportunity to defend against a particular charge.

*Michelson v. United States*, 335 U.S. 469, 475-76 (1948).

This limitation on evidence that merely tars a defendant's image dovetails with the general prohibition on character evidence to prove conduct in Fed. R. Evid. 404(a)

and the circumscribed use of prior acts only for specified purposes in 404(b). *See Old Chief*, 519 U.S. at 181-82 (discussing relation of Rules 403 & 404(b)). As a result, courts have recognized that evidence that appeals to possible juror bias on matters such as race/ethnicity, gender, sexual orientation, or other group membership. Likewise, evidence that unnecessarily conveyed a declarant's bigoted or offensive language raises concerns for excluding unduly prejudicial material. *See United States v. Tocco*, 200 F.3d 401, 419-20 (6th Cir. 2000) (racially offensive statements were "unfairly prejudicial" and should have been excised, but statements on whole were admissible to show existence of conspiracy and identity of co-conspirators).

*Old Chief* concerned whether the actual nature of a predicate, prior felony could be admitted at trial for felon in possession of a firearm. While the Supreme Court acknowledged that parties must be granted leeway to tell its story in its own way, 519 U.S. at 186-89, the asserted probative value of proffered evidence must be discounted by the existence of adequate, alternative means of proving the same fact. *See* 519 U.S. at 182-83. The ability to prove the elements of the offense without adducing the details or even the precise nature of the prior conviction must be deducted from the probative value before weighing the prejudice arising from the jury hearing about potentially inflammatory, past conduct. *See id.* at 190-91. As the details of the past conviction held obvious risk for biasing the jury, and failing to provide those details "leaves no gap

in the story of the defendant's subsequent criminality," the prosecution's refusal to stipulate to the conviction was unwarranted and the admission erroneous. *Id.* at 191.

> In this case, as in any other in which the prior conviction is for an offense likely to support conviction on some improper ground, the only reasonable conclusion was that the risk of unfair prejudice did substantially outweigh the discounted probative value of the record of conviction, and it was an abuse of discretion to admit the record when an admission was available.

*Id.*

This Court applied the *Old Chief* framework in *United States v. Gonzalez-Flores*, 418 F.3d 1093 (9th Cir. 2005), to find that the district court had abused its discretion in admitting unfairly prejudicial evidence. In an alien smuggling prosecution, the district judge allowed evidence that two teenage girls in the party of smuggled aliens suffered severe heat exhaustion and had to be airlifted to a hospital when discovered. *See id.* at 1096. The Court founded a violation of Rule 403, because the evidence of the girls' distress was unfairly prejudicial and the probative value low, since their condition did not logically address any element of the charged offense. *See id.* at 1097-99. " 'Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.' " *Id.* at 1098 (quoting *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992)). Although the prosecution did not "devote a great deal of time" to the girls' condition, the potential for prejudice was still substantial, given their young

41

age and the seriousness of their distress. These facts "very well could have triggered an emotional response from the jury members, who were likely to be sympathetic to the girls and consequently want to punish the man who caused their heat stroke . . . ." *Id.* at 1099. Moreover, the prosecutor's closing argument explicitly drew the connection between the defendant's acts and the injuries. *See id.* As a result, "[t]he likelihood of unfair prejudice was high enough to outweigh the minimal probative value of this evidence; therefore its admission was an abuse of discretion under Rule 403." *Id.* But because all the elements of the charged offense were otherwise firmly established, the risk that the prejudicial evidence affected the verdict rendered the error harmless. *See id.* at 1102.

"Even if no error individually supports reversal, the cumulative effect of numerous errors may support reversal." *United States v. Inzunza,* 638 F.3d 1006, 1024 (9th Cir. 2011) (citing *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996)).

## C.   The District Court Admitted Multiple Instances of Prejudicial Evidence That Was Irrelevant or Lacked Sufficient Probativeness to Satisfy the Requirement of Fed. R. Evid. 403

The district court here violated these precepts when it permitted presentation of multiple instances of unduly prejudicial evidence to the jury, even some that lacked any logical tendency to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence." Fed. R. Evid. 401. The lack of sufficient materiality, in the face of substantially greater risk of unfair prejudice, rendered this evidence inadmissible under the above case law. The cumulative prejudice of these admissions more likely than not affected the jury's decision and so warrants reversal of the conviction. *See Gonzalez-Flores*, 418 F.3d at 1099 (citing *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997 (en banc)).

### *1. The Goldman-Sachs Letter*

In its opening statement, the prosecution made repeated references to the Goldman-Sachs Letter, a series of draft documents taken from Mr. Cao's laptop computer, as well as e-mails with one Brian E. Smith discussing the draft revisions. ER253-54, 258, 259. The prosecution described these documents as showing "the fraud was not limited to Wells Fargo and UBS representations. Mr. Cao and a co-conspirator went a step further. They tried to convince *a casino* that Mr. Cao had a $350 million credit line with Goldman-Sachs, a major New York bank." ER253 (emphasis added). The prosecutor then described changes made to the four drafts and Smith's comment " 'How about Colin E. King? What do you think of that one, eh?' " ER254. He promised the jury that "you will see these e-mails during this trial." *Id.*

These documents were admitted into evidence over a hearsay objection. ER37. Witness Bigley testified that Goldman-Sachs rarely issued a $350 million credit line.

43

ER498.  He was asked to look at the fourth version of the Goldman-Sachs Letter, and he opined it did not appear genuine. ER499-501. The receiver, Ericson, likewise testified that there was no evidence of a Goldman-Sachs credit line to Mr. Cao in this amount.  ER711.

Outside the presence of the jury, Mr. Cao objected to the relevance of the testimony regarding the Goldman-Sachs Letter.  ER38-41.  The district court stated it found the documents relevant, because "witnesses have testified that there were representations that the investments were being guaranteed," and the Goldman-Sachs documents were found on Mr. Cao's computer, imputing to him knowledge of their existence.  ER38.  The defense responded that it did not dispute the imputation, but there was no evidence that anyone else was shown these letters and so were significantly less probative than prejudicial under Rule 403.  *Id.*

The prosecution argued that the various drafts showed a progression toward the final letter in Exhibit 23-1, stating, "Certainly, it's easy for the jury to infer that the final letter, which is admissible into evidence for the Commerce Casino, comes in. There's a clear evidentiary chain."  ER39.  The district court reasoned:

> I think it's competent and relevant, Mr. Packer, for them to prove that whether anyone saw it or not, on the defendant's computer was a letter that the evidence suggests was fraudulent, and it relates to one of the investments. They have to prove fraud and his frame of mind here, and his possession of the document with that content I think goes in that direction.

44

*Id.* When defense counsel objected that the Letter related to the purchase of a casino, not to one of the investment schemes charged in the indictment, ER39, the prosecutor responded that the drafting of the Goldman-Sachs letter was charged in the indictment and that "Additionally, we've heard a number of witnesses testify about Commerce Casino. This letter is about Mr. Cao's attempt to show with Commerce Casino, he has a $350 million credit line." ER40.

In fact, the only testimony regarding Commerce Casino or Commerce II,[14] came from James Quinn, who said that AK Tiger invested in Commerce II Casino (ER417-18, 426) and Kimberly Summitt, who mentioned Commerce Casino as one of the ventures invested in by Northpoint. ER435.[15] No investor in any of the charged investment schemes testified to having received or being shown a copy of the Goldman-Sachs Letter.

In the end, the district court itself discounted the prosecution argument, stating, "the investment opportunity with respect to Commerce Casino was to share in proceeds—ongoing proceeds from gambling revenues, not to purchase." ER40. Instead, the district court stated the relevance lay in

———————————

[14] Not California Commerce Club, Inc., to whom the Goldman-Sachs Letter is addressed in the last three versions, nor Hawaiian Gardens Casino, to whom the initial draft was directed. ER904-12.

[15] Pat Ellis did not know if Commerce Casino was one of the casino businesses involved in Northpoint. ER365, 414.

that that's a fraudulent document. Goldman Sachs didn't guarantee anything with respect to the Commerce Casino. That the defendant has a fraudulent document having to do with the Commerce Casino on the same computer with all these other documents that do have to do with the scheme I find to be relevant. **The jury could find that maybe he was up to something else**. [¶] I'm not suggesting that's my finding, but it's certainly a relevant inference that if he's got false documents and other schemes are afoot, that this scheme was fraudulent and he knew it. [¶] So I have your position on that. The court confirms the decision to admit the evidence.

*Id.* (emphasis added).

The irrelevance of the Goldman-Sachs Letter is shown most prominently by the fact that none of the testifying investors claimed to have seen, considered, or relied upon it in deciding to invest. The Letter had no demonstrated function in the charged conspiracy, since it was not used to induce any investor's making or retaining an investment in either casino-related enterprise (Northpoint or AK Tiger). No evidence connected the dots between the Goldman-Sachs Letter and the investment schemes.[16] Like the smuggled aliens' heat stroke in *Gonzalez-Flores*, the existence of the Letter, and evidence of its drafting stages, made no fact of consequence in this case more likely, since it did not relate to any of the alleged fraudulent inducements.

The Government is certain to argue that the evidence of Mr. Cao collaborating on producing the Letter is evidence that generally supports the existence of the charged

---

[16] The Government conceded in closing argument that the Letter was sent only to casino owners, not the investors. ER803.

conspiracy to induce others to invest. But with no evidence that the Letter was communicated to any potential investor with the purpose of soliciting or retaining funds for the casino-financing venture, there is still no logical connection to the indictment's allegation he "did induce persons to invest funds in his entities" by use of the Goldman-Sachs Letter. ER921.

Nor does it make sense to claim that the Letter had any potential role in the charged fraudulent schemes. The Government's entire theory was that the various investments Mr. Cao promoted were all Ponzi schemes, though it was precluded from using that term to the jury. ER224-28, 972. The essence of a Ponzi scheme is to use investor money to pay off select investors to create the impression of profits, while skimming off the rest of the investment.[17] It is antithetical to such a scheme for the scammer to put his scheme at risk and invest the money in an actual enterprise, since that would simultaneously reduce the skimmed profits and the funds available to make the lulling pay-backs. *See United States v. Wilson*, 659 F.3d 947, 953 (9th Cir. 2011) (stating that in a Ponzi scheme "the fraud victim's money is both an instrumentality and the proceeds of the crime"). The Goldman-Sachs Letter's contents indicate, not a means of soliciting funds for investment, but an effort to induce another business to accept funds for investment. *See* ER258 (Government describing the Letter as aimed

---

[17] *See United States v. Treadwell*, 593 F.3d 990, 993 n.2 (9th Cir. 2010) (discussing history and functioning of Ponzi schemes).

at casino owners, not investors). It is illogical to claim that a document whose overt purpose is to induce *outlay* of investor money furthers a scheme whose essential purpose is to induce a constant *influx* of investment money. Substantial outlays of investor money only shorten the time before the inevitable collapse of the scheme, automatically limiting the scope of the potential profit. *See Treadwell*, 593 F.3d at 993 n.2 (noting that Ponzi schemes by their nature tend toward inevitable collapse over time).

A bogus credit line that was never used to induce any investor to participate in the Ponzi scheme is simply irrelevant to the charged conspiracy. It is, in fact, counterproductive to the scheme's maximizing the scam profits; the Letter cannot rationally be viewed as furthering the alleged fraud. " 'Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury.' " *Gonzalez-Flores*, 418 F.3d at 1098.

The Goldman-Sachs Letter was not relevant, though it was prejudicial, precisely for the reason the district court thought it admissible: it had only a tendency to prove was that Mr. Cao "was up to something else." ER40. In other words, it simply portrayed Mr. Cao as involved in some nefarious conduct, but conduct unrelated to any of the charged offenses. This is the essence of propensity and bad act evidence

prohibited by Rules 403 and 404(a). It has no valid function under Rule 404(b). Admitting this detailed, documentary evidence and testimony highlighting the documents in court, had only one rational effect: to portray Mr. Cao as a schemer, unfairly prejudicing the jury.

### 2. *The spending in Las Vegas*

The district court admitted testimony of a casino official from the Wynn Hotel in Las Vegas as a means of bringing before the jury the details of Mr. Cao's stay at the hotel one night in April 2006. The evidence indicated Mr. Cao stayed one night in a room costing $650 and had a total bill of around $850, which was paid on the American Express card in -2008. ER592-94. The district court expressed some concern about this testimony's relevance, which the prosecution stated showed Mr. Cao spent investors' money lavishly. ER42-44. The prosecution said the receiver's testimony would link payment of the American Express card to money from the investors. The district court reserved on the admissibility, though noting as well the argument that the subscription agreements acknowledged Mr. Cao would be paid out of investor funds. *Id.*

The receiver later testified to the following sequence of events: When the two entities in which the Think! Financiers funds had been invested failed at the end of 2006, Mr. Cao and Doug Lorenzen were able to recover about $2.8 million out of the total invested (about $5 million, including $2.2 million that came from Eastpoint

Management).  ER706.  That money was deposited into the account of Eastpoint

Management.  ER706, 709.  From the Eastpoint account, some unspecified amount of

money was transferred to a Bank of America account for an entity called PFMG;

Mr. Cao was the signatory and controller on that Bank of America account.  ER709.

At some unspecified time and in an unspecified amount, money from the PFMG

account was used to pay some portion of the bill for the American Express card in

-2008.  *Id.*  Mr. Ericson cited no basis for these conclusions; no records for the PFMG

account (apart from the signature card) were put into evidence.  Thus, at most, the

evidence showed that some portion of Think! investors' money, commingled with

separate funds from Eastpoint, was recovered from the failed investments sometime

after December 2006 and deposited back with Eastpoint.  Sometime thereafter, money

from Eastpoint was put into the PFMG account, from which the American Express card

used in Las Vegas some eight months or more earlier was paid.  No records showed

directly that any part of the $2 million recovered in December went to pay the $800

hotel charge from April.[18]

    Even by the district court's own basis to reserve ruling on relevance, the

---

[18] The earliest American Express statement in evidence showed no charges prior
to November 9, 2006, and all the current charges are marked "Due in Full."  ER918.
That statement and the next month's statement indicate Mr. Cao paid the mandatory
amount virtually in full both times.  ER919.  It is mostly likely, then, that any charges
in early 2006 would have been paid long prior to December 2006.

testimony about the hotel stay was never plausibly linked up to investor funds. Nothing showed that a charge made in April 2006 would still be unpaid in January 2007 or later, and no testimony linked payment of card charges to investor money, except the transfer to PFMG sometime in late 2006 or early 2007.

Because no evidence traced payment for the Las Vegas stay to investor money, especially in light of the agreement that Mr. Cao would be compensated out of investor funds, the testimony on the "lavish[ ]" spending was pure prejudice with no probative value whatever to an issue of consequence. ER42.

### 3. *The luxury goods purchases*

The prosecution's testimony regarding certain leather goods, a watch, and an automobile was likewise unanchored to any legitimate purpose at trial; it again merely acted to portray Mr. Cao as a callous big spender with a narcissistic penchant for luxury goods. This was pure prejudice.

The prosecution presented evidence that Mr. Cao bought some $15,000-worth of goods from Louis Vuitton (ER641-44) and a Breitling Bentley watch costing over $7,000 (ER678). This evidence was admitted over defense objections based on relevance, cumulativeness, and prejudice as to the leather goods. ER45-46. The district court overruled the objection, subject to a similar linking-up requirement as for the Wynn Hotel testimony. *Id.* However, like the reserved ruling on the hotel bill, the

district court never revisited the relevance of this evidence after the receiver's testimony. In fact, there was no proper linkage between the purchases and investor funds.

In the first instance, the testimony on the leather goods did not pin down the exact purchase dates for some of the items or the means for their payment. ER647. However, as to the bag that was later connected with Mr. Cao's laptop, the records showed that that item had been purchase in September 2004. ER646. The trial evidence indicated none of the charged investment schemes as active prior to about April 2005, which was the date alleged by FINRA that Mr. Cao began offering Lakeview Estates investments to Ameriprise customers. ER580. Likewise, no investor reported investing any earlier than 2005. Thus, there was no temporal nexus between the purchase of the bag and funds from any investors, who did not get involved with any charged scheme until about a year later. Because the method of payment was unknown, there is not even the tenuous connection to the -2008 credit card that could not be linked up for the hotel payment.

Likewise, the Breitling watch was purchased in March 2006. ER678. Although the records did show that the -2008 card was used, as with the hotel bill one month later, there was no evidence to show that this debt was paid many months later out of funds from the PFMG account—the only funds shown to have even a tenuous connection with

52

investor money. As noted above, these American Express charges were due in full at the time of billing, so most likely they were paid sometime in April or May 2006, and therefore have no connection whatever to the one traceable transfer of investor-derived funds. Accordingly, admission of this evidence was entirely irrelevant, cumulative, and yet prejudicial to the defense.

### 4. The Bentley automobile

The prosecution submitted evidence that Mr. Cao purchased a Bentley Flying Spur for $204,000. ER682, 686. Since this car had been seized and was most likely an object of the forfeiture allegation in the indictment, the defense did not challenge most of the evidence about the vehicle, but it did object to some items of evidence relating to the purchase as irrelevant and cumulative. ER683, 689. Although overruling these, the district court characterized the prosecution's offering photos of the Bentley as only "marginally" admissible. ER689. After the Rule 29 motion was denied, the prosecution *sua sponte* dismissed the forfeiture allegation. ER731.

Like the luxury goods, the probativeness of the testimony concerning the Bentley was far outweighed by the drum-beat prejudice produced by showing Mr. Cao to be a high roller with other people's money. The theory was that Mr. Cao used the car to impress and persuade investors. ER251, 257, 774-75, 777, 809. The prosecution elicited testimony from only three investors about seeing Mr. Cao's car and their

reactions.  ER347, 396-97, 442.  That is, three out of 170 investors were known to see the car, none of which stated they based their investment decisions on that fact.

But whatever minimal probative value Mr. Cao's ownership of a Bentley had, the detailed testimony about its *acquisition*, including a full list of the luxury options ordered, had no relevance to the charges.  The manner in which the car was purchased had no bearing on the case due to the timing of events.  The car was first ordered and the initial deposit paid in June 2005, using a different American Express card from the one ephemerally linked to investor money.[19]  ER573.  The balance on the car was paid with a cashier's check in March 2006, but no testimony traced the source of these funds.  ER687.  Significantly, the prosecution's dismissal of the forfeiture allegation underscores the irrelevance and immateriality of the testimony and documents on the purchase and equipping of the Bentley.  It  essentially concedes there is no provable connection between the car and investor funds so as to support a forfeiture.  That allegation in the indictment in effect acting as a stalking horse, there only to justify admission of detailed evidence of a prejudicial nature that otherwise lacked sufficient probativeness to withstand Rule 403.  Like the other luxury purchases, the probativeness of this evidence was far outweighed by its tendency to prejudice the jury

---

[19] Based on the FINRA disciplinary allegations, ordering the Bentley occurred about two months after Mr. Cao began promoting Lakeview investments; June 2005 was many months before the first documented investments in Northpoint, Think!, or TG Capital.

against Mr. Cao.

### 5. *The acrimonious e-mail exchanges*

The district court permitted admission of e-mail strings regarding investor requests for return of their investments. The theory of relevance was that these exchanges showed how Mr. Cao responded to investors about the ability to retrieve their supposedly guaranteed funds. ER327. However, the later e-mails in the strings included profanities and caustic remarks from Mr. Cao to those requesting refunds. As the district court later put it at sentencing, the e-mails show Mr. Cao "mocking" and belittling his victims in their plight and "portrays a level of belligerence on Mr. Cao's part." ER195. The prosecution highlighted these invectives, quoting the expletive-laced passages in both opening and closing. ER257, 780-82.

The e-mailed demands, however, did not start until April 2007 at the earliest, and at that stage met with promises or requests to submit paperwork. ER503-06, 615-20, 888-90, 899. Only later, after the court-ordered bank account freeze took effect in May 2007, did the demands for money meet more obstinate replies, escalating into name-calling and profanities from both sides. But by then, there was little Mr. Cao could do to restore frozen and lost funds, although the e-mails all included promises to return money when possible. Mr. Cao's intransigence at returning money after May 2007, when he had no legal ability to do so, is of very little probative value as to the nature

of the prior guarantees. In any event, the admission of the unredacted e-mails only served to inflame juror prejudice against Mr. Cao for calling Mr. Cruz "Turtle"; making crude, dismissive remarks about his concerns; and mocking Mr. Callo's aunt's English.

Under *Old Chief*, there is little legitimate, narrative value to submitting these lengthy exchanges for the simple fact that the guarantees to return funds were not honored. That could have been adequately and properly established by the simple testimony that little or nothing was returned, despite their demands. Indeed, this point was fully established by the straightforward testimony from several witnesses, without reference to e-mails. E374, 399-402, 443. The legitimate evidentiary role of the e-mails was so slight and the risk of unnecessary prejudice so great, the e-mails should have been excluded under Rule 403.

**D.**    **The Cumulative Prejudice from These Erroneous Admissions of Evidence Warrants Reversal**

Even if no one instance of the above erroneous admissions of evidence suffices to show that the jury was likely prejudiced against Mr. Cao (inducing it to convict because it believed he was "up to something," in the district court's words), their cumulative effect warrants reversal. Where, as here, a case presents numerous errors, "a balkanized, issue-by-issue harmless error review" is insufficient, and this Court should analyze the overall cumulative impact of all errors upon the fundamental fairness of the trial. *Frederick*, 78 F.3d at 1381 (quoting *United States v. Wallace*, 848 F.2d

56

1464, 1476 (9th Cir. 1988)).

Here, the prosecution's goal from the start was to adduce evidence that had very little use for proving the elements of the offense, but provide 'juicy' slices of prejudice to cast Mr. Cao in a negative light. Because facts such as the Goldman-Sachs Letter, the Las Vegas stay, and the luxury purchases had no to little relation to issues in the case, the weight of their prejudicial effect is that much greater, as in *Gonzalez-Flores*. The thin reeds proffered for admitting this inflammatory portrayal of Mr. Cao as an arrogant and self-indulgent schemer did not outweigh the prejudice. These pervasive appearance in testimony, many pages of exhibits, and repeated prosecution argument, shows that the errors most likely affected the verdict. Reversal is required.

## III

## THE DISTRICT COURT ERRED IN DENYING THE MOTION FOR ACQUITTAL AS TO ALL THE WIRE FRAUD COUNTS

### A.     Standard of Review

This Court reviews *de novo* the sufficiency of evidence on a motion under Fed. R. Crim. P. 29. *United States v. Rizk*, 660 F.3d 1125, 1134 (9th Cir. 2011). The Court must determine whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

**B.** **No Reasonable Juror Could Find the Proffered Wire Communications Were an Essential Element of the Charged Fraud Scheme**

Mr. Cao was charged with six counts of wire fraud in violation of 18 U.S.C. § 1343. ER923-24; CR5. Three counts related to a credit-card payment made in December 2006 for a party at the Hyatt Hotel in San Diego; the other three related to a similar get-together in February 2007, paid for with the same American Express credit card. The jury acquitted Mr. Cao of all three February counts, but convicted on all three December counts. However, the evidence as to the required elements of wire fraud was deficient on both sets of charges, and the district court erroneously denied the motion to acquit as to all six counts. Moreover, the district court's error in denying the motion as to the February counts masked the evidentiary deficiency of the December counts. Retention of all six deficient counts provided the jury with a basis for a compromise verdict on the ground that it found Mr. Cao engaged in a fraudulent conspiracy, despite the lack of the required link between that fraud and the wire transactions.

Wire fraud under § 1343 has three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." *United States v. Shipsey*, 363 F.3d 92, 971 (9th Cir. 2004). The Supreme Court long ago cautioned that the federal *mail* fraud statute "does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v.*

58

*United States*, 323 U.S. 88, 95 (1944). This principle is equally true of the wire fraud statute. *See Shipsey*, 363 F.3d at 972 n.10 ("It is well settled that cases construing the mail fraud and wire fraud statutes are applicable to either."). Thus, although "[i]t is not necessary that the scheme contemplate the use of the [wires] as an essential element," *Pereira v. United States*, 347 U.S. 1, 8 (1954), the use of the wires must at least be "incident to an essential part of the scheme." *Id*.; *see United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000) (stating in the context of a mail fraud prosecution that "the government may not prevail without demonstrating that the mailings were incident to the execution of the scheme").

Here, no reasonable fact-finder could have found beyond a reasonable doubt that the wire communications between the hotel and the credit card company were essential to a fraudulent scheme or incident to an essential part of the fraudulent scheme, because: (1) the wire transfers were nothing more than behind-the-scenes accounting between two parties completely unconnected to the alleged fraudulent scheme; and (2) the holiday party at the hotel was not essential to the alleged fraudulent scheme.

### 1. The wire transfers between the hotel and the credit card company were not shown to be essential to the alleged, fraudulent, investment scheme

The object of the wire fraud statute is to prohibit "the *use* of the . . . wires as part of a fraudulent scheme quite separate from any other potentially illegal conduct."

59

*United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001) (emphasis in original). Hence, the use of the wires is not simply a collateral fact that creates federal jurisdiction, but rather the gravamen of the crime of wire fraud. As Justice Scalia put it succinctly, "it is [wire] fraud, not [wire] and fraud, that incurs liability." *Schmuck v. United States*, 489 U.S. 705, 723 (1989)(Scalia, J., dissenting).

Accordingly, both the Supreme Court and this Circuit have each reversed convictions under the mail or wire fraud statutes when the use of the mail or wires was too attenuated from the alleged fraudulent scheme. *See*, *e.g.*, *United States v. Maze*, 414 U.S. 395 (1974); *United States v. Parr*, 363 U.S. 370 (1960); *Kann*, 323 U.S. 88; *United States v. Lazaraneko*, 564 F.3d 1026 (9th Cir. 2009); *United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995). Notably, none of these cases relies on a conclusion that the government failed to prove the existence of a fraudulent scheme. Instead, as the Court stated in *Manarite*, even where "the evidence shows that (a) there was a scheme to defraud, (b) the defendants were involved, and (c) a mailing occurred, that is not enough to convict . . . absent proof that the mailing was in furtherance of the scheme to defraud." 44 F.3d at 1413 (internal quotations and brackets removed).

Here, while it is undisputed that Mr. Cao gave his credit card to the Hyatt Hotel in order to pay for a holiday party, there was no evidence that the use of the credit card was fraudulent or that the wires themselves contained any material misrepresentations

or omissions related to the alleged scheme to defraud investors. Moreover, Mr. Cao had no interest in how, when, or whether the hotel used interstate wires to establish his ability to pay.

Thus, even assuming the existence of a scheme to defraud investors, there was no evidence showing that the wire communications themselves were essential to or in furtherance of the execution of the scheme. Rather, the evidence at trial merely established that the wire between the hotel and the credit card company was for the purpose of accounting between the hotel and the credit card company. ER536-39, 549-51. This is not sufficient to establish the federal crime of wire fraud. Were an act as mundane as a merchant communicating with a credit card company sufficient to support a conviction for federal wire fraud, it would "extend[] an already broad statute too far." *Lazarenko*, 564 F.3d at 1037 (reversing a conviction of wire fraud where bank transfers were made years after the completion of a fraudulent scheme). In other words, it cannot be Congress's intent that liability under the federal wire fraud statute rests on the decision to pay cash or credit.

This case is similar to *United States v. Maze*, where the Supreme Court concluded that mailings between a hotel and a bank were "directed to the end of adjusting accounts" rather than in furtherance of a credit-card fraud scheme. 414 U.S. at 402. In *Maze*, the defendant used a stolen credit card to pay for a motel room, and the motel

61

mailed the sales slip to the bank that issued the credit card. *Id.* at 395. Maze was subsequently convicted of mail fraud. In reversing the conviction, the Supreme Court concluded that there was "no indication that the success of his scheme depended in any way" on whether the motel, the bank, or the true owner of the card bore the loss when the fraud was discovered. *Id.* at 402. Thus, the motel's mailing of the slip to the bank was not in furtherance of Maze's scheme to defraud. *Id.* Compare the facts of *Maze* with the facts here, where there was no evidence that the wire use itself involved a fraudulent act, further divorcing the wire use from the gravamen of the offense. ER552.

Similarly, in *Parr*, 363 U.S. 370, the Supreme Court found that there was an insufficient connection between a mailing and a fraudulent scheme to support a conviction for mail fraud. In that case, the defendants used a credit card issued to a school district to obtain gasoline for their personal use. *See id.* at 392-93. The Court concluded that mailings between the school district and the oil company that distributed the gasoline were not for the purposes of executing the scheme because it was immaterial to the defendants how the oil company would collect from the school district. *See id.* Again, as there is nothing fraudulent about the use of the American Express card to make the Hyatt Hotel payment, the nexus between the charged fraud and the wire communication is even more remote here than in *Parr*.

As in *Maze* and *Parr*, the wire transfers in this case that form the basis of the wire

fraud counts were too attenuated from the alleged fraudulent scheme to bring this common law fraud case into the purview of the federal wire fraud statute. The connection is even more attenuated in the instant case. Because no reasonable juror could find that the wires were essential to, or even a part of, the alleged fraudulent investment scheme, this Court must reverse Mr. Cao's conviction.

### 2. The celebration party for investors at the Hyatt Hotel was not essential to the alleged fraudulent scheme, as the jury discerned in acquitting on the February counts.

The jury returned a general verdict acquitting Mr. Cao of the wire fraud charges in Counts 5 to 7. These charges were identical to the charges in Counts 2 to 4, except that the former related to the February investors meeting, instead of the holiday party in December. ER924; CR5. The indictment jointly alleges that all the payments were made "for the purpose of executing the above-described material scheme to defraud." *Id.* Since both sets of charges involved indistinguishable acts of wire-effected credit-card payments, the jury's distinction of the counts must lie in a deficient showing of the nexus of the two meetings to the investment schemes. But there is no rational basis to find the December meeting any more essential than the February one beyond a reasonable doubt.

*Maze* and *Parr* illustrate that, for liability under the federal wire fraud laws, a behind-the-scenes wire transfer that occurs as part of a credit-card purchase cannot be

equated with the later use of the purchased good or service. There is thus no need for this Court to reach the issue of whether the party at the Hyatt Hotel hosted by Mr. Cao and others was essential to the alleged scheme to defraud investors. Even if the Court were to adjudge Mr. Cao's criminal liability for wire fraud based on his conduct at the December holiday party, however, there is no evidence upon which a reasonable factfinder could base a finding beyond a reasonable doubt that the party was "essential to" the alleged fraudulent scheme.

First, there was no testimony that anyone relied on conduct at the party in making an investment. For instance, Cynthia Biggs—one of only two investors who testified to attending the party—said that she had attended about seven meetings at other locations before attending the holiday party at the Hyatt. ER306. Ms. Biggs had already invested roughly $42,000 in Lakeview and Northpoint by then, anywhere from sixteen to six months before attending the holiday party, where she met Mr. Cao for the first time. ER272-73, 278, 309. While Ms. Biggs later invested $100,000 in TG Capital, she made her investment over three months *after* attending the party at the Hyatt, and she testified that her decision to invest then was based on representations made at Ness Averion's house and on a website, not due to the December party. ER292. She never stated she had doubts about her previous investments or considered withdrawing them. The sole connection between the party and her portfolio was that

she thought the hotel was "nice," the lobby was "great" and "looked wonderful," was "impressed" by the hotel, and (in response to the district court's leading question following a series of sustained objections) that the setting made her "have confidence" in her investment. ER282-83. [20]

Similarly, Emmanuel Cruz, the only other person who testified to attending the holiday party at the Hyatt, had already invested $20,000 in Think! Financiers about nine months before attending the party. ER607-08. He testified to his view that the setting was "professional" and gave the impression that "everything is doing fine." ER610, 612. But, as with Biggs, since he had already invested months ago, his regard for the setting of the hotel did not support a finding beyond a reasonable doubt that the party was *essential* to the alleged fraudulent scheme as a means of recruiting new investments. The only rational connection to the charged scheme is as a way of lulling the investors from withdrawing from the scheme. And that is precisely how the prosecution argued the Hyatt party's relevance to the jury. ER766.

But what puts pay to that theory is that, far from using the party to lull restive investors (none of whom testified to having reconsidered their investments or having

---

[20] She also mentioned the game Mr. Cao conducted, whereby attendees were asked questions and paid $100 for right answers; Biggs's husband won $100. ER283. However, she never said what effect this game had on her attitude toward her investments. Mr. Cruz characterized the guessing-game and a raffle as having purely social functions of "ice-breaking" and "just for fun." ER610.

withdrawn funds from any of the businesses before April 2007, four months after the party), Mr. Cao stated at the party that "he doesn't like what's going on with Think Mortgage and he did move his money from Think Mortgage." ER611, 627. Mr. Cruz reported that this statement of no-confidence in Think! had a definite, negative effect on him: "At first it's kind of scary because we don't know what happened with our investment." *Id.* Such statements could not have been intended to lull investors. Although Mr. Cruz stated he had "some hope" once Mr. Cao mentioned another, unnamed investment opportunity, Mr. Cruz also stated that Mr. Cao gave no specifics about the new investment and there was no literature about it passed out at the party. ER627-28. It would be an exceedingly odd way to "lull" someone by scaring him into believing his investment is unsound—and stating that the promoter himself is withdrawing his money—but then providing no information or means for the investors to join a substitute scheme. Indeed, Biggs did not invest in the supposed substitute, TG Capital, until three months later, and Cruz, after hearing the pitch, declined completely. ER292-93, 614. It is illogical to infer Mr. Cao undermining his supposed elaborate effort to lull investors by using the party as an opportunity to "scare" them with talk of his own jumping ship. That cannot rationally be an essential part of promoting the alleged fraud scheme.

   The facts here show that this get-together, which the two attendees described as

having an appropriate holiday atmosphere, not as an informational or promotional meeting, was not so connected to the investment scheme as to constitute an essential element. The catering contract with the Hyatt for the December meeting estimated no more than 100 guests (the February contract did the same). ER532, 538 (referencing Exhibits 11-3 and 11-8). The invitation e-mail sent out by Ness went to no more than 42 different addresses. ER897. For a series of schemes involving as many as 170 investors (PSR 7), the party was set up to influence less than 25% at most. That, too, argues against the centrality and essential nature of the holiday party to promoting the alleged fraud.

This case contrasts sharply with *Schmuck*, where the Supreme Court held that mailings were part of the execution of a fraudulent scheme. *See* 489 U.S. at 715. In that case, Schmuck operated a fraud in which he rolled back odometers and then sold cars to dealers at an increased prices. *See id.* at 707. The Supreme Court held that routine, innocent mailings of title-registration documents by the car dealers who bought the cars were incident to an essential part of the scheme *See id.* at 714. In so holding, the Court noted that, without the mailings, "Schmuck's scheme would have come to an abrupt halt," because the scheme "naturally depended on the successful passage of title among the various parties." *Id.* at 712.

Here, it cannot be said that the alleged scheme to defraud investors would have

come to an "abrupt halt" had the holiday party at the Hyatt not occurred. First, the decisions of investors to invest were based on meetings with an unambiguously promotional nature held at Ness Averion's home, the Aurora Café in Colton, and a restaurant in northern California, as well as literature and a website. No one testified that they relied on the party and the hotel setting to convince them to invest or continue investment. Second, only a small portion of the investors were slated for even potential influence by attending the party. Third, even if the investors were somewhat comforted when they attended the party, the party was not an essential part of the alleged fraudulent scheme, because there is no evidence that anything *said* at the party was essential to the investors's decisions. Indeed, Mr. Cao's comments disparaging Think! had the exact opposite effect, and no arrangements had been made to herd scared investors into a new scheme. The actual conduct at the party showed that the alleged fraud scheme could not "naturally depend[ ]" on an event where announcements contrary to the goal were made publically and forcefully. *Schmuck*, 489 U.S. at 712.

Finally, there was no basis to distinguish the December and February events in this regard. Although there was no testimony that anyone attended the February meeting, there was no dispute the meeting was held and that the same American Express card was used to make electronic payments for an identical number of planned

guests at the same hotel setting.[21]  The jury's acquittal shows that there is nothing inherent to lavish investor meetings to make them essential to this scheme.  Thus, the tangential ways in which the December party affected the two investors' decisions cannot be bootstrapped into showing the party was "essential" to the overall scheme.

The acquittal raises a second problem with the Rule 29 motion.  Mr. Cao moved for acquittal on all counts.  ER32.  The district court manifestly erred in denying Mr. Cao's motion for judgment of acquittal on the February counts, since (like the December holiday party) nothing apart from the fancy location of the meeting supported an inference of essentialness.  Although the acquittal might generally cure any prejudice from the denial of a motion under Rule 29 as to these counts, the prejudice from the court's error in this case remained through the verdict.  The submission of the additional counts to the jury facilitated and encouraged a compromise verdict.  Allowing these counts to be decided by the jury—despite no evidentiary support—distracted the jury's attention from the highly attenuated relationship between the December credit-card transactions and the alleged fraudulent scheme.  The district court's failure to grant Mr. Cao's Rule 29 motion on Counts 5, 6, and 7 created an unavoidable likelihood that the jury would compromise on the wire fraud counts rather than confront the insufficiency

---

[21] Mr. Cao had been arrested and his laptop seized just days before the February meeting; the December meeting happened before the collapse of Think! Mortgage created the terminal financial crisis.  ER456-57; PSR 10.  If anything, lulling was an even taller order of the day at the later meeting.

of the evidence as a whole and with regards to the December counts. That is because, having found the existence of a conspiracy as alleged in Count 1, the jurors would naturally be less likely to acquit on all the remaining counts, but even less so when given the opportunity to split their verdict with regard to the two meetings at the Hyatt, even though neither was shown to be essential to the fraud. And, of course, that is what the jury did in this case: convicting on the December counts, because they knew some fraudulent activity was afoot.

The Court must reverse the district court's denial of Mr. Cao's motion for acquittal on Counts 2-4, because no rational juror could distinguish the two sets of wire transactions on the basis of their essentialness to the charged fraud. No rational juror could find the meetings essential to the alleged fraud beyond a reasonable doubt on the state of the evidence at trial.

## IV

### MR. CAO'S SENTENCE WAS PROCEDURALLY UNREASONABLE BECAUSE THE DISTRICT COURT IMPROPERLY RELIED ON MR. CAO'S FAILURE TO DISCLOSE TO DISCLOSE THE LOCATION OF CERTAIN LOST FUNDS AS AN AGGRAVATING FACTOR

#### A.    Standard of Review

This Court reviews the sentence imposed by the district court "to determine whether [it] is reasonable; only a procedurally erroneous or substantively unreasonable sentence will be set aside." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008)

(en banc). First, the Court considers "whether the district court committed significant procedural error, then [it] consider[s] the substantive reasonableness of the sentence." *Id.* Following this Court's decision in *Carty*, the sentencing procedure that district courts must employ is clear. Every "sentencing proceeding[] [is] to begin by determining the applicable Guidelines range." *Id.* at 991. After calculating the Guidelines range, "[t]he district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties." *Id.* The sentencing court must consider all of the factors set forth in section 3553(a); it may not focus on one to the exclusion of all others. *See id.*; *United States v. Paul*, 561 F.3d 970, 975 (9th Cir. 2009).

It is procedural error for the district court to rely on clearly erroneous facts. *Carty*, 520 F.3d at 993. Further, the district court's findings of fact must be supported by a preponderance of the evidence. *United States v. Jenkins*, 633 F.3d 788, 808 (9th Cir. 2011). The Government retains the burden of proving facts relevant to the crime at the sentencing phase, and the district court may not draw adverse inferences from the defendant's silence. *See Mitchell v. United States*, 526 U.S. 314, 330 (1999). A court abuses its discretion when it bases its inquiry on the wrong legal standards. *See Hinkson*, 585 F.3d at 1263.

**B.** **The District Court Erred by Imposing a Longer Sentence Than Otherwise Sufficient on the Improper Basis of Mr. Cao's Intransigence in Refusing to Disclose Supposed Missing Funds**

The district court erred at sentencing by inflexibly focusing on the fact that certain funds—which the court estimated to be in the amount of approximately $10 or $11 million—had not been located by the Government. Although any untraced funds taken from investors had already been accounted for in the loss amounts that formed the basis of Mr. Cao's applicable Guidelines range, the district court was keenly concerned that Mr. Cao might have hidden some money away. Even though the court's suspicion had no evidentiary basis, the district court nonetheless considered the potential that Mr. Cao had hidden money as an aggravating factor. ER24, 29, 172-73, 179-80, 191. This was procedural error.

The district court admitted at the beginning of the sentencing hearing that there was no evidentiary support for its suspicions. The court stated:

> I have this fear . . . that Mr. Cao has got money squirreled away somewhere offshore. *Of course, there's no evidence of that.* The government would have grabbed it, I suppose, or made some attempt to. But at the same time, he didn't spend it, and it's gone. And I don't know where the money is. And that, I have to tell you, is going to affect my sentencing discretion.

ER173 (emphasis added). Indeed, there was good reason for the court to exhibit caution in claiming that Mr. Cao had hidden away money in a secret account that he could access at a later time. The only basis for the court's fear was that the Government and

72

the receiver could not account for all of the money that had been lost. ER189. Yet the fact that those parties could not find the money was not proof by a preponderance of the evidence that Mr. Cao *had* hidden it. *See Jenkins*, 633 F.3d at 808. Mr. Cao denied there was any hidden money and said everything (apart from some cash profits) was reflected in his bank statements seized by the SEC. ER189.

Unable to make a finding based on the Government's evidence, the district court then impermissibly shifted the burden to Mr. Cao to disclose where all of the money had ended up. The court stated,

> I'll tell you what I don't want to do. I don't want to go easy on Mr. Cao if there's money waiting for him out there and it's this stolen money that belongs to all these people who've been so deeply affected by this. [¶] And I want to hear about that. I want to hear about what happened to that money, where it is, what the prospect is that that money can be brought back and given back . . .

ER 173. The court repeatedly pressed both Mr. Cao and his counsel to state where the money that had been lost ended up. After conceding that "if the government looked at this very carefully," they probably would have discovered the location of the money, the district court insisted that Mr. Cao was "in the best position to know" where the money went. PSR 6-13. The court stated bluntly that "a promise [by Mr. Cao] to come forward with that money . . . then it would be a different case in my judgment." E179. In other words, the court considered Mr. Cao's silence with regard to the money an aggravating factor, and ignored the government's burden of proof. In any event, the

district court clearly erred so as to exaggerate the appearance of missing money; while it opined that $12 million was unaccounted for, the prosecution estimated it was more in the range of $4-5 million. ER176, 205.

The Supreme Court reviewed a similar situation in *Mitchell*. In that case, the defendant pled guilty to conspiracy and drug distribution. *See* 526 U.S. at 317. At sentencing, the government presented testimony by alleged co-conspirators to establish the amount of drugs for which Mitchell was responsible. *See id.* at 318. Mitchell decided not to speak at the hearing. *See id.* at 319. The district court in that case said "'I held it against you that you didn't come forward today and tell me that you really only did this a couple of times.... I'm taking the position that you should come forward and explain your side of the issue.'" *Id.* The Supreme Court held that "[b]y holding petitioner's silence against her in determining the facts of the offense at the sentencing hearing, the District Court imposed an impermissible burden on the exercise of the constitutional right against compelled self-incrimination." *Id.* at 330.

Here, the district court recognized that there were Fifth Amendment implications in forcing Mr. Cao to address its concerns, but attempted to sidestep them. The court said that "I have to tell you that things you say conceivably could be used against you," but added, "I want to tell you that they could also be used in your favor too." ER186. What the court did not say—but what was obvious from the totality of the

74

circumstances—is that remaining silent would certainly have prejudiced Mr. Cao. That was impermissible under *Mitchell* and requires reversal.

Due to the district court's double-edged advisal, however, the instant case eventually proceeded differently than in *Mitchell*. Because the district court made it clear up front that Mr. Cao would receive additional punishment if he did not speak in his own defense, Mr. Cao made the decision to explain to the court his position. Mr. Cao stated that much of the money that concerned the court had in fact vanished due to bad investments and others scamming him. ER188. Mr. Cao also explained that, as he had been scammed out of the funds, he felt threatened by the people who deceived him. *Id.* Mr. Cao denied that he had hidden away any money or that he had access to any of the money that had been invested by the alleged victims of the fraudulent scheme. Mr. Cao testified flatly, "There are no hidden accounts out there that I know of." ER189. Moreover, the district court rejected Mr. Cao's representations that he was afraid to disclose his partners' names, as the Government could not adequately protect him in prison or effectively recover the money. ER188-89, 192-93. But Mr. Cao maintained a sincere reluctance to appear to cooperate with fingering the culprits, right down to his final statement to place on the record, "I have already declined all offers." ER29.

This reluctance of Mr. Cao to place himself in harm's way did not stop the

district court, however, from increasing Mr. Cao's sentence based on its suspicions. In pronouncing its sentence, the district court remarked that Mr. Cao's statements made the court "even more suspicious," ER24, conjecturing that "you just don't lose that amount of money." ER20. But whatever the cause of the court's increased suspicion, no amount of bare suspicion can reach the level of proof by a preponderance of the evidence. The final sentence imposed, though lower than the prosecution recommendation, was manifestly greater than it would have been if the district court had not taxed Mr. Cao with exhibiting obstinate and unrepentant silence on the missing money. The district court unaccountably failed to consider even the potential that with so much money involved, Mr. Cao could have a genuine fear for his safety.

In sum, what occurred at Mr. Cao's sentencing was an impermissible mixture of procedural and constitutional error. The district court shifted the burden of proof to Mr. Cao, compelled him to testify, and then based its sentence on an aggravating factor that had no evidentiary support. Put simply, the district court, apparently frustrated by the fact that there was no record evidence to support its suspicions, held that lack of evidence against Mr. Cao. Together and individually, these errors warrant vacating the sentence and remand.

# V

## THE SENTENCE WAS SUBSTANTIVELY UNREASONABLE AS BASED ON UNSUPPORTED PREMISES AND FAILING TO AVOID UNWARRANTED DISPARITY

### A. <u>Introduction</u>

Under the "overarching" provision of 18 U.S.C. § 3553(a), the sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." *Kimbrough v. United States,* 552 U.S. 85, 101 (2007). As shown by *Kimbrough*, which dealt with the Guidelines' disparate treatment of crack and powder cocaine, when the advisory Guidelines yields a sentence that violates the overarching parsimony principle, the court has the authority and duty to vary from that recommendation to impose a sentence that is indeed no greater than necessary to suffice. The Supreme Court has repeatedly stressed the ability to vary from the Guidelines on policy grounds, especially where the Guidelines are not based on empirical support. *See Spears v. United States*, 555 U.S. 261, 264 (2009); *Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011).

Here, Mr. Cao argued that a Guidelines-derived sentence would be unreasonable, given that the history of the fraud Guidelines' development shows they are not based on empirical determinations and are in some instances counterproductive to the statutory sentencing goals in § 3553(a). ER78-90; CR75. The district court failed to

77

take these arguments into account in its sentencing, and so the sentence imposed is unreasonable, as it is derived from the unsupported Guidelines recommendation. ER17.

Moreover, the sentence imposed here is excessive on concrete comparison with numerous others who have been sentenced for far more serious frauds, judging by the district court's own criterion. The evidence presented to the district court showed that Mr. Cao's sentence was unreasonable in creating unwarranted disparity and contrary to the goals of § 3553(a)(2). For both these reasons, the sentence should be vacated and the case remanded.

**B.** **The Fraud Guidelines Produce Unreasonably Elevated Sentence Recommendations Which Are Unsuppported or Contradicted by Empirical Evidence**

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the Guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach," which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *See id.* at 348-50. After *Rita,* the Supreme Court recognized that not all Guidelines were developed in this manner. *See Gall v. United*

*States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough*, 552 U.S. at 96. When a Guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,' " the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough,* 552 U.S. at 109-10.

The fraud Guideline is an example of calculations *not* based on empirical data of past practice or on national experience. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, sentencing courts may reject the Guidelines sentence on reasoned policy grounds, and should do so, if necessary to impose a parsimonious sentence. *See Pepper*, 131 S. Ct. at 1247; *Spears*, 555 U.S. at 264-65; *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

Before the Guidelines, first offenders convicted of sophisticated fraud involving the highest loss amounts who were sentenced to prison served, on average, a prison sentence of 18-24 months, and 18% of such defendants received probation. *See* U.S.S.C., *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 33 (1987). When the Commission adopted the original Guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar

79

offenses. *See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest,* 17 Hofstra L. Rev. 1, 22-23 (1988). The Commission required some form of confinement for all but the least serious cases and adopted a fraud guideline requiring no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I. *See* U.S.S.G. § 2F1.1 (1987). The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." U.S.S.G. ch. 1, intro., pt. 4(d) (1987).

However, the Commission's deterrence rationale was not based on empirical evidence. The empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Moreover, the Commission quickly abandoned its original goal of ensuring short but definite sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased. The effect of those

increases on this case was to add four levels for loss in 1989, to add five more levels for loss in 2001, to increase the base offense level by one level in 2003, and to add six levels for the number of victims in 2001 and 2003. As a result, Mr. Cao's advisory Guideline range was five times the range under the original 1987 Guideline.

The explanations offered by the Commission for the two amendments which added nine levels are deficient and inaccurate. In both instances, the Commission amended the Guideline, not in the exercise of its characteristic institutional role as an independent expert body, but instead based on unsupported signals. The Commission ignored the overwhelming empirical research demonstrating that increases in sentence severity, as opposed to certainty, have no deterrent value, and it ignored the actual feedback from the district courts. The 1989 and 2001 increases in the fraud Guideline led to the absurd result that first-time, nonviolent fraud offenders were subject to Guideline ranges as high as those imposed on armed drug traffickers and even higher than those applicable to the most violent offenders. *Compare* U.S.S.G. § 2B1.1 (2001) (offense level 30 for loss over $7 million, sophisticated means, abuse of position of trust) *with* § 2D1.1 (2001) (offense level 30 for trafficking in 3 kilograms of cocaine while possessing a firearm); § 2A2.1 (2001) (offense level 28 for assault with intent to commit first degree murder); § 2A4.1 (2001) (offense level 24 for kidnapping),§ 2K1.4 (2001) (offense level 24 for arson creating substantial risk of death or serious bodily

81

injury), § 2A1.3 (2001) (offense level 25 for voluntary manslaughter).

Then, in 2003, the base offense level was increased from six to seven for defendants convicted of an offense with a statutory maximum of 20 years. *See* U.S.S.G. app. C, amend. 653 (2003). As its stated reason, the Commission pointed to Congress's directive in section 905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No. 107-204, which instructed it to consider whether the guidelines are "sufficient to deter and punish" certain economic crimes "in view of the statutory increases in penalties contained in the Act." *See* U.S.S.G. app. C, amend. 653 reason for amendment (2003). Having just substantially raised penalties in 2001, the Commission could have narrowly targeted the high-end corporate scandals that prompted the Sarbanes-Oxley Act. That is what all commentators (other than the Department of Justice) advised, and the empirical evidence showed that across-the board-increases were unnecessary. But in doing so, the Commission once again ratcheted up the fraud guideline to more closely match the unsound drug guidelines, and explicitly tied the base offense level to the statutory maximum, thus abdicating to Congress its independent judgment regarding the seriousness of the offense.

The fraud Guideline also overcounts common factors to most federally prosecuted frauds. The first fraud Guideline included two specific offense characteristics in addition to loss. Today, § 2B1.1 includes *sixteen* cumulative specific

offense characteristics, many with multiple alternatives. *See* U.S.S.G. § 2B1.1 (2010). In the initial Guideline, if there was "more than minimal planning" and "more than one victim," one 2-level enhancement applied. Today, "sophisticated means" and "250 or more victims" cumulatively produce an 8-level enhancement.

Twelve of the levels used to calculate Mr. Cao's Guideline range come from specific offense characteristics in § 2B1.1 (4 levels for number of victims, 2 levels for sophisticated means) and a 6-level adjustment from Chapter Three (4 levels for role and 2 levels for abuse of trust). PSR 16-17. These factors are "closely correlated" with each other and with loss. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 170 (Feb. 2008). "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id.* The result is that the various fraud provisions double count many factors for which loss was already a proxy. *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648-49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation."); Alan Ellis et al., *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("the loss table often overstates the

actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics."). The Commission itself has recognized in its fifteen-year report this problem of "factor creep," by which more and more adjustments are added, increasingly the difficulty to ensure that their cumulative effect properly tracks offense seriousness. *See* U.S.S.C., *Fifteen Years of Guidelines Sentencing* 137 (2004).

Moreover, the higher sentencing ranges in § 2B1.1 are not warranted by deterrence concerns. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Gabbay, *supra,* at 447-48 ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Criticism of the fraud sentence calculations has continued. "While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Ellis et al., *supra*, at 37; *see also United States v.*

84

*Ovid*, No. 09-CR-216 (JG), 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").

As a concrete sign of judicial discontent with these high sentences, in fiscal year 2010, sentences below the Guideline range were imposed in 41% of all fraud cases; 18% were government-sponsored, 23% were non-government sponsored. *See* U.S.S.C., *Preliminary Quarterly Data Report, Fourth Quarter FY 2010*, tbl.5. "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Bowman, *supra*, at 169.

The fraud Guidelines' history show they rank with the crack-powder cocaine sentences for lack of an empirical basis for the recommended sentences. The Supreme Court has repeatedly, in *Kimbrough, Spears*, and most recently in *Pepper*, stressed that sentencing courts can and should deviate from Guidelines that advise a sentence greater than necessary to serve the statutory goals of sentencing. The district court here erred

in rejecting, without any explanation, the undisputed evidence of the historical lack of rationality to the fraud Guidelines.[22] *See Pepper*, 131 S. Ct. at 1247 (variance from Guidelines is particularly warranted "where, as here, the Commission's views rest on wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted.").

## C. <u>The Sentence Creates Unwarranted Disparities</u>

The sentence was substantively unreasonable, because the district court failed to account for documented disparities with other fraud case of much greater seriousness, as shown by number of victims and amount of loss. As a result, it imposed a sentence greater than necessary to serve the statutory sentencing goals.

The sentencing court must avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. *See* 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the Guideline range. *See Gall*, 552 U.S. at 55 (noting the "need to avoid unwarranted similarities among other co-conspirators who were not similarly situated").

_____

[22] The district court's only response to the defense evidence was: "and as you said, make an argument that the Guidelines themselves are flawed because they are not based on empirical research, at least in this broad area. [¶] Those things said, they are what they are." ER18. The lack of adequate explanation is, in itself, a procedural flaw warranting remand. *See Carty*, 520 F.3d at 992; *United States v. Waknine*, 543 F.3d 546, 555 (9th Cir. 2008).

The chart proffered below and included in the Appendix to this brief includes a sample of fraud cases from districts across the country, many of which involved losses far greater than in this case, in which defendants received sentences substantially below the Guideline ranges applicable in those cases, and substantially below the Guideline range of 360 months to life, capped at 240 months, calculated here. As here, none of the defendants in these cases received a departure based on cooperation. The district court failed to take into account these national sentencing trends to avoid unwarranted disparity.

In *United States v. Parris*, Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders—at the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *See* 573 F. Supp. 2d 744, 752 (E.D.N.Y. 2008). Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. The court relied on this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range. *Id.* at 745.

As shown by the data in the Appendix, the sentence imposed here is far stiffer than that imposed on many more serious offenses, measuring by pure loss amount, which even the district court recognized was the most concrete way to compare cases. ER19. To take just one example from the Appendix, in the case of defendant Stephen Richards in 2006, who faced a Guidelines range of life, the sentence given was 84 months in prison. The Government's loss amount estimate there was $2.2 billion. Thus, Mr. Richards was responsible for about 200 times the calculated loss amount of Mr. Cao, yet he received a sentence less than one-fourth as long. PSR16 (setting loss amount at between $10 and $12 million).

The district court failed to credit these comparable cases, stating it did not know all the sentencing factors in each case.[23] ER19. However, the argument on disparity under § 3553(a)(6) goes only to comparable seriousness of offense and prior criminal record, and the loss amounts are concededly the principal measure of the seriousness of a fraud scheme. Therefore, the district court did have sufficient, reliable evidence to make the proper comparisons and adjustments for the vast disparities between white-collar sentences. Despite the district court's opining on the increasing length of fraud

---

[23] The district court noted that some of the cases cited in the Government's memo were "close to where their recommendation is," ER19. But the Government did not include *any* loss amounts, only raw sentences imposed. ER165; CR69. The defense proffer therefore provided the only evidence suitable for comparison, by the district court's own criterion.

sentences in the last 30 years, the actual data before it showed that the sentence proposed for Mr. Cao was way out of proportion to recent, comparable cases: even if the absolute length of sentences has increased, the *relative* length between Mr. Cao's sentence and others of similar seriousness (and likely similar, low, criminal history score) called for being factored into the final sentence under § 3553(a)(6).

The comparison data show that the sentence imposed was greater than necessary to serve sufficiently the statutory factors in § 3553(a)(2) by reflecting the seriousness of the offense, the need to punish, promote respect for the law, and to protect the public. It therefore violated the "overarching" parsimony mandate of § 3553(a). *Kimbrough*, 552 U.S. at 101. If two sentences equally serve the sentencing concerns of § 3553, then the district court would be obliged to impose the *lower* sentence, as the longer sentence is greater than necessary to suffice. *See United States v. Martinez-Barragan,* 545 F.3d 894, 904 (10th Cir. 2008); *United States v. Shortt*, 485 F.3d 243, 248 (4th Cir. 2007); *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). In other words, the parsimony principle acts as a final arbiter of reasonableness when two proposed sentences are viewed as sufficient. A violation of the parsimony principle results in a substantively unreasonable sentence. *See United States v. Crowe*, 563 F.3d 969, 977 n.16 (9th Cir. 2009). This Court should vacate the sentence.

## CONCLUSION

For the above reasons, the Court should reverse the conviction and sentence in this case.

Respectfully submitted,


DATED:  January 17, 2012        *s/ James Fife*
                                JAMES FIFE
                                Federal Defenders of San Diego, Inc.
                                225 Broadway, Suite 900
                                San Diego, California  92101-5097
                                Telephone: (619) 234-8467

                                Attorneys for Defendant-Appellant

## **CERTIFICATE OF RELATED CASES**
## **(9th Cir. R. 28-2.6)**

Counsel for the Appellant is unaware of any related appeal pending before this

Court.

Respectfully submitted,

DATED: January 17, 2012          *s/ James Fife*
                                 **JAMES FIFE**
                                 Attorney for Mr. Cao

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(A)(7)(C) AND
CIRCUIT RULE 32-1 FOR CASE NUMBER 11-50200

I certify that:  (check appropriate options(s))

 X  1. Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1,
the attached opening appeal brief is

    ✕    Proportionately spaced, has a typeface of 14 points or more and
contains 21,845 words (opening, answering, and the second and third
briefs filed in cross-appeals must **NOT** exceed 14,000 words; reply
briefs must **NOT** exceed 7,000 words).

**A motion to file an oversize brief was filed with this brief under Fed. R. App. P
32; 9th Cir. R. 32-2.**

January 17, 2012                       _s/ JamesFife_
 Date                                   Signature of Attorney or
                                           Unrepresented Litigant

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on ___*January 17, 2012*___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ _____*James Fife*_____

# ADDENDUM
# (9th Cir. R. 28-2.7)

Table of Contents

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

28 U.S.C. § 455(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

U.S.S.G. § 2B1.1 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

## 18 U.S.C. § 1341 Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## 18 U.S.C. § 1343 Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

## 18 U.S.C. § 1349 Attempt and conspiracy

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## 18 U.S.C. § 3553

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any

97

amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

\* \* \*

98

## 28 U.S.C.§ 455 Disqualification of justice, judge, or magistrate judge

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

* * *

## Fed. R. Crim. P. 29 Motion for a Judgment of Acquittal

(a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

* * *

## Fed. R. Evid. 403 Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

## Fed. R. Evid. 404  Character Evidence; Crimes or Other Acts

(a) Character Evidence.
(1) Prohibited Uses. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

* * *

(b) Crimes, Wrongs, or Other Acts.

99

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
>
> (B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

**U.S.S.G § 2B1.1 Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States**

**(a)** Base Offense Level:

**(1)** 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

**(2)** 6, otherwise.

**(b)** Specific Offense Characteristics

**(1)** If the loss exceeded $5,000, increase the offense level as follows:

| | **Loss** (Apply the Greatest) | **Increase in Level** |
| --- | --- | --- |
| **(A)** | $5,000 or less | no increase |
| **(B)** | More than $5,000 | add 2 |
| **(C)** | More than $10,000 | add 4 |

| | | |
|---|---|---|
| **(D)** | More than $30,000 | add 6 |
| **(E)** | More than $70,000 | add 8 |
| **(F)** | More than $120,000 | add 10 |
| **(G)** | More than $200,000 | add 12 |
| **(H)** | More than $400,000 | add 14 |
| **(I)** | More than $1,000,000 | add 16 |
| **(J)** | More than $2,500,000 | add 18 |
| **(K)** | More than $7,000,000 | add 20 |
| **(L)** | More than $20,000,000 | add 22 |
| **(M)** | More than $50,000,000 | add 24 |
| **(N)** | More than $100,000,000 | add 26 |
| **(O)** | More than $200,000,000 | add 28 |
| **(P)** | More than $400,000,000 | add 30. |

**(2)** (Apply the greatest) If the offense--

**(A)**(i) involved 10 or more victims; or (ii) was committed through mass-marketing, increase by 2 levels;

**(B)** involved 50 or more victims, increase by 4 levels; or

**(C)** involved 250 or more victims, increase by 6 levels.

**(3)** If the offense involved a theft from the person of another, increase by 2 levels.

**(4)** If the offense involved receiving stolen property, and the defendant was a person

101

in the business of receiving and selling stolen property, increase by 2 levels.

**(5)** If the offense involved misappropriation of a trade secret and the defendant knew or intended that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 2 levels.

**(6)** If the offense involved theft of, damage to, destruction of, or trafficking in, property from a national cemetery or veterans' memorial, increase by 2 levels.

**(7)** If (A) the defendant was convicted of an offense under 18 U.S.C. § 1037; and (B) the offense involved obtaining electronic mail addresses through improper means, increase by 2 levels.

**(8)** If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than $20,000,000, increase by 4 levels.

**(9)** If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency; (B) a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines; or (D) a misrepresentation to a consumer in connection with obtaining, providing, or furnishing financial assistance for an institution of higher education, increase by 2 levels. If the resulting offense level is less than level 10, increase to level 10.

**(10)** If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

**(11)** If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to

produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

**(12)** If the offense involved conduct described in 18 U.S.C. § 1040, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

**(13)** If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

**(14)** If the offense involved (A) the conscious or reckless risk of death or serious bodily injury; or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

**(15)** (Apply the greater) If--

    **(A)** the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels; or

    **(B)** the offense (i) substantially jeopardized the safety and soundness of a financial institution; (ii) substantially endangered the solvency or financial security of an organization that, at any time during the offense, (I) was a publicly traded company; or (II) had 1,000 or more employees; or (iii) substantially endangered the solvency or financial security of 100 or more victims, increase by 4 levels.

    **(C)** The cumulative adjustments from application of both subsections (b)(2) and (b)(15)(B) shall not exceed 8 levels, except as provided in subdivision (D).

    **(D)** If the resulting offense level determined under subdivision (A) or (B) is less than level 24, increase to level 24.

**(16)** If (A) the defendant was convicted of an offense under 18 U.S.C. 1030, and the offense involved an intent to obtain personal information, or (B) the offense involved the unauthorized public dissemination of personal information, increase by 2 levels.

103

**(17)(A)** (Apply the greatest) If the defendant was convicted of an offense under:

**(i)** 18 U.S.C. 1030, and the offense involved a computer system used to maintain or operate a critical infrastructure, or used by or for a government entity in furtherance of the administration of justice, national defense, or national security, increase by 2 levels.

**(ii)** 18 U.S.C. 1030(a)(5)(A), increase by 4 levels.

**(iii)** 18 U.S.C. 1030, and the offense caused a substantial disruption of a critical infrastructure, increase by 6 levels.

**(B)** If subdivision (A)(iii) applies, and the offense level is less than level 24, increase to level 24.

**(18)** If the offense involved--

**(A)** a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director of a publicly traded company; (ii) a registered broker or dealer, or a person associated with a broker or dealer; or (iii) an investment adviser, or a person associated with an investment adviser; or

**(B)** a violation of commodities law and, at the time of the offense, the defendant was (i) an officer or a director of a futures commission merchant or an introducing broker; (ii) a commodities trading advisor; or (iii) a commodity pool operator,

increase by 4 levels.

**(c)** Cross References

**(1)** If (A) a firearm, destructive device, explosive material, or controlled substance was taken, or the taking of any such item was an object of the offense; or (B) the stolen property received, transported, transferred, transmitted, or possessed was a firearm, destructive device, explosive material, or controlled substance, apply § 2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy), § 2D2.1 (Unlawful Possession; Attempt or Conspiracy), § 2K1.3 (Unlawful Receipt,

104

Possession, or Transportation of Explosive Materials; Prohibited Transactions Involving Explosive Materials), or § 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition), as appropriate.

**(2)** If the offense involved arson, or property damage by use of explosives, apply § 2K1.4 (Arson; Property Damage by Use of Explosives), if the resulting offense level is greater than that determined above.

**(3)** If (A) neither subdivision (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

(4) If the offense involved a cultural heritage resource or a paleontological resource, apply § 2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources), if the resulting offense level is greater than that determined above.

# APPENDIX

| Case | Conviction | Loss | Guideline Range | Sentence Imposed/% of guideline range |
|---|---|---|---|---|
| Christian Milton, AIG, Vice President (D. Conn. 2009) | Convicted at trial of various counts of fraud. | | LIFE imprisonment | 48 months[1] 10% of guideline range; life treated as 470 months |
| Ronald Ferguson, CEO, General Reinsurance Corp. (D. Conn. 2008) | Convicted at trial of conspiracy, securities fraud, false statements to SEC, and mail fraud. | $544 million | LIFE imprisonment | 24 months[2] 5% of guideline range; life treated as 470 months |
| Travis Correll, (N.D. Ga. 2008) | Pled guilty to wire fraud (related to Ponzi scheme). | $29 million (ordered in restitution) | 188-235 months | 144 months 76% of guideline range (Correll was initially sentenced to 144 months, but later received a further reduction to 108 months under Rule 35.[3]) |
| Robert Cole, Sales Rep., Diebold (N.D. Ohio 2008) | Pled guilty to securities fraud. | $509,000 | 30-37 months | 12 months and 1 day[4] 40% of guideline range |
| William Ledee, Founder of fictitious insurance company (N.D. Ga. 2007) | Pled guilty to making false financial statements, engaging in business of insurance as a convicted felon, mail fraud, conspiracy to commit money laundering, etc. | $21.6 million (ordered in restitution) | The PSR indicated a total offense level of 51, and criminal history category II, resulting in a guideline range of LIFE. | 70 months 15% of guideline range; life treated as 470 months (varied below type C agreement's cap of 7.5 years[5]) |
| John Whittier, Manager, Wood River Partners (S.D.N.Y. 2007) | Pled guilty to securities fraud, failure to disclose ownership in excess of 5% of publicly traded security, and failure to disclose ownership in excess of 10% of publicly traded security. | $88 million (ordered in restitution) | 188-235 months | 36 months[6] 19% of guideline range |
| Hector Orlansky, President, E.S. Bankest (S.D. Fla. 2007) | Convicted at trial of conspiracy to commit bank fraud and wire fraud, bank fraud, making false statements, wire fraud, conspiracy to commit money laundering, and money laundering. | $164.5 million (ordered in restitution) | 262-327 months | 240 months[7] 91.6% of guideline range |

| Richard Adelson, CEO & President, Impath (S.D.N.Y. 2006) | Convicted at trial of conspiracy, securities fraud, and filing false reports with SEC. | $50 -$100 million (court ordered restitution of $50 million) | Guidelines called for life imprisonment; statutory maximum was 85 years. | 42 months[8] 9% of guideline range; life treated as 470 months |
|---|---|---|---|---|
| Jamie Olis, Tax Lawyer, Dynegy (S.D. Tex. 2006) | Convicted at trial of: (1) conspiracy to commit securities fraud, mail fraud, wire fraud, (2) securities fraud, (3) mail fraud, and (4) wire fraud. | $79 million | 151 -188 months | 72 months[9] 47% of guideline range |
| E. Kirk Shelton, Vice Chairman, Cendant Corporation (D. Conn. 2005) | Convicted at trial of: (1) conspiracy to commit securities fraud, mail fraud, wire fraud, and false statements to SEC, (2) mail fraud, (3) wire fraud, (4) false statements to SEC, (5) securities fraud. | $3.275 billion (ordered in restitution) | 151-188 months (1997 Guidelines were used; 2006 Guidelines would have called for life imprisonment, limited by a statutory cap of 300 months) | 120 months[10] 79% of guideline range |
| Bernard Ebbers, CEO, WorldCom (S.D.N.Y. 2005) | Convicted at trial of conspiracy, securities fraud, making false filings with the SEC. | Over $1 billion | 360 months to life | 300 months[11] 83% of guideline range |
| Sanjay Kumar, CEO, Computer Associates Int'l (E.D.N.Y. 2006) | Pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, false statements to SEC, conspiracy to obstruct justice, obstruction of justice, and false statements. | $2.2 billion (according to Gov't's Sent'g Memo) | LIFE imprisonment under 2005 Guidelines 188 to 235 under 1998 Guidelines (Unclear how District Court resolved dispute over which version should apply.) | 144 months[12] 30% of guideline range; life treated as 470 months |

| | | | | |
|---|---|---|---|---|
| Stephen Richards, Sr. Vice President, Computer Associates (E.D.N.Y. 2006) | Pled guilty to conspiracy to commit securities fraud and wire fraud, securities fraud, false statements to SEC, conspiracy to obstruct justice, obstruction of justice, and perjury. | $2.2 billion (according to Government's Sentencing Memorandum | LIFE imprisonment under 2005 Guidelines 151 to 188 under 1998 Guidelines (Unclear how District Court resolved dispute over which version should apply.) | 84 months[13] 18% of guideline range; life treated as 470 months |
| Mehdi Gabayzadeh, CEO, American Tissue (E.D.N.Y. 2006) | Convicted at trial of conspiracy to commit securities fraud, conspiracy to commit bank fraud, bank fraud, wire fraud, interstate transport of property obtained by fraud, bankruptcy fraud, conspiracy to commit perjury, and obstruction of justice. | PSR found total loss of $193 million (Court ordered $65 million in restitution.) | LIFE imprisonment | 180 months[14] 38% of guideline range; life treated as 470 months |
| John Rigas, Founder, Adelphia (S.D.N.Y. 2004) | Convicted at trial of securities fraud, bank fraud, and conspiracy to: (a) commit securities fraud, (b) commit bank fraud, and (c) make or cause to be made false statements in filings to SEC. | $2.3 billion | Guideline range was LIFE imprisonment; however, statutory maximum was 185 years. | 144 months[15] 31% of guideline range; life treated as 470 months; 6% of statutory maximum cap |
| Timothy Rigas, CFO, Adelphia (S.D.N.Y. 2004) | Convicted at trial of securities fraud, bank fraud, and conspiracy to: (a) commit securities fraud, (b) commit bank fraud, and (c) make or cause to be made false statements in filings to SEC. | $2.3 billion | Guideline range was LIFE imprisonment; however, statutory maximum was 185 years. | 204 months[16] 43% of guideline range; life treated as 470 months; 9% of statutory maximum cap |

| | | | | |
|---|---|---|---|---|
| Jacob Jacobowitz, Executive VP, Allou Healthcare (E.D.N.Y. 2007) | Pled guilty to making false statements in reports to the SEC. | $30 million (ordered in restitution) | Guideline range was 168-210 months; however, statutory maximum was 120 months. | 84 months[17] 50% of guideline range; 70% of statutory maximum cap |
| Herman Jacobowitz CEO, Allou Healthcare (E.D.N.Y. 2007) | Pled guilty to conspiracy to commit bank, securities, and mail fraud and making false statements in reports to SEC. | $176 million (ordered in restitution) | Guideline range would have been LIFE imprisonment; plea agreement structured to provide statutory maximum of 180 months. | 180 months[18] 38% of guideline range; life treated as 470 months |
| Aaron Jacobowitz Manager of various companies controlled by Jacobowitz family (E.D.N.Y. 2007) | Pled guilty to money laundering. | $176 million (ordered in restitution) | Guideline range was LIFE imprisonment; plea agreement structured to provide statutory maximum of 120 months. | 120 months[19] 25% of guideline range; life treated as 470 months |
| Carole Argo CFO, SafeNet, Inc. (S.D.N.Y. 2008) | Pled guilty to securities fraud. | $1 -2.5 million (stipulated loss amount) | 97 -121 months | 6 months[20] 6% of guideline range |
| Lennox Parris, Director, Queench, Inc. (E.D.N.Y. 2008) | Convicted at trial of conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | Between $2.5 and $7 million | 360 months to LIFE | 60 months[21] 16.7% of guideline range |
| Lester Parris, Director, Queench, Inc. (E.D.N.Y. 2008) | Convicted at trial of conspiracy to commit securities fraud, securities fraud, conspiracy to commit witness tampering, and witness tampering. | Between $2.5 and $4.9 million | 360 months to LIFE | 60 months[22] 16.7% of guideline range |

| | | | | |
|---|---|---|---|---|
| Raquel Kohler, Mutual Benefit Corp. (S.D. Fla. 2007) | Pled guilty to conspiracy to commit securities fraud. | $471 million (ordered in restitution) | Guideline range 324-405 months, statutory maximum 120 months. | 60 months[23] 18.5% of guideline range; 50% of statutory maximum cap |
| Marc Dreier, Managing Partner, Dreier LLP (S.D.N.Y. 2009) | Pled guilty to securities fraud, wire fraud, and conspiracy to commit securities and wire fraud. | $387 million (ordered in restitution) | Guideline range LIFE, statutory maximum limited sentence to 145 years. | 240 months[24] 51% of guideline range; life treated as 470 months; 13.8% of statutory maximum cap |