C.A. No. 11-50200

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THANH VIET "JEREMY" CAO,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Southern District of California
Honorable Larry A. Burns, Chief District Judge

BRIEF FOR APPELLEE UNITED STATES

LAURA E. DUFFY
United States Attorney

BRUCE R. CASTETTER
Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division

JOSEPH J.M. ORABONA
Assistant U.S. Attorney

880 Front Street, Room 6293
San Diego, California  92101-8893
Telephone:  (619) 546-7951

Attorneys for Plaintiff-Appellee
United States of America

## TOPICAL INDEX

Page

TABLE OF AUTHORITIES                                              iii

I     QUESTIONS  PRESENTED                             1

II    JURISDICTION                                        2

    A.   BASIS FOR SUBJECT MATTER JURISDICTION
        IN THE DISTRICT COURT                         2

    B.   BASIS FOR JURISDICTION IN THE COURT OF
        APPEALS                                       2

    C.   THE NOTICE OF APPEAL WAS TIMELY               2

    D.   BAIL STATUS                                   2

III   STATEMENT OF THE CASE                            3

    A.   PRIOR PROCEEDINGS                             3

    B.   STATEMENT OF FACTS                            4

        1.   Introduction                             4

        2.   The Crime                                5

            a.   Cao's Financial Background            5

            b.   Cao Continues His Ponzi Scheme        6

                (1)   Lakeview - Real Estate Scam      6

                (2)   Northpoint - Casino Financing Scam   7

                (3)   Think Financiers - Mortgages Scam   7

                (4)   Cao Spends Investors' Money      8

                (5)   Fraudulent Goldman Sachs Letters   9

i

<u>TOPICAL INDEX</u> (Continued)

<u>Page</u>

| | | | |
|---|---|---|---|
| | c. | Cao Threatens to Kill His Business Partner | 9 |
| | d. | Cao's Investment Meetings at the San Diego Hyatt | 10 |
| | e. | Arrested for Threatening His Business Partner | 11 |
| | f. | Cao Continues to Spend Investor Money | 11 |
| | g. | TG Capitol Was the End of the Ponzi Scheme | 12 |
| | h. | Overseas Transfers of TG Capitol | 14 |
| | i. | Cao Confesses to Investigators | 14 |
| | j. | Cao Notifies Investors of a New Guarantee | 14 |
| | k. | Accounts Frozen and Bentley Seized | 15 |
| | l. | Cao Responds With Hostility to His Investors | 16 |
| | m. | Cao Retaliates Against Judges and Prosecutors | 17 |
| | n. | Receiver Appointed to Take Over Cao's "Businesses" | 17 |
| | o. | Cao Is Indicted for His Ponzi Scheme | 18 |
| 3. | | Motions of Significance to This Appeal | 18 |
| | a. | Motion to Rescue the District Judges and U.S. Attorney's Office for Objective Bias | 18 |
| | | (1) Defense Pleadings | 18 |
| | | (2) Government Response | 19 |
| | | (3) Hearing | 19 |
| 4. | | Jury Trial and Verdict | 20 |

ii

## TOPICAL INDEX (Continued)

Page

5.  Sentencing                                                      20

    a.   Recommendations                                            20

         (1)   The PSR                                              20

         (2)   Defense                                              21

         (3)   Government                                           21

    b.   Hearing                                                    21

IV   SUMMARY OF ARGUMENT                                            22

V    ARGUMENT                                                       23

     A.   THE DISTRICT COURT PROPERLY DENIED CAO'S
          MOTION TO RESCUE THE DISTRICT JUDGES AND
          U.S. ATTORNEY'S OFFICE IN THE SOUTHERN
          DISTRICT OF CALIFORNIA                                    23

          1.   Introduction                                         23

          2.   Standard Review                                      24

          3.   The District Court Applied the Correct Legal
               Standards for Recusal                                25

          4.   The District Court Properly Denied the Motion
               to Recuse All of the District Judges                 26

          5.   The District Court Properly Denied the Motion
               to Disqualify AUSA Owens and the Entire
               U.S. Attorney's Office                               30

     B.   THE DISTRICT COURT PROPERLY ADMITTED
          MULTIPLE ITEMS OF RELEVANT AND HIGHLY
          PROBATIVE EVIDENCE AT TRIAL WERE NOT
          UNFAIRLY PREJUDICIAL                                      35

iii

<u>TOPICAL INDEX</u> (Continued)

                                                                    <u>Page</u>

1.    Introduction                                                   35

2.    Standards of Review                                            36

3.    The Admissibility of Relevant Evidence                         37

4.    The District Court Properly Admitted Relevant
      Evidence That Was Not Prejudicial but Rather
      Established Proof of Cao's Intent and Scheme to
      Defraud His Investors                                          38

      a.    The Goldman Sachs Letters                                41

      b.    The Las Vegas Trip to the Wynn Hotel                     44

      c.    The Louis Vuitton Purchases                              45

      d.    The Breitling by Bentley Watch                           46

      e.    The Bentley Automobile                                   47

      f.    Cao's Email Exchanges With Investors Were
            Relevant Evidence of Cao's Specific Intent and
            His Scheme to Defraud, and Were Not Overly
            Prejudical                                               48

5.    Even if It Was Error to Admit Any or All of the
      Evidence Above, Any Such Error Was Harmless
      Given the Overwhelming Evidence                                49

C.    THE DISTRICT COURT PROPERLY DENIED CAO'S
      MOTION FOR ACQUITTAL BECAUSE THE WIRES
      WERE INCIDENT TO AN ESSENTIAL PART OF CAO'S
      PONZI SCHEME                                                   50

      1.    Introduction                                             50

      2.    Standard of Review                                       50

<u>TOPICAL INDEX</u> (Continued)

<u>Page</u>

3.    Test for Sufficiency of the Evidence    51

4.    Sufficient Evidence Existed for Each Count of Conviction and, in Particular, There Was Sufficient Evidence That the Wires Were Incident to an Essential Part of the Fraud    52

    a.    A Reasonable Juror Find Cao's Use of the Wires to Pay for the Hyatt Meeting Had a Lulling Effect on Investors and Furthered His Ongoing Ponzi Scheme    54

    b.    Contrary to Cao's Claim, His Use of the Wires Is Distinguishable from the Cases He Relies Upon    56

    c.    The Acquittal on Charges Related to the February Investor Meeting Has No Bearing on the Sufficiency of the Evidence Related to the December Investor Meeting    57

D.    THE DISTRICT COURT IMPOSED A PROCEDURALLY PROPER SENTENCE WHERE IT CONSIDERED THE LOCATION OF FUNDS CAO TRANSFERRED OVERSEAS THAT COULD BE USED TO PROVIDE RESTITUTION TO VICTIMS OF CAOS PONZI SCHEME    58

1.    Introduction    58

2.    Standard of Review    58

3.    The District Court Did Not Commit Procedural Error by Affording Cao an Opportunity to Disclose the Location of the Stolen Money That He Wired Overseas    59

v

## TOPICAL INDEX (Continued)

Page

E.    THE DISTRICT COURT IMPOSED A SENTENCE
THAT WAS SUBSTANTIVELY REASONABLE
GIVEN ITS CAREFUL CONSIDERATION OF THE
UNDISPUTED GUIDELINE CALCULATION, § 3553(a)
FACTORS, AND ALL SENTENCING ARGUMENTS
INCLUDING THE EMPIRICAL EVIDENCE
CONCERNING SENTENCES FOR WHITE-COLLAR
CRIMINALS   65

    1.   Introduction   65

    2.   Standard of Review   65

    3.   The District Court Considered, but Rejected Within
Its Discretion, Cao's Arguments Concerning the
Empirical Evidence Concerning Sentences for
White-Collar Criminals   66

VI   CONCLUSION   70

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

CERTIFICATE OF SERVICE

vi

TABLE OF AUTHORITIES

<u>Cases</u>                                                             <u>Page</u>

<u>Arnell v. McAdam,</u>
    2007 WL 2021826 (S.D. Cal. July 10, 2007) (unpublished)    26

<u>Clearwater-Thompson v. Michael A. Grassmueck, Inc.,</u>
    160 F.3d 1236 (9th Cir. 1998)    32, 33

<u>Clemens v. U.S. District Court for the Central District of CA.,</u>
    428 F.3d 1175 (9th Cir. 2005)    25, 27, 28, 29

<u>Cavazos v. Smith,</u>
    132 S. Ct. 2 (2011) (per curiam)    51, 52

<u>Flanagan v. United States,</u>
    565 U.S. 259 (1984)    32

<u>Gall v. United States,</u>
    552 U.S. 38 (2007)    59

<u>Huddleston v. United States,</u>
    485 U.S. 681 (1988)    36

<u>In re Bernard,</u>
    31 F. 3d 842 (9th Cir. 1994)    25

<u>In re Nettles,</u>
    394 F. 3d 1001 (7th Cir. 2005)    27

<u>Jackson v. Virginia,</u>
    443 U.S. 307 (1979)    50, 51, 52

<u>Liteky v. United States,</u>
    510 U.S. 540 (1994)    25

<u>Microsoft Corp. v. United States,</u>
    530 U.S. 1302 (2000)    25

<u>Mistretta v. United States,</u>
    488 U.S. 361 (1989)    66

<u>TABLE OF AUTHORITIES</u> (Continued)

<u>Cases</u>                                                                      <u>Page</u>

Mitchell v. United States,
    526 U.S. 314 (1999)                                             64

Neder v. United States,
    527 U.S. 1 (1999)                                               39

Nichols v. Alley,
    71 F.3d 347 (10th Cir. 1995)                                    27

Parr v. United States,
    363 U.S. 370 (1960)                                             56

People v. Cao,
    2010 WL 2282090 (Cal. App. 4th, June 8, 2010)                    9

Pesnell v. Arsenault,
    543 F.3d 1038 (9th Cir. 2008)                          24, 26-27

Rita v. United States,
    551 U.S. 338, 351 (2007)                                        60

Rodriguez v. Shulman,
    2012 WL 507014 (D.D.C. Feb. 2012) (unpublished)                 30

Schmuck v. United States,
    489 U.S. 705 (1989)                                     52, 53, 55

Taylor v. Hayes,
    418 U.S. 488 (1974)                                             29

United States v. Abel,
    469 U.S. 45 (1984)                                              36

<u>TABLE OF AUTHORITIES</u> (Continued)

<u>Cases</u>                                                                      <u>Page</u>

United States v. Barrington,
    648 F.3d 1178 (11th Cir. 2011)
    <u>cert. denied,</u> 132 S. Ct. 1066 (2012)                              62, 63

United States v. Bernard,
    151 F.3d 1002 (9th Cir. 1988)                                      40, 42

United States v. Blitz,
    31 F.3d 842 (9th Cir. 1994)                                           25

United States v. Bolden,
    353 F.3d 870 (10th Cir. 2003)                               30, 31, 32, 33

United States v. Bonanno,
    852 F.2d 434 (9th Cir. 1988)                                          38

United States v. Booker,
    543 U.S. 220 (2005)                                                   59

United States v. Booth,
    309 F.3d 566 (9th Cir. 2002)                            39, 44, 45, 46, 48

United States v. Brutzman,
    731 F.2d 1449 (9th Cir. 1984)                           39, 45, 46, 47, 48

United States v. Burgum,
    633 F.3d 810 (9th Cir. 2011)                                          67

United States v. Caggiano,
    660 F.2d 184 (6th Cir. 1981)                                       31, 33

United States v. Cantrell,
    433 F.3d 1269 (9th Cir. 2006)                                         65

United States v. Carpenter,
    95 F.3d 773 (9th Cir. 1996)                                           39

<u>TABLE OF AUTHORITIES</u> (Continued)

<u>Cases</u>                                                                                    <u>Page</u>

<u>United States v. Carty</u>,
   520 F.3d 984 (9th Cir. 2008) (en banc)                     59, 66, 67, 68

<u>United States v. Cherer</u>,
   513 F.3d 1150 (9th Cir. 2007)                                            36

<u>United States v. Ciccone</u>,
   219 F.3d 1078 (9th Cir. 2000)                                            38

<u>United States v. Cooley</u>,
   1 F.3d 985 (10th Cir. 1993)                                              26

<u>United States v. Curtin</u>,
   489 F.3d at 935 (9th Cir. 2007) (en banc)                          37

<u>United States v. Curtin</u>,
   588 F.3d at 993 (9th Cir. 2009)                                          63

<u>United States v. Cusino</u>,
   694 F.2d 185 (9th Cir. 1982)                                          38-39

<u>United States v. Day</u>,
   107 F.3d 17 (9th Cir. 1997) (unpublished)                        28, 29

<u>United States v. Derington</u>,
   229 F.3d 1243 (9th Cir. 2000)                                            37

<u>United States v. Dota</u>,
   33 F.3d 1179 (9th Cir. 1994)                                             57

<u>United States v. Easter</u>,
   66 F.3d 1018 (9th Cir. 1995)                                             36

x

TABLE OF AUTHORITIES (Continued)

Cases                                                            Page

United States v. Ebbers,
    458 F.3d 110 (2d Cir. 2006)                                    66

United States v. Edwards,
    235 F.3d 1173 (9th Cir. 2000)                                  36

United States v. Ferguson,
    412 Fed. Appx. 974 (9th Cir. Jan. 27, 2011) (unpublished)      47

United States v. Fernandez,
    231 F.3d 1240 (9th Cir. 2000)                                  30

United States v. Garner,
    663 F.2d 834 (9th Cir. 1981)                                54, 55

United States v. Gallego,
    943 F. Supp. 343 (S.D.N.Y. 1996)                               62

United States v. Gering,
    716 F.2d 615, 622 (9th Cir. 1983)               39, 45, 46, 47, 48

United States v. Gomez,
    426 Fed. Appx. 540 (9th Cir. 2011) (unpublished)              63

United States v. Green,
    592 F.3d 1057 (9th Cir. 2010)                                  38

United States v. Halbert,
    640 F.2d 1000 (9th Cir. 1981)                                  39

United States v. Hasarafally,
    529 F.3d at 125 (2d Cir. 2008)                                 30

United States v. Heldt,
    668 F.2d 1238 (D.C. Cir. 1981)                           31, 33-34

United States v. Hernandez,
    109 F.3d 1450 (9th Cir. 1997) (per curiam)                     25

<u>TABLE OF AUTHORITIES</u> (Continued)

<u>Cases</u>                                                                 <u>Page</u>

<u>United States v. Higuera-Llamos,</u>
        574 F.3d 1206 (9th Cir. 2009)                                        36

<u>United States v. Holland,</u>
        519 F.3d 909 (9th Cir. 2008)                                     25, 26

<u>United States v. Hubbards,</u>
        96 F.3d 1223 (9th Cir. 1996)                                         38

<u>United States v. Inzunza,</u>
        580 F.3d 894 (9th Cir. 2009)                                     50, 51

<u>United States v. Johnson,</u>
        610 F.3d 1138 (9th Cir. 2010)                                        24

<u>United States v. Jones,</u>
        712 F.2d 1449 (9th Cir. 1983)                                    53, 55

<u>United States v. Klock,</u>
        8 Fed. Appx. 620 (9th Cir. Apr. 16, 2001) (unpublished)          28, 29

<u>United States v. Krohn,</u>
        573 F.2d 1382 (10th Cir. 1978)                                   39, 49

<u>United States v. Lane,</u>
        474 U.S. 438 (1986)                                              53, 55

<u>United States v. Lorenzo,</u>
        995 F.2d 1448 (9th Cir. 1993)                                        32

<u>United States v. Manarite,</u>
        44 F.3d 1407 (9th Cir. 1995)                             52, 53, 56, 57

## TABLE OF AUTHORITIES (Continued)

| Cases | Page |
|---|---|
| United States v. Marcial–Santiago, <br> 447 F.3d 715 (9th Cir. 2006) | 67 |
| United States v. Martin <br> 455 F.3d 1227 (11th Cir. 2006) | 66, 67 |
| United States v. Mateo-Mendez, <br> 215 F.3d 1039 (9th Cir. 2000) | 36 |
| United States v. Maze, <br> 414 U.S. 395 (1974) | 52, 56, 57 |
| United Stats v. McNeil, <br> 320 F.3d 1034 (9th Cir. 2003) | 38 |
| United States v. Miller, <br> 676 F.2d 359 (9th Cir. 1982) | 54, 55 |
| United States v. Mix, <br> 457 F.3d 906 (9th Cir. 2006) | 60, 65, 66 |
| United States v. Mueffelman, <br> 470 F.3d 33 (1st Cir. 2006) | 66 |
| United States v. Munoz, <br> 36 F.3d 1229 (1st Cir. 1994) | 44 |
| United States v. Murray, <br> 648 F.3d 251 (5th Cir. 2011), <br> cert. denied, 132 S. Ct. 1065 (2012) | 69 |
| United States v. Nevils, <br> 598 F.3d 1158 (9th Cir. 2010) | 51, 58 |
| United States v. Panthaky, <br> 232 Fed. Appx. 645 (9th Cir. May 1, 2007) (unpublished) | 54, 55 |

<u>TABLE OF AUTHORITIES</u> (Continued)

<u>Cases</u>                                                                            <u>Page</u>

<u>United States v. Pelisamen</u>,
    641 F.3d 399 (9th Cir. 2011)                                     53, 55

<u>United States v. Petters</u>,
    663 F.3d 375 (8th Cir. 2011)                                         69

<u>United States v. Plancarte-Alvarez</u>,
    366 F.3d 1058 (9th Cir. 2004).                                       36

<u>United States v. Prantil</u>,
    764 F.2d 548 (9th Cir. 1985)                                         31

<u>United States v. Rainey</u>,
    2012 WL 1850633 (6th Cir. May 21, 2012) (unpublished)                69

<u>United States v. Ramirez</u>,
    176 F.3d 1179 (9th Cir. 1999)                                        36

<u>United States v. Rangel</u>,
    -- F.3d. --, 2012 WL 2948544 (9th Cir. July 20, 2012)                64

<u>United States v. Reyes- Bosque</u>,
    596 F.3d 1017 (9th Cir. 2010)                                        37

<u>United States v. Romero-Rendon</u>,
    220 F.3d 1159& n.4 (9th Cir. 2000)                                   64

<u>United States v. Rosnow</u>,
    977 F.2d 399 (8th Cir. 1992)                                         33

<u>United States v. Rude</u>,
    88 F.3d 1538 (9th Cir. 1996)                 39, 42, 45, 46, 48, 52, 53, 55

<u>United States v. Rutledge</u>,
    28 F.3d 998 (9th Cir. 1994)                                          61

xiv

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                    <u>Page</u>

<u>United States v. Sampson,</u>
    371 U.S. 75 (1962)                                                52, 55

<u>United States v. Schales,</u>
    546 F.3d 965 (9th Cir. 2008)                                           49

<u>United States v. Sibla,</u>
    624 F.2d 864 (9th Cir. 1980)                                           25

<u>United States v. Silvestri,</u>
    409 F.3d 1311 (11th Cir. 2005)                                         17

<u>United States v. Shipsey,</u>
    363 F.3d 962 (9th Cir. 2004)                                    38, 53, 55

<u>United States v. Snipes,</u>
    611 F.3d 855 (11th Cir. 2010)                                          68

<u>United States v. Spangle,</u>
    626 F.3d 488 (9th Cir. 2010), <u>cert. denied</u>, 132 S. Ct.186 (2011)    27, 60, 61

<u>United States v. Studley,</u>
    783 F.2d 934 (9th Cir. 1986)                                25, 26, 28, 29

<u>United States v. Suarez,</u>
    682 F.3d 1214 (9th Cir. 2012)                                          57

<u>United States v. Sutcliffe,</u>
    505 F.3d 944 (9th Cir. 2007)                                           26

<u>United States v. Treadwell,</u>
    593 F.3d 990 (9th Cir. 2010)                                            4

<u>United States v. Tierney,</u>
    947 F.2d 854 (8th Cir. 1991)                                           32

<u>United States v. Utz,</u>
    886 F.2d 1148 (9th Cir. 1989)                                          42

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                <u>Page</u>

<u>United States v. Vlahos</u>,
    33 F.3d 758 (7th Cir. 1994)                                      31, 33

<u>United States v. Ward</u>,
    760 F. Supp. 2d 480 (D. NJ. 2011)                                28, 29

<u>United States v. Wencke</u>,
    604 F.2d 607 (9th Cir. 1979)                                     33

<u>United States v. Wheeler</u>,
    540 F.3d 683 (7th Cir. 2008)                                     17

<u>United States v. Whittaker</u>,
    268 F.3d 185 (3d Cir. 2001)                                      31

<u>Young v. United States ex rel. Vuitton et Fils S.A.</u>,
    481 U.S. 787, 807 (1987)                                         31, 32, 33

    <u>Constitutions and Statutes</u>

Fifth Amendment                                                            64

18 U.S.C. § 208(a)                                                         31

18 U.S.C. § 1343                                                           2, 3

18 U.S.C. § 1349                                                           2, 3

18 U.S.C. § 3231                                                           2

18 U.S.C. § 3553                                                           66

18 U.S.C. § 3553(a)                                    1, 21, 59, 60, 65, 67, 68

18 U.S.C. § 3553(a)(1)                                                     62

18 U.S.C. § 3553(a)(2)                                                     62

18 U.S.C. § 3553(a)(7)                                                     62

TABLE OF AUTHORITIES

Constitutions and Statutes                                  Page

18 U.S.C. § 3742                                               2

28 U.S.C. § 144                                              25

28 U.S.C. § 455                                             25

28 U.S.C. § 1291                                              2

Regulations

28 C.F.R. § 45.2                                             32

28 C.F.R. § 45.2(d)                                         32

Rules

Fed. R. App. P. 4(b)(1)(A)                                    2

Fed. R. Crim. P. 29                                        50

Fed. R. Evid. 401                                        36, 37

Fed. R. Evid. 402                                        36, 37

Fed. R. Evid. 403                                        36, 38

Miscellaneous

Annotation, What Circumstances Justify Disqualification of Prosecutor
in Federal Criminal Case, 110 A.L.R. Fed. 523 (1992 & Supp. 1997)     31

S. Rep. No. 98-225 (1983) reprinted in 1984 U.S.C.C.A.N. 3185, 3259     67

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | C.A. No. 11-50200 |
| | ) | D.C. No. 10CR2217-LAB |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THANH VIET "JEREMY" CAO, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

I

QUESTIONS PRESENTED

A.   Whether the district court properly denied Cao's motion for recusal of the district judges and U.S. Attorney's Office for the Southern District of California.

B.   Whether the district court properly admitted multiple items of relevant and highly probative evidence at trial that were not unfairly prejudicial.

C.   Whether the district court properly denied Cao's motion for acquittal on the wire fraud counts because the use of the wires was incident to an essential part of Cao's Ponzi scheme.

D.   Whether the district court imposed a procedurally proper sentence where it considered information about funds Cao transferred overseas that could have been used to provide restitution to the victims of Cao's Ponzi scheme.

E.   Whether the district court imposed a substantively reasonable sentence at the low end of the Guideline range given its careful consideration of the undisputed Guideline calculations, the § 3553(a) factors, and all of the sentencing arguments, including the empirical evidence concerning sentences for white-collar criminals.

II

JURISDICTION

A.    BASIS FOR SUBJECT MATTER JURISDICTION
      IN THE DISTRICT COURT

Appellant Thanh Viet "Jeremy" Cao ("Cao") appeals from his conviction and sentence for conspiracy to commit mail and wire fraud and wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343, respectively. The district court had jurisdiction under 18 U.S.C. § 3231.

B.    BASIS FOR JURISDICTION IN THE COURT OF APPEALS

This Court has jurisdiction over appeals from final judgments of the district courts under 28 U.S.C. § 1291. A judgment of conviction in a federal criminal case is a final order subject to appeal under 28 U.S.C. § 1291. Sentences in federal cases are final decisions appealable under 18 U.S.C. § 3742.

C.    THE NOTICE OF APPEAL WAS TIMELY

The judgment was entered on May 19, 2011, and amended to fix a clerical error on January 24, 2012. [ERI 1-15; SER 1-15.][1] The Notice of Appeal was timely filed on May 19, 2011, under Fed. R. App. P. 4(b)(1)(A). [ERII 221.][2]

D.    BAIL STATUS

Cao is currently serving a 360-month custodial sentence. According to the Bureau of Prisons website,[3] his projected release date is December 8, 2036.

---

[1]      "ERI" refers to Cao's Excerpts of Record, Volume I. "SER" refers to Cao's Supplement Excerpts of Record.

[2]      "ERII" refers to Cao's Excerpts of Record, Volume II.

[3]      The Bureau of Prisons website may be accessed at www.bop.gov.

III

<u>STATEMENT OF THE CASE</u>

A.    <u>PRIOR PROCEEDINGS</u>

On June 4, 2010, a federal grand jury for the Southern District of California returned a seven-count criminal Indictment charging Cao with one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, and six counts of wire fraud, in violation of 18 U.S.C. § 1343.  [ERVI 920-26.][4/]

On August 23, 2010, Cao filed pre-trial motions, including a motion to recuse all district judges and prosecutors in this district.  [ERVI 927-42.]  On September 13, 2010, the district court held a hearing and ruled on the pre-trial motions.  [ERVI 948-62.]  During the hearing, the district court heard arguments from counsel and denied Cao's motion for recusal of all the district judges and prosecutors.  [ERVI 949-57.]

The Government presented its case during a three-day trial.  Cao did not present a case.  On December 9, 2010, the jury found Cao guilty of conspiracy to commit mail and wire fraud; and three counts of wire fraud.  [ERV 819-21, 845.][5/]  The jury found Cao not guilty of three counts of wire fraud.  [Id.]

On May 16, 2011, Cao was sentenced to 360 months' custody, followed by 3 years of supervised release, and was ordered to pay restitution to the victims in the amount of $12,408,172.01.  [ERII 216-20.]

This appeal followed.

———————————

[4/]      "ERVI" refers to Cao's Excerpts of Record, Volume VI.

[5/]      "ERV" refers to Cao's Excerpts of Record, Volume V.

B.    STATEMENT OF FACTS

 1.    Introduction

From at least 2005 and continuing up to June 2008, Cao operated a Ponzi scheme[6] using different investment schemes and entities and cheated his victims out more than $19.4 million. [ERIII 268-322, 329-78, 387-454; ERIV 495-522, 528-97, 604-62, 676-725.][7]  Cao touted his financial background with Ameriprise and the National Association of Securities Dealers ("NASD") in a private placement memorandum, omitting the fact that he had been fired by Ameriprise for misconduct and suspended by the NASD. [ERIV 566-67, 572, 577-81; ERV 863-64.][8]  Cao pitched his "guaranteed" investments at investor meetings and at a grand hotel in San Diego in order to lull his victims into a false sense of security and to convince them to entrust him with millions of dollars of their money.  [ERIII 282-84, 306-08, 346-47, 366, 396-97, 442-43; ERIV 610-12.]  Cao promised guaranteed returns, guaranteed principal, investments backed by gold reserves, and enormously high rates of return. [ERIII 270-72, 276-79, 297, 306, 319, 331-37, 341-46, 391-98, 423-25, 434-38, 441-42; ERIV 606-07, 612-14.]

These promises were nothing but lies, and like all Ponzi schemes, the pyramid collapsed.  There was no revenue stream from any of the investments, and Cao simply paid investors' returns with other investors' money. [ERIV 704-05, 718-20.]  When

---

 [6] See generally United States v. Treadwell, 593 F.3d 990, 992-93 n.2 (9th Cir. 2010) (describing the inner workings of a Ponzi scheme).

 [7] "ERIII" refers to Cao's Excerpts of Record, Volume III.

 [8] "ERIV" refers to Cao's Excerpts of Record, Volume IV.

investors began demanding the return of their "guaranteed" investments, Cao became belligerent, mocked investors, and responded with disdain. [ERV 901-03; GSER 3-8.][9/] Rather than investing their money, Cao spent the investors money on a luxury car (Bentley), trips to Las Vegas, expensive jewelry and luggage, and to remodel his parents' home. [ERIV 677-78, 680-90; GSER 50-68.]

        2.    <u>The Crime</u>

            a.    <u>Cao's Financial Background</u>

Cao began his Ponzi scheme in 2005, while he was working at Ameriprise Financial Services ("Ameriprise"), a division of American Express ("AMEX"). Cao began selling shares in a private real estate investment known as Lakeview. [ERIV 554-55, 561-63, 568.] Without authorization, Cao used Ameriprise letterhead to deceive his investors into believing that Ameriprise was backing the Lakeview investment. [ERIV 561-63, 568.] However, Ameriprise did not back Cao's investment. [ERIV 564.]

Cao was verbally suspended by Ameriprise on July 27, 2005. [ERIV 566.] Following an internal investigation, Cao was terminated by Ameriprise on September 29, 2005. [ERIV 567.] Moreover, Cao was suspended for one year and fined $10,000 by the NASD on February 20, 2007, for his unauthorized sale of real estate shares to ten investors for a total of approximately $330,000 while he was working at Ameriprise. [ERIV 580, 584.]

---

[9/]      "GSER" refers to Government's Supplemental Excerpts of the Record.

### b. Cao Continues His Ponzi Scheme

After his termination from Ameriprise in September 2005, Cao told an investor that he had quit Ameriprise in order to devote more of his time to his investment group. [ERIII 389-90.] Thereafter, Cao continued to promote his new investment scams in casino financing ("Northpoint Ventures") and mortgages ("Think Financiers" or "Think"). [ERIII 270-79, 306, 331-34, 388-95, 434-38; ERIV 605-08, ERV 888; GSER 1-2, 13-14, 15-17, 48-49.] Cao recruited more than 170 investors into his Ponzi scheme [PSR 7],[10] including: Cynthia Biggs [ERIII 268-322], Ryan Callo [ERIII 329-69], Amado Baladad [ERIII 369-78], Patricia Ellis [ERIII 387-416], James Quinn [ERIII 416-33], Kimberly Summit [ERIII 433-54], and Emmanuel Cruz [ERIV 604-31]. Investors relied on Cao as their professional financial advisor. [ERIII 321.]

### (1) Lakeview – Real Estate Scam

In 2005, Biggs and Ellis attended investor meetings concerning real estate investments that Cao was promoting. [ERIII 270-73, 388-89.] At one of the meetings, Cao handed his Ameriprise business card to Ellis and told Ellis that she could contact him anytime at the number on the business card. [ERIII 389.] Ellis called Cao at Ameriprise to discuss Lakeview. [ERIII 389.] In September 2005, Biggs and Ellis invested $17,500 and $35,000, respectively, in Lakeview. [ERIII 273, 390-91.] The return from Lakeview would result from the sale of the land in the

---

[10] "PSR" refers to the Presentence Report. The docket shows the PSR was filed under seal with this Court on January 19, 2012.

6

future. [ERIII 275.] The real estate investments provided Cao with enough upfront cash to conduct his Ponzi scheme.

### (2)    Northpoint – Casino Financing Scam

In November 2005, Cao pitched to investors his casino financing scheme known as Northpoint Ventures. [ERIII 270-72, 276-79, 306, 331-34, 391-96, 434-38.] Cao handed out diagrams to investors, which described the casino venture.  [ERIII 276-78, 393-96; GSER 1-2, 13-14.]  In particular, these documents stated that the investment principal was guaranteed and that investors could obtain the return of their principal within ten days. [Id.]  Cao told investors that the rate of return was also guaranteed. [ERIII 333.]  Based upon these promises and guarantees, Biggs, Callo, Ellis, and Summitt invested $25,000, $60,000, $35,000, and $20,000, respectively, in Northpoint. [ERIII 278, 334, 392, 436.]  These investors received alleged returns in the mail and witnessed Cao handing out returns in envelopes with large sums of cash to other investors, making Biggs, Callo, Ellis, and Summit more confident in their investments with Cao. [ERIII 280-81, 335-36, 395, 435.]

### (3)    Think Financiers – Mortgages Scam

In February 2006, Cao pitched another investment in mortgage companies known as Think Financiers. [ERIII 336-37, 397; ERIV 606-07; GSER 15-17.]  The investment involved two companies, Think! Mortgage and Invest America.  [ERII 11; ERIII 336, 397.]  Cao promised astronomical returns ranging from 288% to 338% over five years. [GSER 15-17.]  Cao also promised that the initial investment would be guaranteed and that "worst-case scenario" investors would receive their original

7

money back "any time you please." [Id.; ERIII 336-37, 397; ERIV 606-07.] Based upon these promises and guarantees, Callo, Ellis, Summitt, and Cruz invested $40,000, $10,000, $20,000, and $20,000, respectively, in Think Financiers. [ERIII 337-340, 397, 436; ERIV 608.]

(4)    <u>Cao Spends Investors' Money</u>

On March 6, 2006, Cao purchased a Breitling by Bentley watch for approximately $7,000. [ERIV 677-78; GSER 35-38.] The next day, on March 7, 2006, Cao purchased a custom-made, $200,000 Bentley automobile. [ERIV 680-90; GSER 41-47.] Cao purchased the watch and Bentley with money from bank accounts that contained only investor funds because none of Cao's investments generated any profits or income. [ERIV 696-700, 704-05, 707-10, 717-20.]

Cao drove his Bentley to the investor meetings to create an appearance of success and to lull investors into a false sense of security. [ERIII 346-47, 366, 396-97, 442-43.] After seeing Cao arrive in his new Bentley, investors had more confidence that their investments with him were succeeding. [ERIII 347, 442-43.] In particular, one investor said: "I was very impressed by [the Bentley] because you can't afford a car like that if you're not doing well." [ERIII 442.]

Continuing his appearance of being rich and successful, in April 2006, Cao traveled to Las Vegas and stayed in a luxury suite at the Wynn Hotel. [ERIV 589-97; GSER 39-40.] While staying at the hotel, Cao purchased items from the Louis Vuitton store in the hotel. [ERIV 591; ERV 913-916.]

8

(5)   Fraudulent Goldman Sachs Letters

In September 2006, Cao and Brian Smith communicated by email and created a series of fraudulent letters indicating that the casino investment obtained a $350 million credit line from Goldman Sachs. [ERV 904-12; GSER 18-28.] In the email exchange, Cao joked about which managing director to fraudulently list as the signatory on the letter. [ERV 910 ("How about Colin E. King, waddya think of that one eh?").] However, Goldman Sachs never had a business relationship with Cao nor did they issue a $350 million credit line to Cao or as part of any of his investments. [ERIV 495-503.] Moreover, Colin E. King did not sign the fraudulent letter. [ERIV 501-02; GSER 102-03.]

c.   Cao Threatens to Kill His Business Partner

In 2005, Cao met Anthony Amaradio, who had two start up companies seeking capital – Think! Mortgage and Invest America. [PSR 10; ERII 111 (exhibit containing appellate decision in People v. Cao, 2010 WL 2282090 (Cal. App. 4th, June 8, 2010); ERIII 336, 397; ERIV 705-07.] Cao and Doug Lorenzen, who later received funds from Cao's frozen accounts in violation of a court order [ERIV 701-04], invested $10 million in these two companies. [ERII 111.] Soon after investing the funds, which came from Cao's investors in his Ponzi scheme (Think Financiers), the companies collapsed. [Id.] Between December 2006 and January 2007, Cao threatened to kill Amaradio, his wife and his children unless Amaradio paid him back. [ERII at 111-12.] In one instance, Cao threatened Amaradio by claiming that "the

9

family" had taken "a baby in front of the mother and father" "and chopped it up, then killed the wife in front of the father." [ERII 112.]

    d. Cao's Investment Meetings at the San Diego Hyatt

With the collapse of the Think! investment at the end of 2006, Cao needed to maintain his investors' confidence. On December 8, 2006, investors received an email providing them with details of an investor-only event. [ERV 897-98.] The Hyatt invoices indicated that Cao was hosting an investment celebration on behalf of Northpoint. [GSER 29-32.] Cao paid for the December 2006 investment meeting at the Hyatt with his AMEX card ending 2008. [ERV 535-37; GSER 91-101.]

On December 10, 2006, Cao hosted the investor-only meeting at the Manchester Grand Hyatt in San Diego, California. [ERIV 532-38.] Biggs and Cruz were in attendance. [ERIII 282-84, 306-09; ERIV 610-12.] Both investors were impressed with the lavish hotel, the abundance of food, the numerous investors in attendance, the size of the ballroom, and the professional atmosphere. [id.] During the meeting, Cao gave a presentation to investors. [ERIV 306-08, 611.]

Cao told investors that he did not like what was going on at Think! Mortgage, but did not tell them that he lost their money. [ERIV 306-09, 611, 704-06, 718-20.] Rather, Cao simply told investors that he moved his money out of Think. [ERIV 306-09, 611.] Cao mentioned a new investment opportunity. [See id.]

Cao also passed out hundred-dollar bills to investors. [ERIV 610.] In fact, Biggs' husband answered one of Cao's questions correctly and received a hundred-dollar bill. [ERIII 283, 308.]

Given this setting at the Hyatt meeting, Biggs and Callo had more confidence in their investments and had the impression that their investments with Cao were doing fine. [ERIII 283; ERIV 612.]

In February 2007, Cao held another investment meeting on behalf of Northpoint Ventures at the Manchester Grand Hyatt in San Diego. [ERIV 538-39.] Cao arranged the meeting and used his AMEX card ending 2008 to pay for it. [ERIV 535-37, 539.]

### e.    Arrested for Threatening His Business Partner

On February 12, 2007, Cao was arrested for threatening his business partner in the Think! investment. [ERIV 456; ERII 111.] At Cao's residence, police found computer devices, firearms and body armor. [ERIV 454-62.] State and federal agents searched Cao's computer devices and found evidence of his Ponzi scheme, including emails and fraudulent documents. [ERIV 465-71, 478-95.]

### f.    Cao Continues to Spend Investor Money

Cao's investors in Think Financiers suffered huge losses. [ERIV 705-07.] Despite these losses, Cao continued to use investor money for his own personal benefit. For example, between December 2006 and March 2007, Cao wrote checks from the bank accounts containing investor funds to pay for remodeling his parents' home. [ERIV 715-16, 724-25; GSER 50-68.] Moreover, in January 2007, Cao made checks totaling more than $550,000 payable to himself from bank accounts containing investor funds. [ERIV 697-700, 704-05, 710-711, 718-20; GSER 69-87.]

11

g.    TG Capital Was the End of the Ponzi Scheme

Cao began his pitch for TG Capital at the Hyatt investment meeting in December 2006 when he told his investors he was moving his money from Think into a new investment program. [ERIV 611-12, 627-29.] At several subsequent investor meetings, Cao said that TG Capital was backed by a guarantee from Wells Fargo Bank and that the investment principal and returns would also be guaranteed. [ERIII 297, 319, 341-46, 371-75, 397-98, 423-25, 441-42; ERIV 612-14.]  In fact, one investor noted that Cao used the word "guaranteed" over 20 times when describing the TG Capital investment.  [ERIII 441.]  Cao told investors that TG Capital was backed by gold reserves.  [ERIII 297, 342-43, 373.]  In addition, Cao told his investors that they could invest new capital, roll over their 401(k) and retirement accounts, or "roll" their investments from Think Financiers into TG Capital.  [ERIII 292, 344, 371-73, 398-99, 442.]  However, little did investors know that Cao had already lost their investments in Think and that there truly was no money to "roll" over into TG Capital. [ERIV 704-06, 718-20.]  The Ponzi scheme was on the verge of collapse. [Id.]

Cao told his investors that there was a website where investors could learn more about TG Capital. [ERIII 284-85, 398, 425, 440-41.]  Several investors visited the website and downloaded the investment prospectus, or the Private Placement Memorandum ("PPM"). [ERIII 285, 398, 425, 440-41.]  The PPM contained several false and fraudulent statements.  First, it claimed that the TG Capital investment was "guaranteed by the assets of the company, a bank guarantee, and 99.9% graded, certified gold held in reserve."  [ERV 847.]  Next, it claimed investors would earn

12

monthly returns of 2%, quarterly returns of 6.5%, and annual returns of 28%. [ERV 860.] The PPM also stated that the investment would be guaranteed by a bank-issued bank guarantee. [Id.] Most importantly, the PPM provided that:

> TG Capital has formed a strategic alliance with the investment banking divisions of Wells Fargo Bank and UBS in the United States. Therefore, funds from the United States will be issued with a bank guarantee from Wells Fargo Bank or UBS. Attached, as Appendix B, is a letter from Wells Fargo Bank, stating its intent to work with TG Capital, LLC.

[ERV 860.] Despite all of these statements by Cao about bank guarantees and gold, none of it was true. UBS did not have a banking relationship or a strategic alliance with Cao, TG Capital, or any of Cao's investments. [ERIV 503-08, 711.] Wells Fargo does not issue bank guarantees, and therefore, neither had a strategic alliance nor had it issued such a guarantee to Cao, TG Capital, or any of Cao's entities. [ERIV 631-41, 710-11.] In fact, the letter from Wells Fargo was fake because it did not contain the correct logo and it was not in the correct form. [ERIV 637.] Finally, there was no gold held in reserve. [ERIV 710-11.]

Without knowing that Cao had deceived them, investors rolled over money from retirement accounts, "rolled" over their investments from Think, and invested new funds in TG Capital. [ERIII 292, 344, 371-73, 398-99, 443.] In particular, Biggs, Callo, Baladad, Ellis, and Summit invested $100,000, $100,000, $10,000, $10,000, and $20,000, respectively in TG Capital. [ERIII 292, 345, 373, 399, 443.] Quinn and Cruz had invested $100,000 and $20,000 with Cao, respectively. [ERIII 420; ERIV 608.] While Quinn and Cruz learned about TG Capital, neither one invested. [ERIII 423-26; ERIV 614-15.]

13

h.    Overseas Transfers of TG Capital Funds

On April 4, 2007, Cao sent a wire transfer in the amount of $1.78 million to a bank in Hong Kong. [ERIV 712.]  These funds came from Cao's investors. [ERIV 712.]  That same day, Cao transferred an additional $720,000 from investor money to a bank account in San Francisco.  [ERIV 713-14.]

i.    Cao Confesses to Investigators

When Wells Fargo received a copy of the bogus letter addressed to Cao that was part of TG Capital from one of its customers, investigators became suspicious and contacted law enforcement. [ERIV 650; ERV 885.]  On April 10, 2007, Detective Morel interviewed Cao to discuss the bogus Wells Fargo letter associated with TG Capital. [ERIV 650.]  Cao told investigators he was the principal decision-maker at TG Capital. [ERIV 651.] Cao confessed that Wells Fargo was not backing the TG Capital investment. [ERIV 654.]  Cao admitted that he had created the fake Wells Fargo letter. [ERIV 654.]  However, Cao said that he lost his laptop. [ERIV 652.]  Cao claimed that the Wells Fargo logo on the letter accidentally ended up on his website. [ER 655.]  Later during the interview, Cao admitted that his laptop had actually been seized by police. [ER 653.]

j.    Cao Notifies Investors of a New Guarantee

After admitting the Wells Fargo letter was a fraud, on April 15, 2007, Cao provided a letter to investors notifying them that Wells Fargo no longer guaranteed their investment in TG Capital.  [ERV 887.]  Rather, Cao claimed a bank in Indonesia (Bank Negara Indonesia, or BNI) had issued a $3 million bank guarantee.  [ERIII 373-

14

74; ERV 886, 887.] However, the BNI Bank Guarantee that was provided to investors was also a fraud. [ERIV 508-22; ERV 886.] Unlike an official BNI Bank Guarantee, the bank confirmed that Cao's certificate was not authentic, was not in the proper bank form, and contained numerous misspellings. [ERIV 511-22.]

In the April 15, 2007 letter, Cao also informed investors that he was cooperating with a government investigation to ensure that "none of the managers or members of TG Capital, LLC have an illegal source of funding." [ERV 887.] Cao told his investors that he was "available 24 hours per day, 7 days per week to talk to each individual investor with any questions." [Id.]

### k.  Accounts Frozen and Bentley Seized

On May 22, 2007, the Securities and Exchange Commission (SEC) filed a complaint against Cao, and his bank accounts were frozen. [PSR 4.] Despite the freeze, Cao violated the court order and distributed investor proceeds to select individuals who assisted Cao with his fraudulent investments and to remodel his parents' home. [ERIV 701-04.]

In May 2007, law enforcement obtained seizure warrants for Cao's Bentley. [ERIV 655; PSR 4, 5.] In June 2007, they activated the tracking system and discovered that the Bentley was not at Cao's residence. [ERIV 656-57; PSR 5.] Rather, the Bentley had been transferred to someone else in San Diego. [ERIV 658-60, 662.] Law enforcement located and seized the Bentley. [ERIV 658-60.]

15

l.     Cao Responds With Hostility to His Investors

Around the time that his Bentley was seized, on June 15, 2007, Cao sent his investors a letter that informed them about the government investigation, and advised them that they had legal rights in these "frivolous legal proceedings."  [ERV 891.] Cao told investors that he hoped he could "count on their cooperation as you've counted on me these past years."  [Id.]

When investors began demanding the return of their "guaranteed investments," Cao became hostile.  [ERV 901-902, 903; GSER 3-8.]  Contrary to Cao's "available any time" claim, he responded to their demands with mocking emails, expletives and disdain.  [ERV 887, 901-02, 903; GSER 3-8.]  In an email exchange with an investor asking "Where's our Money?," Cao responded using the F-word. [GSER 3-8.]

Despite being promised the return of his "guaranteed" investment in ten days, Cruz, about a year later, still had not received his investment, but received an email update from Cao.  [ERV 899-901.]  In the email, Cao mocked Cruz by calling him a "TURTLE," telling him to have one of Cao's letters translated if he did not understand it, and daring him to put a lawsuit together against him.  [Id.]  Cao, referring to himself as the "RABBIT," spewed profanities at Cruz claiming "that will help to better your feelings."  [Id.]  Cao's promises were nothing but lies.

Finally, in May 2008, Cao emailed Quinn and mocked him by sarcastically telling him that he must know everything and suggesting that Quinn, too, hire an attorney and file a lawsuit against him.  [ERV 903.]

16

Cao used these mocking and expletive-filled emails to conceal the truth that Cao had lost and spent a substantial portion of the investors' money. [ERIV 719-20.] Of the $19.4 million invested in Cao's Ponzi scheme, he distributed approximately $4.2 million back to investors. [ERIV 720.] At the time the SEC froze the 40 or so bank accounts, there was only $4.7 million left in the accounts. [Id.] Thus, the investors lost more than $10 million from Cao's fraud. [Id.]

m.     Cao Retaliates Against Judges and Prosecutors

In retaliation for the seizure of his Bentley and the criminal investigation into his Ponzi scheme, Cao filed bogus liens against U.S. District Judges Dana M. Sabraw and Anthony J. Battaglia and prosecutors in the U.S. Attorney's Office in June 2008. [ERII 129-31.] Cao was subsequently charged in a criminal action by the Tax Division in the District of Nevada for filing the false liens. [ERII 145-50.]

n.     Receiver Appointed to Take Over Cao's "Businesses"

On June 25, 2008, the district court handling the SEC complaint appointed a receiver to seize assets and take control of Cao's entities that were used to further his Ponzi scheme. [ERIV 695-700.][11/] Robert Ericson ("Receiver") worked for the law firm appointed as the Receiver and identified Cao's entities and their alleged investment purposes. [ERIV 696-98; G-SER 48-49.] The Receiver traced investor

---

[11/]     A receiver is a neutral party, often an attorney, who is appointed by a court to seize assets and take control of entities in lawsuits in which there are allegations of mismanagement or fraud. See generally United States v. Silvestri, 409 F.3d 1311, 1322 (11th Cir. 2005); United States v. Wheeler, 540 F.3d 683, 692 (7th Cir. 2008). The receiver is tasked with the job of gathering and protecting assets under the court's supervision. See id. The purpose of the receivership is to bring all assets derived from the alleged fraud into the custody and control of the court. See id.

17

funds through the bank accounts, as there were no accounting records, and identified over 40 accounts controlled by Cao. [ERIV 698-700.] None of Cao's investments or entities generated a positive revenue stream. [ERIV 705.] Moreover, there was over $2 million in losses from Think Financiers. [ERIV 706.] The Receiver did not identify any other assets other than the money in the bank accounts – there were no gold reserves, no bank guarantees, and no credit line with Goldman Sachs. [ERIV 711.] Given the lack of any income or positive revenue identified in the businesses, only investor funds were deposited into Cao's bank accounts. [ERIV 704-05, 710-11, 718-20.] The Receiver traced Cao's use of investor funds to purchase personal items and pay for his AMEX card ending 2008. [Id.]

o.     Cao Is Indicted for His Ponzi Scheme

After an investigation by state and federal agents, a federal grand jury in the Southern District of California, indicted Cao on one count of conspiracy and six counts of wire fraud on June 4, 2010. [ERVI 920-28.]

3.     Motions of Significance to This Appeal

a.     Motion to Recuse the District Judges and
        U.S. Attorney's Office for Objective Bias

(1)     Defense Pleadings

On August 23, 2010, Cao moved to recuse all the district judges and prosecutors in the Southern District of California. [ERVI 930-34.] First, Cao claimed that because he filed liens against two of the district judge's colleagues that the district judge assigned to his case, the Honorable Larry A. Burns, should have recused himself

18

to avoid the appearance of bias. [ERVI 930-32.] Second, Cao contended that because he filed a lien against one of the prosecutor investigating this case that not only should that prosecutor be recused but that the entire U.S. Attorney's Office should also be recused to avoid the appearance of impartiality. [ERVI 932-34.]

(2)     Government Response

On September 6, 2010, the Government filed its response and opposition and argued that Cao's attempt to use his false lien scam to remove all judges and prosecutors in this district from this case lacked merit. [ERVI 944-47.] The Government contended that should Cao recuse an entire court by filing of false liens, then he could "readily manipulate the system by threatening every jurist on the 'wheel' until [Cao] gets a judge he preferred." [ERVI 945 (citation omitted).] Moreover, the Government argued that recusal of an entire U.S. Attorney's Office was a drastic measure, and a ruling that permitted Cao to pick and choose his prosecutor by simply filing false liens against them is the type of criminal gamesmanship regularly rejected by the courts. [ERVI 946-47.]

(3)     Hearing

The district court held a motion hearing on September 13, 2010. [ERVI 948-79.] The district court denied Cao's motion to recuse all the judges in this district noting that "a litigant that is so inclined [to file bogus liens against one judge] could do that and effect the recusal of an entire bench." [ERVI 950-54.] The district court referred to the reasonable person standard several times throughout its findings, set forth its lack of bias toward Cao, and concluded that recusal was not warranted.

19

[Id.]  In turning to the motion to recuse all the prosecutors in the U.S. Attorney's Office, the district court recognized that recusing the entire U.S. Attorney's Office was rare and implicated separation of powers. [ERVI 955-56.] The court noted that the liens were filed while the investigation was ongoing and therefore appeared to be "reactionary or preemptory [sic]." [ERVI 957.]  Therefore, the district judge denied the motion to recuse the entire U.S. Attorney's Office. [ERVI 956-57.]

### 4. Jury Trial and Verdict

From December 7, 2010, through December 9, 2010, the United States presented its evidence of Cao's Ponzi scheme to the jury.  During the trial, Cao objected to the admission of several items of evidence on relevancy grounds. [ERIII 379-8; ERIV 523-26, 598-600.]  The district court overruled all of Cao's relevancy objections. [Id.] On December 9, 2010, after several hours of deliberations, the jury found Cao guilty of one count of conspiracy to commit mail and wire fraud and three counts of wire fraud.  [ERV 819-21, 845.]  The jury also found Cao not guilty of three counts of wire fraud. [Id.]

### 5. Sentencing

#### a. Recommendations

##### (1) The PSR

The probation officer determined that the applicable advisory Guideline sentencing range was between 360 months and life in prison.  [PSR 18.]  The probation officer recommended that Cao be sentenced to 480 months in prison, followed by 3 years of supervised release.  [PSR 20-21.]

20

(2)     Defense

In his sentencing memorandum, Cao described his history and characteristics, the need for the sentence imposed, the kinds of sentences available, and did not dispute the advisory Guidelines' calculated by the probation officer.  [ERII 66-92.] In particular, Cao presented his empirical evidence arguments concerning the Guidelines. [ERII 78-90.]   Cao requested a sentence of 120 months in prison. [ERII 90.]

(3)     Government

The Government submitted its sentencing memorandum discussing its concurrence with the probation officer's advisory Guideline calculations and its interpretations of the relevant sentencing factors.   The Government requested a sentence of 480 months' custody, followed by 3 years of supervised release, and a restitution order in the amount of $12,408172.01.  [ERII 93-168.]

b.     Hearing

On May 16, 2011, the district court held a sentencing hearing.  [ERII 169-220.] After hearing arguments from counsel and considering the probation reports, advisory guidelines, arguments of counsel, and the § 3553(a) factors, the district court sentenced Cao to 360 months' custody, followed by 3 years of supervised release, and entered a restitution order in the amount of $12,408172.01.  [ERII 216-20.]

21

IV

SUMMARY OF ARGUMENT

Cao first argues the district court abused its discretion when it denied his motion to recuse the district judges and the U.S. Attorney's Office in the Southern District of California. It did not. The district court applied the proper objective standard and concluded that recusal of the entire bench, the assigned prosecutors, and the entire U.S. Attorney's Office was not warranted.

Second, Cao contends that the district court abused its discretion when it admitted certain evidence, namely fraudulent letters, luxury purchases and trips, and emails sent to investors. These arguments lack merit. The district court is accorded a wide discretion in determining the admissibility of evidence. The district court properly balanced the probative value of the evidence against any danger of unfair prejudice. The evidence was probative of Cao's specific intent and scheme to defraud and was not unfairly prejudicial. Thus, the district court did not abuse its discretion in admitting this evidence.

Third, Cao argues that the district court improperly denied his motion for acquittal because the wires charged in the Indictment were not essential to the scheme to defraud. This argument fails. The wires need only be incident to an essential part of the scheme or be a step in the plot. The Government proved that Cao's use of interstate wires to pay for the lavish investor meeting at the Hyatt in December 2006 had a lulling effect on his investors and furthered his ongoing Ponzi scheme. In fact, when the evidence is viewed in the light most favorable to the prosecution, a rational

22

trier of fact could have found the essential elements of Cao's conspiracy and wire fraud beyond a reasonable doubt. The motion for acquittal was properly denied.

Fourth, Cao contends that district court committed procedural error by treating Cao's refusal to disclose the location of the missing investor money as an aggravating factor at sentencing. It did not. The district court properly considered the relevant sentencing factors, including the need to provide restitution to victims, which the location of the missing money would have achieved. By attempting to ascertain the location of the missing money, the district court did not place an impermissible burden on Cao. Thus, there was no procedural error at his sentencing.

Finally, Cao argues that his sentence is substantively unreasonable because it was based on empirically deficient assumptions and failed to avoid unwarranted sentencing disparities. These arguments also lack merit. The district court properly calculated the undisputed Guideline range and applied the relevant sentencing factors in arriving at the sentence imposed. Thus, the sentence was reasonable.

V

ARGUMENT

A.  THE DISTRICT COURT PROPERLY DENIED CAO'S MOTION TO RECUSE THE DISTRICT JUDGES AND U.S. ATTORNEY'S OFFICE IN THE SOUTHERN DISTRICT OF CALIFORNIA

    1.  Introduction

Cao's first contention is that the district court erred when it denied his motion to recuse the district judges, Assistant U.S. Attorney John B. Owens ("AUSA Owens"), and the entire U.S. Attorney's Office in the Southern District of California

23

("U.S. Attorney's Office"). [AOB 27-34.][12] Cao argues that the district judge applied the wrong legal standard when analyzing the recusal motion. [AOB 28-29.] Cao also contends that the court erred by not recusing the district judges, the prosecutors, and the entire U.S. Attorney's Office in the Southern District of California. None of these contentions have merit. The record is clear that the district court applied the correct, objective "reasonable person" standard. In deciding the issue, the district court properly denied the motion to recuse itself because a litigant could simply recuse an entire bench by simply filing false liens against one of the judges. The court also determined that a reasonable person would not perceive any appearance of bias. Moreover, the district judge recognized that recusing AUSA Owens and an entire U.S. Attorney's Office implicates separation of powers and almost always results in reversible error. Such a disqualification should only occur in the rarest of cases. The district judge properly determined that this was not such a case.

      2.   <u>Standard of Review</u>

The district court's denial of a recusal motion is reviewed for an abuse of discretion. <u>United States v. Johnson</u>, 610 F.3d 1138, 1147 (9th Cir. 2010) (citing <u>Pesnell v. Arsenault</u>, 543 F.3d 1038, 1043 (9th Cir. 2008)).

---

[12]    "AOB" refers to Appellant Cao's Opening Brief.

3.    The District Court Applied the Correct
Legal Standards for Recusal

Recusal is governed by 28 U.S.C. §§ 144 and 455.  This Court has held that the "substantive standard for recusal under §§ 144 and 455 is the same: "[W]hether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."  United States v. Hernandez, 109 F.3d 1450, 1453-54 (9th Cir. 1997) (per curiam) (quoting United States v. Studley, 783 F.2d 934, 939 (9th Cir. 1986)).  This is an objective inquiry made from the perspective of a reasonable observer who is fully informed "of all the surrounding facts and circumstances."  Microsoft Corp. v. United States, 530 U.S. 1302, 1302 (2000); see also United States v. Holland, 519 F.3d 909, 914 (9th Cir. 2008) ("The reasonable third-party observer is not a partly informed man-in-the-street but rather someone who understands all the relevant facts and has examined the record and law.") (internal quotations omitted).  In other words, the reasonable person in the recusal context means, "a well-informed, thoughtful observer as opposed to a hypersensitive or unduly suspicious person."  Clemens v. U.S. District Court for the Central District of Ca., 428 F.3d 1175, 1178 (9th Cir. 2005) (citations and internal quotations omitted). Recusal motions "must be decided by the very judge who impartiality is being questioned."  In re Bernard, 31 F.3d 842, 843 (9th Cir. 1994) (citing United States v. Sibla, 624 F.2d 864, 868 (9th Cir. 1980)).  The inquiry covers a judge's interests, relationships, biases, or prejudices and requires them "to be evaluated on an objective basis."  Liteky v. United States, 510 U.S. 540, 548 (1994).

Here, Cao contends that the district court applied the wrong standard for recusal because it used the phrases "get the shaft" and "could not get a fair trial." [AOB 28-29.] This argument lacks merit. The district court was well-aware of the applicable standard to be applied. See, e.g., Arnell v. McAdam, 2007 WL 2021826 (S.D. Cal. July 10, 2007) (unpublished) (U.S. District Judge Larry A. Burns summarized the objective standard applied to recusal motions). During the motion hearing, the district court repeatedly referred to and applied the objective, reasonable person standard. [ERVI 952-54.] Cao contends that the standard should be broadly construed given the district judge's comments [AOB 28-29], however, that contention has been rejected. Holland, 519 F.3d 909, 913 ("The standard 'must not be so broadly construed that it becomes, in effect presumptive so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." (citing United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993)). The record is clear in this case – the district judge applied the correct objective "reasonable person" standard when he analyzed Cao's recusal motion.

4. The District Court Properly Denied the Motion to Recuse All of the District Judges

Turning to the merits of recusal, a district judge is not disqualified by a litigant's civil suit or threatened suit against him or by a litigants "intemperate and scurrilous attacks." Studley, 783 F.2d at 940 (citations omitted); United States v. Sutcliffe, 505 F.3d 944, 953 (9th Cir. 2007) (finding no abuse of discretion in denying recusal motion where trial judge allegedly made hostile remarks); Pesnell v.

26

Arsenault, 543 F.3d 1038, 1044 (9th Cir. 2008) (recusal of judge not warranted where litigant failed to establish bias outside the judicial proceeding and failed to demonstrate any "deep-seated favoritism that would make fair judgment impossible"); United States v. Spangle, 626 F.3d 488, 496 (9th Cir. 2010), cert. denied, 132 S. Ct.186 (2011) (holding that it was "imperative that we not allow defendants to 'manipulate the system' by threatening every jurist on the 'wheel' until the defendant gets the judge he prefers.") (citations omitted)); Clemens, 428 F.3d at 1180 (no reasonable observer could draw an inference that a threat against three judges results an appearance of bias for the entire bench).

In Clemens, the defendant was charged with threatening three district judges in the Central District of California. 428 F.3d at 1177. The defendant's case was set before another district judge in the Central District of California and the defendant moved to disqualify all the judges and the prosecutors in the district. Id. The district judge assigned to the case denied defendant's motion for recusal. Id. In applying the objective standard, this Court distinguished the defendant's case from Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995) (the bombing of the Oklahoma City federal building) and In re Nettles, 394 F.3d 1001, 1002-03 (7th Cir. 2005) (bomb plot involving the federal courthouse). The Court held that Nichols was different because the judge's personal chambers had been damaged by the explosion. Clemens, 428 F.3d at 1179 (citations omitted). Similarly, the Court distinguished Nettles by holding that recusal of all judges was required because the defendant was charged with planning to bomb the building in which all of the district bench had chambers.

27

Clemens, 428 F.3d at 1179 (citations omitted).  The Court recognized that "[w]here other circuits have required recusal, the recused judge was an intended victim of the alleged crime."  Id.  However, in Clemens, no such allegation existed, either toward the assigned judge or the entire bench.  Id.  The Court concluded that:

> We have previously rejected an attempt to disqualify a judge based on his relationship with the victim. . . . Given that mandatory disqualification of a single judge is not warranted simply because of a professional relationship with a victim, it follows perforce that disqualification of an entire district is not justified except under highly exceptional circumstances, which are not present in this case.

Clemens, 428 F.3d at 1179-80.

The filing of a lien against a judge is not a sufficient basis for recusal.  Studley, 783 F.3d at 940 ("the mere fact that [the judge] may be one of numerous federal judges that [the plaintiff] has filed suit against is not sufficient to establish that her recusal from his case is warranted"); United States v. Klock, 8 Fed. Appx. 620, 621 (9th Cir. Apr. 16, 2001) (unpublished) (applying the rule in Studley to liens filed against a judge's property); United States v. Day, 107 F.3d 17 (9th Cir. 1997) (unpublished) (where a group affiliated with defendant filed liens against the district judge, the Court rejected defendant's arguments for recusal); United States v. Ward, 760 F. Supp. 2d 480, 484 (D. NJ. 2011) (where defendant filed a commercial lien in Florida against a district judge in New Jersey, the district court denied the recusal motion because the filing of a suit against a judge by a litigant is not a sufficient basis for recusal).

This case is similar to <u>Clemens</u>, <u>Studley</u>, <u>Klock</u>, <u>Day</u> and <u>Ward</u>. Cao filed bogus liens against two district judges in the Southern District of California after they became involved in the seizure of his Bentley and during the ongoing investigation into his Ponzi scheme. [ERII 129-31, 147-48.] Even though the district judge assigned to Cao's case has a professional relationship with the two judges against whom Cao filed liens, that is an insufficient basis for recusal of the entire bench. The district court properly denied Cao's recusal motion.

Cao attempts to compare his case to those of the courthouse bombings in Oklahoma and the fatal shooting of a district judge in Arizona. [AOB 29-31.] However, the cases cited by Cao are not similar to the facts of his case. In this case, Cao did not attempt to bomb the courthouse where the district judge worked nor did he attempt to kill one of the district judge's colleagues. Rather, Cao simply obstructed justice by filing civil lawsuits involving bogus liens against two judges who were involved in the seizure of Cao's Bentley. [PSR 4, 5; ERII 129-31, 147-48; ERIV 655.] More importantly, Cao filed the bogus liens in another district, namely, the District of Nevada. [ERII145-50.] The district judge assigned to this case did not preside over the seizure warrant nor did he receive one of Cao's bogus liens.

In this case, no reasonable person would find an appearance of bias in light of the district judge's statement that he did not feel the need to vindicate his colleagues interests. [ERVI 952.]; <u>see</u> <u>Taylor v. Hayes</u>, 418 U.S. 488, 501 (1974) (recognizing it is the rarest of circumstances where events in the courtroom embroil a judge into a controversy that there is a likelihood of bias or an appearance of bias that the judge

29

was unable to hold the balance between vindicating the interests of the court and the interests of the accused).

For all of these reasons, the district judge did not abuse his discretion in denying the motion to recuse all the judges in this district.

5.  The District Court Properly Denied the Motion to Disqualify AUSA Owens and the Entire U.S. Attorney's Office

Next, Cao contends that the district court committed error by failing to disqualify AUSA Owens. [AOB 31-37.][13] Moreover, since AUSA Owens was the Criminal Chief overseeing all of the prosecutors in the U.S. Attorney's Office, Cao claims the district court erred by not disqualifying the entire office. [AOB 33-34.] None of these arguments have merit. Disqualifying the entire United States Attorney's Office is "a drastic measure and a court should hesitate to impose it except where necessary." United States v. Bolden, 353 F.3d 870, 878 (10th Cir. 2003) (citation omitted); United States v. Hasarafally, 529 F.3d 125, 128 (2d Cir. 2008) ("[w]hile a private attorney's conflict of interest may require disqualification of that attorney's law firm in certain cases, such an approach is not favored when it comes to the office of a United States Attorney, or, a fortiori, to the Department of Justice as a whole"). Disqualification has occurred in only extreme circumstances. See, e.g.,

_____

[13] While Cao cites to the U.S. Attorney's Manual ("USAM") in support of his argument for recusal, this Court has held that "a failure of a United States Attorney's Office to comply with Chapter 3-2.170 of the Manual provides no basis upon which Plaintiffs could bring a motion to disqualify." Rodriguez v. Shulman, 2012 WL 507014 (D.D.C. Feb. 16, 2012) (unpublished) (citing United States v. Fernandez, 231 F.3d 1240, 1246 (9th Cir. 2000)). As such, Cao's reliance on the USAM has no bearing on the merits of this appeal or his recusal motion.

Bolden 353 F.3d at 876 ("only rarely-if ever-imagine a scenario in which a district court could properly disqualify an entire United States Attorney's office"); Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 807 (1987) (actual conflict of interest because appointed prosecutor also represented another party) (plurality) (Brennan, J.); United States v. Heldt, 668 F.2d 1238, 1275 (D.C. Cir. 1981) (bona fide allegations of bad faith performance of official duties by government counsel in a civil case); United States v. Prantil, 764 F.2d 548, 552-53 (9th Cir. 1985) (prosecutor who will act as a witness at trial). Every circuit court that has considered the disqualification of an entire U.S. Attorney's Office has reversed the disqualification. Bolden, 353 F.3d at 879 (citing United States v. Whittaker, 268 F.3d 185 (3d Cir. 2001), United States v. Vlahos, 33 F.3d 758 (7th Cir. 1994), United States v. Caggiano, 660 F.2d 184 (6th Cir. 1981)).

There is very little case law concerning the recusal or disqualification of a prosecutor due to an alleged "conflict of interest." See generally, Annotation, What Circumstances Justify Disqualification of Prosecutor in Federal Criminal Case, 110 A.L.R. Fed. 523 (1992 & Supp. 1997); see also 18 U.S.C. § 208(a) (government employee may not participate in matter in which she or spouse has a financial interest); 28 C.F.R. § 45.2 (prohibiting Justice Department employee from participating in a prosecution if he or she has a personal relationship with anyone with "a specific and substantial interest that would be directly affected by the outcome of

31

the investigation or prosecution").[14]  Whatever the standard for recusal is, it "require[s] a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists." Young, 481 U.S. at 811. See also United States v. Tierney, 947 F.2d 854, 864-86 (8th Cir. 1991) (following Young plurality).

Disqualifying an entire United States Attorney's Office implicates separation of powers issues. Bolden, 353 F.3d at 876 (citing Flanagan v. United States, 565 U.S. 259, 268–69 (1984)).  Given the separation of powers issues, "disqualifying an entire United States Attorney's office is almost always reversible error."  Id. "Further, because disqualifying government attorneys implicates separation of powers issues, the generally accepted remedy is to disqualify 'a specific Assistant United States . . . , not all the attorneys in' the office."  Bolden, 353 F.3d at 879 (citation omitted). While the generally accepted remedy is to disqualify a specific Assistant United States Attorney, the mere appearance of impartiality is insufficient grounds for prosecutorial disqualification.  See United States v. Lorenzo, 995 F.2d 1448, 1453 (9th Cir. 1993) (holding that the appropriate standard requires a showing of actual prejudice to disqualify an entire U.S. Attorney's Office); Bolden, 353 F.3d. at 879.

Here, Cao relies upon two cases where the civil attorney was also charged with being the "prosecutor" for the criminal contempt proceeding. [AOB 31-34 (relying on Clearwater-Thompson v. Michael A. Grassmueck, Inc., 160 F.3d 1236 (9th Cir. 1998); Young v. United States ex rel. Vuitton et Fils, 481 U.S. 787 (1987).] These

---

[14]  Section 45.2 "is not intended to create rights enforceable by private individuals or organizations." See 28 C.F.R. § 45.2(d).

cases are distinguishable from this case. In contrast to Clearwater and Young, AUSA Owens was only responsible for prosecuting the criminal fraud case involving Cao's Ponzi scheme. Neither AUSA Owens nor the U.S. Attorney's Office prosecuted Cao for filing the false liens. [ERII 95, 126-143, 145-150.] Rather, the Tax Division handled that matter out of the District of Nevada [ERII 145-50], and there is no allegation that AUSA Owens or the U.S. Attorney's Office had a financial interest in Cao's case. [AOB 31-34.] A ruling that permits a defendant to pick and choose his prosecutor or the U.S. Attorney's Office by committing additional illegal actions is simply nonsensical. Not surprisingly, courts regularly reject this criminal gamesmanship. See, e.g., United States v. Wencke, 604 F.2d 607, 611 (9th Cir. 1979) ("There is no authority which would allow a defendant to disqualify a government attorney by merely alleging potential civil litigation. Similarly, threatening to file a grievance with a bar association against a United States Attorney does not constitute a conflict of interest requiring disqualification."); United States v. Rosnow, 977 F.2d 399, 411 (8th Cir. 1992) (AUSA not disqualified even though defendants filed bogus lawsuits against AUSA); see also Bolden, 353 F.3d at 876, 879 (reversing decision to disqualify entire U.S. Attorney's Office); United States v. Vlahos, 33 F.3d 758, 763 n. 5 (7th Cir. 1994) (same); United States v. Caggiano, 660 F.2d 184, 191 (6th Cir. 1981) (same). AUSA Owens did not have conflicting duties. Thus, the holdings in Clearwater and Young do not apply to this case.

Disqualification is not required simply because a prosecutor in the office, or the office itself, is the victim of a bogus lien or a civil lawsuit. See Heldt, 668 F.2d at

1276 n.80 (noting that "[t]he potential conflict of interest that might result from a personal civil suit filed against an [AUSA] by a defendant in a criminal case for acts undertaken by the AUSA in his official capacity in the criminal matter would have to be very strong before disqualification would be justified . . . [and] would require proof, by clear and convincing evidence, of a <u>prima facie</u> case of misconduct on the part of the AUSA.").

Here, there is great irony in the fact that Cao sought recusal as a remedy for a "conflict" he himself created. The district court was correct not to reward Cao for his own misdeeds. If recusal was appropriate in this case, then Cao could ostensibly preclude any other U.S. Attorney's Office or AUSA from prosecuting his case by continuing to file bogus liens against them. Nevertheless, there is no basis in the law for Cao's request. The case law is clear – only the most extraordinary circumstances would justify the removal of an AUSA and an entire U.S. Attorney's Office from a case. The district court properly found that this was not such an extraordinary case. Any perceived "conflict" between Cao and AUSA Owens or the U.S. Attorney's Office was created by Cao when he filed a bogus lien against AUSA Owens.

Cao has provided nothing more than generalized allegations that a "conflict" existed. [AOB 31-34.] While Cao attempts to argue that statements made by prosecutors to the probation officer concerning Cao's dangerousness and their fear of retaliation demonstrate bias [AOB 33 (citing PSR 5)], such statements show nothing of the sort. Rather, the prosecutors' statements were supported by Cao's own <u>known</u> belligerent and obstructionist conduct – that is, Cao's threats of violence that

34

he made to a business partner and his family [ERII 110-15]; Cao's contempt for the court [ERII 122-25, 151-55, 156-57]; and Cao's retaliation, after the seizure of his Bentley, by filing false liens against AUSA Owens, other prosecutors, federal and state agents, and U.S. District Judges Dana M. Sabraw and Anthony J. Battaglia (who was a magistrate judge when the lien was filed). [ERII 95, 126-55.] Such misguided claims and generalizations of bias are wholly unfounded and inadequate to disqualify AUSA Owens or the entire U.S. Attorney's Office.

The overwhelming weight of authority counsels against disqualification of AUSA Owens and the entire U.S. Attorney's Office in this case. Thus, the district court properly denied Cao's recusal motion.

B.   THE DISTRICT COURT PROPERLY ADMITTED MULTIPLE ITEMS OF RELEVANT AND HIGHLY PROBATIVE EVIDENCE AT TRIAL THAT WERE NOT UNFAIRLY PREJUDICIAL

1.   Introduction

Cao's second contention is that certain evidence admitted at trial was not relevant and was overly prejudicial. In particular, Cao contests the admission of: (1) evidence of a series of fraudulent Goldman Sachs' letters found on his computer; (2) a trip to a luxurious Las Vegas hotel; (3) purchases of various luxury items, including Louis Vuitton merchandise and a Breitling by Bentley watch; (4) purchase of a $200,000 Bentley automobile; and (4) inflammatory emails written by Cao responding to investor requests for return of their "guaranteed" investments. To the contrary, this evidence had the tendency to make the existence of a fact of consequence, namely Cao's specific intent to defraud his investors and the existence

35

of Cao's scheme to defraud, more probable than it would be without the evidence. None of this evidence was overly prejudicial under Rule 403. And even had the district court erred in admitting this evidence, such error was harmless given the overwhelming evidence of Cao's guilt presented at trial.

###### 2. Standards of Review

A trial court's decision to admit or exclude evidence under Rules 401, 402, and 403 is reviewed for an abuse of discretion. United States v. Cherer, 513 F.3d 1150, 1157 (9th Cir. 2007); United States v. Mateo-Mendez, 215 F.3d 1039, 1042 (9th Cir. 2000) (holding that questions of the admissibility of evidence that involve factual determinations, rather than questions of law, are reviewed for an abuse of discretion); United States v. Plancarte-Alvarez, 366 F.3d 1058, 1062 (9th Cir. 2004). The district judge is given wide latitude and discretion in determining the admissibility of evidence and determining whether to exclude evidence by balancing the prejudicial effect against its probative value. See United States v. Abel, 469 U.S. 45, 54 (1984); Huddleston v. United States, 485 U.S. 681, 687-88 (1988); United States v. Easter, 66 F.3d 1018, 1021 (9th Cir. 1995); United States v. Higuera-Llamos, 574 F.3d 1206, 1209 (9th Cir. 2009) (balancing under Rule 403). Such rulings will be reversed for an abuse of discretion only if such non constitutional error more likely than not affected the verdict. United States v. Edwards, 235 F.3d 1173, 1178 (9th Cir. 2000); United States v. Ramirez, 176 F.3d 1179, 1182 (9th Cir. 1999).

Where a party fails to object at trial below, review is for plain error. To show plain error, a complaining appellant must show that there was: "(1) error; (2) that is

plain; and (3) that affects substantial rights." <u>United States v. Reyes-Bosque</u>, 596 F.3d 1017, 1032-33 (9th Cir. 2010) (citation omitted). Finally, if the complainant meets those three conditions, this Court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." <u>Reyes-Bosque</u>, 596 F.3d at 1032-33.

If evidence is improperly admitted, reversal is appropriate only if the error was not harmless. <u>United States v. Derington</u>, 229 F.3d 1243, 1247 (9th Cir. 2000). "Harmless error analysis focuses upon the likely impact of trial error in the context of what actually happened at trial . . . If, on the record as a whole, consideration by the jury of evidence for that purpose would not have likely changed its decision, then the error was harmless." <u>Id.</u>

### 3.    The Admissibility of Relevant Evidence

All relevant evidence is admissible. Fed. R. Evid. 402. Relevant evidence is "evidence having <u>any</u> tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). "To be 'relevant,' evidence need not be conclusive proof of a fact sought to be proved, or even strong evidence of the same. All that is required is a 'tendency' to establish the fact at issue." <u>United States v. Curtin</u>, 489 F.3d 935, 943 (9th Cir. 2007) (en banc). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

>    4.    The District Court Properly Admitted Relevant Evidence
>          That Was Not Prejudicial but Rather Established Proof
>          of Cao's Intent and Scheme to Defraud His Investors

Here, the Indictment charged Cao with conspiracy and wire fraud. [ERVI 920-926.] The elements of a conspiracy to commit mail and wire fraud are: (1) there was an agreement between two or more persons to commit at least one crime as charged in the indictment; (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it, and (3) the defendant acted with the intent to defraud. United States v. Bonanno, 852 F.2d 434, 440-41 (9th Cir. 1988) (citations omitted) (wire fraud conspiracy); United States v. Hubbards, 96 F.3d 1223, 1227 (9th Cir. 1996) (mail fraud conspiracy).

The elements of wire fraud are: "a scheme to defraud, use of the wires in furtherance of the scheme, and the specific intent to defraud." United Stats v. McNeil, 320 F.3d 1034, 1040 (9th Cir. 2003).  To convict a person of wire fraud, the United States must prove that the accused participated in a scheme to defraud and used the wires to further the scheme.  See United States v. Green, 592 F.3d 1057, 1064-67 (9th Cir. 2010); United States v. Shipsey, 363 F.3d 962, 971 (9th Cir. 2004).

A scheme to defraud requires specific intent and a material misrepresentation or material omission.  Id. at 1064-65; see also United States v. Ciccone, 219 F.3d 1078, 1082 (9th Cir. 2000). The specific intent required relates only to the intent to defraud, not the causing of the wire transmission.  See, e.g., United States v. Cusino,

694 F.2d 185, 188 (9th Cir. 1982). Intent to defraud can be proved through circumstantial evidence. United States v. Booth, 309 F.3d 566, 575 (9th Cir. 2002) (citation omitted). Moreover, materiality is an essential element of the crime of wire fraud. Neder v. United States, 527 U.S. 1 (1999). Materiality of statements or promises must be established. United States v. Halbert, 640 F.2d 1000, 1007 (9th Cir. 1981). Materiality is a question of fact for the jury. United States v. Carpenter, 95 F.3d 773, 776 (9th Cir. 1996). However, success of the scheme to defraud is immaterial. United States v. Rude, 88 F.3d 1538, 1547 (9th Cir. 1996); United States v. Utz, 886 F.2d 1148, 1150-51 (9th Cir. 1989).

This Court has held that the misuse of investor funds for personal use is probative of both the fraudulent nature of the scheme and intent to defraud. Booth, 309 F.3d at 575 (holding that defendants who represented to clients that their investments were refundable but promptly spent the money on themselves was probative of the fraud and intent); Rude, 88 F.3d at 1549 n.10 ("[T]he government may, in a fraud case, prove that the defendants did not use the funds obtained for their intended purpose."); United States v. Brutzman, 731 F.2d 1449, 1452 (9th Cir. 1984) ("The misuse of the funds directly established the fraudulent nature of the scheme."); United States v. Gering, 716 F.2d 615, 622 (9th Cir. 1983) (in a prosecution for mail fraud, defendant's testimony that investor's money was spent for another purpose was probative since an integral part of the fraudulent scheme was defendant's misuse of investor funds); United States v. Krohn, 573 F.2d 1382, 1386-89 (10th Cir. 1978) (holding that misuse of investor funds by defendants to pay their own personal living

39

expenses was probative of fraudulent intent and the existence of the fraudulent scheme).

To establish the misuse of investor funds, an analysis of bank records is relevant to prove how the defendant spent the investor's money. United States v. Blitz, 151 F.3d 1002, 1007-09 (9th Cir. 1988) (holding that the bank records went to a central issue of the wire fraud – the existence of the scheme to defraud). In Blitz, the Court acknowledged that the bank records revealed that a great deal of money flowed into defendant's account, while very little was paid out to customers. Id. at 1007. The Court held that these records "had some tendency to show the fraudulent nature of [the defendant's] telemarketing scheme." Id.

Here, the Government used a multitude of witnesses and documentary evidence to prove to the jury that Cao engaged in a scheme to defraud his investors, that Cao had the specific intent to defraud his investors, and that Cao used or caused to be used interstate wire transmissions in furtherance of his scheme. [ERIII 268-471; ERIV 476-725.] Among the relevant evidence used to prove these elements, the Government introduced a series of fake Goldman Sachs Letters and emails associated with the generation of those letters. [ERV 904-12; GSER 18-28.] The Government also introduced evidence that Cao misused investor funds for his own personal benefit, namely, a trip to Las Vegas, purchases of luxury items, and the purchase of a $200,000 Bentley automobile. [ERIV 589-97, 641-48, 677-78, 680-90, 696-720; GSER 35-47.] Finally, the Government introduced a series of emails containing

Cao's reaction to investors' requests for return of their supposed "guaranteed" investments. [ERV 901-03; GSER 3-8.]

The district court admitted this evidence as probative of Cao's fraudulent scheme and intent to defraud. Cao contends that none of the evidence was relevant. [AOB 34-51.] Cao also argued that this evidence should have been excluded because it was overly prejudicial. [Id.] None of Cao's arguments have merit.

### a. The Goldman Sachs Letters

Cao claims that the Goldman Sachs letters had a low probative value because they were not shown to anyone. [AOB 38-43.] But the district court admitted the evidence because it was found on Cao's computer, which he possessed at the time of his arrest in February 2007. [ERIII 454-71; ERIV 476-95; ERV 904-12; GSER 18-28.] The district court reasoned that Cao's possession of the letters was probative of his intent to defraud. [ERIV 523-26.] The district court was correct.

The Goldman Sachs letters were relevant because the progression of these letters and their supporting emails between Cao and Brian Smith tended to show that Cao and Smith were involved in a conspiracy to defraud the investors in the casino venture (Northpoint). [ERV 904-12; GSER 18-28.] The letters and emails discuss fraudulently placing the name of different Goldman Sachs executives as signatories on the letter. [Id.] Moreover, the letters were found on Cao's computer, where other fraudulent documents also related to his Ponzi scheme were uncovered. [ERIV 478-95.] The letters were probative of Cao's scheme to defraud.

41

The progression of Goldman Sachs letters was also probative of Cao's specific intent to defraud his investor because these letters were part of the Northpoint Ventures investment and contained the same false promises of high-yield returns with unrealistically low risk and guaranteed principal, which is the same as Cao's investments in Think Financiers and TG Capital. [ERV 847-85; GSER 1-2, 13-17.] In fact all of these investments were part of one Ponzi scheme. See Rude, 88 F.3d at 1549-50. Moreover, the conduct involving the Goldman Sachs letters occurred in between Cao's investments in Lakeview and Think, but just prior to the collapse of Think and Cao's pitch to investors of TG Capital. [See supra Section III.B.2.b.] Given the timing of this evidence and similarities of guaranteed principal and returns, this evidence was highly probative of Cao's scheme to defraud and his intent to defraud. None of Cao's arguments demonstrate that the probative value of the Goldman Sachs letters was substantially outweighed by the danger of unfair prejudice. Blitz, 151 F.3d at 1008-09 (emphasis added).

Even assuming these letters were not shown to investors, the success of the wire fraud is not necessary to establish the probative nature of this evidence. Rude, 88 F.3d at 1547; United States v. Utz, 886 F.2d 1148, 1150-51 (9th Cir. 1989). Given that the fraudulent Goldman Sachs letters were found on Cao's computer, which also contained Cao's admittedly fraudulent Wells Fargo letter and Private Placement Memorandum [ERIV 478-95], one could also reasonably conclude that the existence of these fraudulent letters was probative of Cao's intent and his scheme to defraud his investors. Rude, 88 F.3d at 1547. While Cao argues that there was no proof that the

42

Goldman Sachs letters were shown to investors, this argument is contradicted by Cao's suggestion to Brian Smith that he should sign the letter and mail it out. [ERV 911.] In fact, Cao emailed Brian Smith attaching the final version of the Goldman Sachs letter and told him to: "Print it out at your nearest FedEx Kinko's, sign it and send it out." [ERV 911.] Contrary to Cao's claim, this evidence tends to show that this letter was sent out at Cao's direction. Nevertheless, Cao was free to argue his inference to the jury, and therefore, his contention goes to the weight of the evidence, not its admissibility.

Even if the letter was not shown to investors, it was probative of Cao's intent to defraud because it was part of a pattern of conduct that was inextricably intertwined with Cao's Ponzi scheme – that is, Cao used these fake letters to deceive investors into believing a major financial institution backed Cao's investments. It began with Cao's unauthorized use of Ameriprise letterhead during the sales of the Lakeview investment. [ERIV 563-64.] Then, there was Cao's unauthorized use of Wells Fargo, UBS, and Bank Negara Indonesia to sell his investment in TG Capital. [ERIV 503-22, 631-41.] The unauthorized use of Goldman Sachs during the sales of the casino venture (Northpoint) was part of these badges of fraud and directly connected to his Ponzi scheme. [ERIV 495-503.] This evidence was clearly probative of Cao's intent and fraudulent scheme.

Despite Cao's contention, the admission of the Goldman Sachs letters and the testimony of the Goldman Sachs executive were not unfairly prejudicial. [AOB 42-43.] The Goldman Sachs letters were part of the casino venture (Northpoint) and part

43

of Cao's Ponzi scheme. [ERIII 276-78, 393-96; ERV 904-12; GSER 18-28.] The progression of the letters with Brian Smith makes the existence of Cao's scheme to defraud his investors more probable and was powerful evidence establishing Cao's specific intent to accomplish his fraud. This kind of prejudice – damage done to the merits of the defense case – is not the kind of "unfair" prejudice that Rule 403 is concerned with. See United States v. Munoz, 36 F.3d 1229, 1233 (1st Cir. 1994) ("The damage done to the defense is not a basis for exclusion; the question under Rule 403 is one of 'unfair' prejudice-not of prejudice alone.") (internal quotation marks omitted). Thus, the district court did not abuse its discretion in admitting the progression of the Goldman Sachs letters.

>     b.     The Las Vegas Trip to the Wynn Hotel

Cao objected to the admission of the evidence concerning his stay in an 1800 square foot suite at the Wynn Hotel in Las Vegas in April 2006, which occurred during his operation of his Ponzi scheme. [ERIV 589-97.] The district court admitted the evidence subject to the Government linking the payment for the expenses to investor funds. [ERIV 598-600.] Cao claims the Government failed to link the payments. He is incorrect.

In Booth, this Court held that evidence of the defendant's misuse of investor funds for his own personal use, such as airplanes and trips to Las Vegas, was probative of fraudulent intent. 151 F.3d at 1007-09. Similarly, the district court in this case found that the evidence of Cao's personal use of investor funds for personal use (such as a trip to Las Vegas) was probative of his fraudulent scheme. [ERIV 598-

44

600.] Contrary to Cao's contention, the Government properly linked the spending at the Las Vegas hotel to investor funds through the testimony of the Receiver who was responsible for identifying and tracing the assets associated with Cao's fraudulent investment programs. [ERIV 697-700, 705-11, 718-20.] The Receiver testified that there was no positive revenue stream or income identified from any of Cao's investments. [ERIV 697-700, 705-07, 718-20.] After taking over, no one came forward and claimed to be in possession of any missing profits or income from Cao's investments. [ERIV 707.] Therefore, the jury drew the logical inference that all the money in the bank accounts used to pay Cao's personal expenses came directly from investor funds. [ERIV 697-700, 705-11, 718-20.] There was no unfair prejudice to the admission of this evidence. [GSER 39-40.] Rather, this evidence was properly admitted as probative of the fraud and Cao's intent. <u>Booth</u>, 309 F.3d at 575; <u>Rude</u>, 88 F.3d at 1549 n.10; <u>Brutzman</u>, 731 F.2d at 1452; <u>Gering</u>, 716 F.2d at 622.

### c. The Louis Vuitton Purchases

Cao also objected on relevance grounds to the admission of the evidence concerning his multiple purchases of expensive items from Louis Vuitton, many of which were bought at the Wynn Hotel in Las Vegas. [ERIV 641-48; ERV 913-16.] The district court admitted the evidence subject to linking the purchases to investor funds. [ERIV 697-700, 705-11, 718-20.] Like the payment of the Wynn hotel, the Receiver established that the only funds in Cao's possession belonged to investors. [ERIV 697-700, 705-11, 718-20.] Many of the purchases made at Louis Vuitton occurred after Cao was fired by Ameriprise on September 29, 2005, and devoted

himself to his investment group. [ERIII 309; ERIV 567; ERV 913-16.] Thus, the Government properly linked the purchases to investor funds, and therefore, the evidence was properly admitted as probative of the fraud and Cao's intent. Booth, 309 F.3d at 575; Rude, 88 F.3d at 1549 n.10; Brutzman, 731 F.2d at 1452; Gering, 716 F.2d at 622.

### d.    The Breitling by Bentley Watch

Cao contends that the evidence of the Breitling by Bentley watch was irrelevant, cumulative, and prejudicial to his defense. [AOB 46-47.] However, Cao did not object to the admission of this evidence at trial. [ERIV 677-78.] Moreover, Cao did not even cross-examine the witness regarding his testimony. [ERIV 680.] Thus, the admissibility of the evidence of Cao's purchase of the Breitling by Bentley watch for $7,079.18 on March 6, 2006, which was the day before he paid for his Bentley automobile, should be reviewed only for plain error. There was no plain error.

Cao purchased the Breitling watch the day before he paid for his Bentley and charged it to his AMEX card ending 2008. [ERIV 677-78; GSER 35-47.] The Receiver testified that the AMEX card ending 2008 was paid with investor funds that were transferred between several bank accounts controlled by Cao. [ERIV 697-700, 705-10.] Moreover, the Receiver confirmed that none of Cao's investments generated any profits or positive revenue streams. [ERIV 705-11, 718-20.] Therefore, the money in the bank accounts used to pay the AMEX card was investor money. The use of investor money to purchase the watch was probative of Cao's intent to defraud and of his scheme to defraud. Thus, the Government sufficiently linked Cao's purchase

of this $7,079.18 watch to investor money.  Booth, 309 F.3d at 575; Rude, 88 F.3d at 1549 n.10; Brutzman, 731 F.2d at 1452; Gering, 716 F.2d at 622.  For all of these reasons, it was no abuse of discretion --and certainly no plain error -- for the district court to admit this relevant (and not objected to) evidence.

>        e.        The Bentley Automobile

Cao did not object to the admission of the Bentley purchase in the district court.  Cao claims that he did not do so because he believed it would be subject of the forfeiture allegation. [AOB 47-48.][15/]  This argument is nonsensical.  Similar to the watch, the admission of the Bentley evidence should be reviewed for plain error.

Cao used his Bentley to lull investors into believing he was rich and successful.  Several investors testified that after seeing Cao driving his Bentley, they each believed he was successful and it gave them more confidence in their investments with him.  [ERIII 346-47, 366, 396-97, 442-43.]  This was relevant evidence.  See, e.g., United States v. Ferguson, 412 Fed. Appx. 974 (9th Cir. Jan. 27, 2011) (unpublished) (defendant based his Ponzi scheme on appearing rich and successful and used Hawaii trip to lull investors; after the trip, investors gave defendant thousands of dollars).

Cao purchased the Bentley with a cashier's check for $197,769.48 drawn on an account that contained only investor funds. [ERIV 687, 697-700, 705-07, 709-11, 717-20.]  In addition, Cao charged $1,412.86 to his AMEX card ending in 2008 to pay

---

[15/]        Given that the Receiver had control over the assets of Cao's Ponzi scheme, the Government did not need to pursue the forfeiture allegation.  [ERIV 694-700.]  The Bentley had been forfeited in 2008.  [See United States v. Bentley Flying Spur Sedan 2006 et al., 07CV2100-DMS-AJB, filed in the Southern District of California.]

for the Lojack system, which was activated to seize the car. [ERIV 688; GSER 46-47.] Again, the Received established that the funds in the bank accounts used to pay the AMEX card ending 2008 were derived solely from investors. [ERIV 697-700, 705-11, 717-20.] Thus, the Government properly linked the purchase of the Bentley to investor funds, and therefore, the evidence was properly admitted as probative of the fraud and Cao's intent. <u>Booth</u>, 309 F.3d at 575; <u>Rude</u>, 88 F.3d at 1549 n.10; <u>Brutzman</u>, 731 F.2d at 1452; <u>Gering</u>, 716 F.2d at 622

Cao knew how important his Bentley was to his appearance of success, that when he was served with the warrant for its seizure, he transferred the Bentley to another party in San Diego. [ERIV 655-62; PSR 4-5.] Cao's attempt to hide his Bentley from authorities after they had legal process to seize it made the fact of its purchase more probative of Cao's fraudulent intent.

      f.    Cao's Email Exchanges With Investors Were Relevant Evidence of Cao's Specific Intent and His Scheme to Defraud, and Were Not Overly Prejudicial

Cao contends that the Government introduced the email exchanges between Cao and his investors to inflame the passions of the jury and for an improper purpose. [AOB 49-51.] This is incorrect. The Government introduced these emails to establish Cao's fraudulent intent and state of mind indicating that he knew he had cheated his investors, lied to them about the "guaranteed" investments, and deceived them into believing that they could receive their "guaranteed" principal back at anytime. In fact, Cao mocked his investors daring them to file lawsuits and calling them names. [ERV 901-03; GSER 3-8.] Moreover, when another investor simply asked for return of his

investment, Cao launched expletives at him. [GSER 3-8.] Cao's verbal assault on his investors was an attempt to intimidate and bully them in order to perpetrate his scheme. These emails were highly probative of Cao's fraudulent intent and the existence of his scheme to defraud.

Cao's contention that the Government admitted this evidence to inflame the jury is simply untrue and unsupported by the record. These emails were relevant, and on balance, their admission was not error. Krohn, 573 F.2d at 1389 (holding that while a racial remark made by defendant could have impacted the jury's attitude, the government did not introduce it for that purpose; the remark was highly probative of the defendant's fraudulent intent and his state of mind that he knew the victim had been duped).

> 5.  Even if It Was Error to Admit Any or All
> of the Evidence Above, Any Such Error Was
> Harmless Given the Overwhelming Evidence

Even if the admission of any of the Goldman Sachs letters, the Las Vegas trip, the luxury item purchases, the Bentley, and the emails constituted error, that error was harmless. Given the overwhelming evidence of Cao's guilt, the testimony of the victims, banks, and law enforcement officers concerning Cao's long-term Ponzi scheme, and the Receiver's tracing and analysis of the investor funds and lack of any profits or assets associated with Cao's alleged investment programs, Cao has failed to establish that any of these items of evidence more likely than not affected the verdict in this case. See United States v. Schales, 546 F.3d 965, 976 (9th Cir. 2008) (defendant must establish that erroneously admitted evidence more likely than not

49

affected the verdict, otherwise the admission of the evidence is harmless error). Even

if it were error for the district court to admit this evidence, that error was harmless.

### C. THE DISTRICT COURT PROPERLY DENIED CAO'S MOTION FOR ACQUITTAL BECAUSE THE WIRES WERE INCIDENT TO AN ESSENTIAL PART OF CAO'S ONGOING PONZI SCHEME

#### 1. Introduction

Cao's third contention is that the wires charged in the Indictment were not an

essential part of the scheme to defraud. [AOB 53.] That, however, is not the law.

The wire need not be essential to the success of the scheme to defraud; it needs to be

incident to an essential part of the scheme or a step in the plot. That standard was met

here because the Hyatt meeting in December 2006 was used by Cao to continue his

appearance of being rich and successful, to cover up his failures, to pitch his next

investment scheme, to lull victims into a false sense of security, to maintain investor

confidence in their existing investments, and ultimately, to prevent the collapse and

discovery of his ongoing Ponzi scheme.

#### 2. Standard of Review

When the defendant has made a motion for acquittal under Rule 29, the

standard of review for determining the sufficiency of the evidence "is whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable

doubt." United States v. Inzunza, 580 F.3d 894, 899 (9th Cir. 2009) (quoting Jackson

v. Virginia, 443 U.S. 307, 319 (1979)). This Court reviews de novo the denial of a

motion for acquittal.  Id.  (citing United States v. Tucker, 133 F.3d 1208, 1214 (9th Cir. 1998)).

### 3.     Test for Sufficiency of the Evidence

In Jackson, the Supreme Court established a two-part test for considering a challenge to the sufficiency of the evidence.  443 U.S. at 319.  First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution.  Id.; see also United States v. Nevils, 598 F.3d 1158, 1164-65 (9th Cir. 2010) (en banc) (holding that in addressing the sufficiency of the evidence, the reviewing court may not construe evidence in a manner favoring innocence rather than in a manner favoring the prosecution).    Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.  Jackson, 443 U.S. at 319. While review is de novo, the Supreme Court recently made it clear that "it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from the evidence.  A reviewing court may set aside a jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury," viewing the evidence in a light most favorable to the government.  Cavazos v. Smith, 132 S. Ct. 2, 3 (2011) (per curiam).  Jackson "unambiguously instructs that the reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer

51

to that resolution.'" <u>Cavazos</u>, 132 S. Ct. at 6 (citing <u>Jackson</u>, 443 U.S. at 326)). The Government does not need to rebut all reasonable interpretations of the evidence nor rule out every hypothesis. <u>Id.</u> at 326. It is not the role of the reviewing court to decide whether the Government's theory was correct. <u>Cavazos</u>, 132 S. Ct. at 7.

> 4. Sufficient Evidence Existed for Each Count of Conviction and, in Particular, There Was Sufficient Evidence That the Wires Were Incident to an Essential Part of the Fraud

Cao only challenges the sufficiency of whether the Government proved that the AMEX wires were incident to an essential part of the fraudulent scheme. [AOB 51-62.] But, the use of the wires need not be an essential part of the scheme. <u>See</u> <u>Rude</u>, 88 F.3d at 1544 (quoting <u>Schmuck v. United States</u>, 489 U.S. 705, 710 (1989)). It is sufficient for the wire to be "incident to an essential part of the scheme" or "a step in [the] plot." <u>Rude</u>, 88 F.3d at 1544 (quoting <u>Schmuck</u>, 489 U.S. at 710). The wires may be caused by someone other than the defendant, or may be routine in the ordinary course of business. <u>See</u> <u>id.</u>

A wire may be in furtherance of the fraudulent scheme if it was meant to lull investors or would have furthered an ongoing fraud. <u>See</u> <u>United States v. Manarite</u>, 44 F.3d 1407, 1412-13 (9th Cir. 1995) (citing Supreme Court case law). In a lulling scheme, the use of the wires may be incident to an essential part the scheme when such use "lull[s] victims into a false sense of security, postpone[s] their ultimate complaint to the authorities, and therefore make[s] the apprehension of the defendants less likely." <u>Manarite</u>, 44 F.3d at 1412-13 (quoting <u>United States v. Maze</u>, 414 U.S. 395, 403 (1974)); <u>cf.</u> <u>United States v. Sampson</u>, 371 U.S. 75, 77-80 (1962) (defendant

obtained money after making lavish promises and mailed letters to lull victims into believing defendant would perform all services promised); United States v. Lane, 474 U.S. 438 (1986) (mailings occurring after the receipt of money or property obtained by fraud are within the statute if they are designed to lull the victims into a false sense of security); United States v. Jones, 712 F.2d 1449, 1320-21 (9th Cir. 1983) (finding a classic lulling scheme where investors relied on mailings as demonstrating investments doing well and that they made a good investment); Rude, 88 F.3d at 1544 (money returned to the victim by wire transfer created the impression that the victim was earning an immediate, substantial return on its investment, as promised by the defendants, and lulled victim into a false sense of security). In a lulling scheme, an event associated with the use of the wires "reassures the victim that all is well, discouraging him from investigating and uncovering the fraud." See Jones, 712 F.2d at 1321.

Moreover, in an ongoing fraud, use of the wires may be incident to an essential part of the scheme when such use is for the purpose of gaining the trust of investors, facilitating additional transactions, and preventing detection by occurring prior to the scheme reaching fruition. Manarite, 44 F.3d at 1413 (citing Schmuck, 489 U.S. at 711-12); United States v. Pelisamen, 641 F.3d 399, 409-10 (9th Cir. 2011) (wire transfer setting up bank account was essential to advancing the fraudulent scheme); United States v. Shipsey, 363 F.3d 962, 972 (9th Cir. 2004) (wire fraud had not reached fruition when defendant sent fraudulent requests to the bank); United States v. Panthaky, 232 Fed. Appx. 645 (9th Cir. May 1, 2007) (unpublished) (mailings that

53

encouraged lenders to provide "new infusions of funds that allowed the pyramid scheme to continue" were in furtherance of the ongoing fraud); United States v. Miller, 676 F.2d 359, 362 (9th Cir. 1982) (mail fraud not complete until copies of deed mailed in ordinary course of business to establish ownership of property); United States v. Garner, 663 F.2d 834, 838 (9th Cir. 1981) (telephone calls made in furtherance of the ongoing wire fraud).

>   a.   A Reasonable Juror Could Find Cao's Use of the Wires to Pay for the Hyatt Meeting Had a Lulling Effect on Investors and Furthered His Ongoing Ponzi Scheme

Immediately before the Hyatt meeting in December 2006, Cao had suffered huge losses in Think Financiers. [ERIV 705-07, 718-20.] Had Cao failed to keep his investors' spirits high and on his side, they would have demanded the return of their "guaranteed" principal, and reported the fraud to authorities. Instead, the investor meeting at the Hyatt was lavish, with plenty of food and with Cao handing out hundred-dollar bills – an illusion that the investments were successful. [ERIII 282-84, 306-09; ERIV 610-12.] More importantly, Cao deceived his investors at the meeting by telling them he was taking his money out of Think Financiers and "rolling it" into a new investment program. [ERIII 306-09; ERIV 611.] Cao told his investors that they could "roll" their investments, too. [Id.] However, as the Receiver noted, there was no money to "roll" into this new investment because the money from Think Financiers had been lost. [ERIV 705-07, 718-20.] And while the law does not require these wires to be an essential part of the scheme, their impact resulted in several investors continuing their interest to learn about this new investment program,

which was later identified as TG Capital. [ERIII 283, 292, 306-09, 345, 373, 399, 443; ERIV 610-12.] There is no doubt that with investor confidence high after the lavish investor meeting at the Hyatt, Cao was able to obtain investor funds for TG Capital. [Id.]

Similar to Schmuck, Sampson, Lane, Jones, and Rude, the Hyatt meeting was meant to lull investors and reassure them that all was well with their investments. Cao designed the meeting to lull investors into a false sense of security because Cao had not told them that he had lost millions in Think. Instead, Cao told investors he was taking his money out of Think and that investors could do the same. By "rolling" their investments into a new opportunity, Cao prevented investors from uncovering his fraud and postponed their ultimate complaint to authorities. Moreover, Cao staged the Hyatt event at a lavish hotel with an abundance of food and the opportunity to receive hundred-dollar bills in an effort to convince investors that his investment programs were profitable and that they invested in legitimate businesses. In fact, Cao's investment meeting had a "lulling effect" because the investors that attended invested additional funds with Cao and agreed to "roll" their investments from Think into TG Capital. See Lane, 474 U.S. at 453-54. Thus, Cao's payment for the Hyatt meeting furthered his fraudulent scheme.

Similar to Schmuck, Pelisamen, Shipsey, Panthaky, Miller, and Garner, Cao's fraud was ongoing when he paid for the investment meeting at the Hyatt in December 2006. With the collapse of Think, Cao's ongoing Ponzi scheme (i.e., Lakeview, Northpoint, and Think) was on the verge of being uncovered. Cao needed more

55

investor money to gain investor trust and facilitate future investments in order to maintain payments of the promised returns. The meeting was designed to encourage investors to continue their investments with Cao. Therefore, Cao paid for the Hyatt event to continue his ongoing fraud, prevent its detection, and pitch his new investment opportunity – TG Capital.

In sum, a rational jury, viewing the evidence in the light most favorable to the prosecution, could conclude that the charges used to pay for this lavish investor meeting was incident to an essential part of the Cao's ongoing scheme to defraud.

> b. Contrary to Cao's Claim, His Use of the Wires Is Distinguishable From the Cases He Relies Upon

While Cao relies on Parr and Maze to contend that the wires in this case were not essential, these cases are not on point. [AOB 55-56 (citing Parr v. United States, 363 U.S. 370 (1960); United States v. Maze, 414 U.S. 395 (1974)).] As discussed above, the wires in this case served a function different from the mailings in Parr and Maze. The credit card invoice mailings in Parr and Maze involved nothing more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss. In contrast, a jury could rationally conclude that the credit card charges at the Hyatt were an essential step in the successful continuation of his Ponzi scheme and in lulling investors into a false sense of security.

Moreover, unlike Manarite, Cao's Ponzi scheme was ongoing at the time of the wire transmissions. See 44 F.3d at 1413. Cao's fraud began at Ameriprise with the

56

unauthorized sale of an alleged real estate deal and continued through his pitch of TG Capital. Moreover, Cao sought to gain the trust of his investors at the December meeting, and to facilitate additional investments in his new scheme – TG Capital. Cao used the lavish meeting at the Hyatt to continue to reap the rewards of his scam. Moreover, unlike Maze and Manarite, in which the after-the-payoff mailing was far from furthering the ongoing fraud, but was more likely to unravel it, Cao's use of his AMEX card to pay for the Hyatt investment meeting, where he pitched his next investment opportunity, was intended to further his ongoing Ponzi scheme.

> c. The Acquittal on Charges Related to the February Investor Meeting Has No Bearing on the Sufficiency of the Evidence Related to the December Investor Meeting

The jury acquitted Cao of the wire fraud charges associated with Cao's investment meeting in February 2007. [ERV 845.] Cao claims that this proves that these Hyatt meetings were not essential to the fraud. [AOB 60-62.] However, this claim lacks merit. None of the investors who testified at trial had attended Cao's investment meeting at the Hyatt in February 2007. In contrast, two investors – Biggs and Cruz – testified and provided details concerning the Hyatt meeting that they attended in December 2006. [ERIII 282-84, 306-09; ERIV 610-12.] With regard to sufficiency of the evidence, each count is analyzed independently, without regard to consistency of the verdicts on different counts. United States v. Suarez, 682 F. 3d 1214 (9th Cir. 2012) (inconsistent verdicts may stand, regardless whether they are rationally incompatible with acquittal, provided there is sufficient evidence to support the guilty verdict); United States v. Dota, 33 F.3d 1179, 1187 (9th Cir. 1994) ("Jury

57

verdicts are insulated from review for inconsistency."). Therefore, Cao is incorrect to request this Court to find that the jury "split the verdict" because any conflicting inferences must be presumed to have been resolved by the jury in favor of the prosecution. Nevils, 598 F.3d at 1164. Thus, the district court properly denied Cao's motion for acquittal.

> D. **THE DISTRICT COURT IMPOSED A PROCEDURALLY PROPER SENTENCE WHERE IT CONSIDERED THE LOCATION OF FUNDS CAO TRANSFERRED OVERSEAS THAT COULD BE USED TO PROVIDE RESTITUTION TO VICTIMS OF CAO'S PONZI SCHEME**

> 1. Introduction

Cao's fourth contention is that the district court placed an impermissible burden on him at sentencing to disclose the location of investor money that Cao had wired overseas. [AOB 63-68.] Cao claims that the district court imposed a longer sentence because Cao refused to disclose the location of the missing money. [Id.] These arguments lack merit.

Courts have recognized that there is a distinction between considering a defendant's silence as an aggravating factor in sentencing and granting leniency in exchange for information. Cao consulted with counsel before voluntarily waiving his constitutional rights and addressing the issue of the overseas investor funds. The district court's rejection of Cao's explanation of where the investor funds had gone was not clearly erroneous. The district court's refusal to grant leniency in exchange for Cao's explanation, which it did not deem credible, does not rise to the level of procedural error.

2.    Standard of Review

When reviewing a sentence, this Court first considers "whether the district court committed significant procedural error," and then it considers "the substantive reasonableness of the sentence." United States v. Carty, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (citing Gall v. United States, 552 U.S. 38, 50 (2007)). Appellate review is limited "to determine whether the sentence is reasonable; only a procedurally erroneous or substantively unreasonable sentence will be set aside," and the abuse of discretion standard applies. Carty, 520 F.3d at 993 (citing United States v. Booker, 543 U.S. 220, 261-63 (2005); Gall, 552 U.S. at 45-46, 50-51). Recognized procedural errors include: (1) failing to calculate, or calculating incorrectly, the Guidelines range, (2) treating the Guidelines as mandatory, (3) failing to consider § 3553(a) factors, (4) choosing a sentence based on clearly erroneous facts and (5) failing to adequately explain to sentence. Carty, 520 F.3d at 993.

3.    The District Court Did Not Commit Procedural Error
by Affording Cao an Opportunity to Disclose the
Location of the Stolen Money That He Wired Overseas

Here, the district court committed no procedural error in sentencing Cao. The district court properly began its sentencing analysis by calculating the advisory Sentencing Guidelines, a calculation that was undisputed by both parties. [ERII 206.] Cao's sentencing range was calculated to be between 360 months to life. [ERII 208.] The district court then allowed both parties to present arguments as to what they believed the appropriate sentence should be and permitted Cao to allocute throughout the proceeding. [ERII 174-97, 198-206.] The district court applied the § 3553(a)

59

factors. The district court offered a detailed explanation of what facts served as aggravating factors [ERII 172], and what facts could be factors in Cao's favor. [ERII 186.] During the sentencing hearing, the district court permissibly afforded Cao the opportunity to disclose the location of missing money before imposing a sentence. [ERII 177-98.] Cao claimed he was "scammed out of it" and declined any assistance from the Government to retrieve it. [ERII 187-90, 192-93, 219.] Instead, Cao insisted he could recover the money himself. [Id.]

Ultimately, the district court, after carefully considering all of the § 3553(a) factors, sentenced Cao to 360 months, which was the low end of the properly calculated and undisputed Guideline range. [ERII 208-16.]. The district court thoroughly explained its reasoning as to how that sentence was reached. [Id.]

While the district court considered all of the factors set forth in § 3553(a), it did not consider Cao's refusal to disclose the location of the stolen money as an aggravating factor. The district court made clear that Cao retained Fifth Amendment protection that continued in the sentencing hearing. [ERII 186.] The district court found facts, however, suggesting that Cao knew where to find the investors' money that he transferred overseas. See United States v. Mix, 457 F.3d 906, 911 (9th Cir. 2006) (citations omitted) (factual findings are reviewed for clear error); Spangle, 626 F.3d at 497 (holding that factual findings were part of the trial court's "duty to determine the credibility of such proffered explanations, and drawing the inference from these facts that [the defendant] was pursuing a vendetta against his former probation officer"; affirming the district court's finding that defendant's explanation

60

was implausible and suspicious). The district court thereby afforded Cao an opportunity to disclose the current location of the money he had transferred overseas. [ERII 191.] The district court made clear that should Cao make such a disclosure, then the district court would take that fact into consideration in possibly mitigating the sentence to be imposed. [Id.]

The district court's belief that Cao knew where the stolen money was located at the time of sentencing was not based on "clearly erroneous facts." As the district court deduced from the facts of the case, the money had not been located by authorities and Cao was the person in the best position to know where the money went. [ERII 178-79.] The district court properly found Cao's explanations for the missing money to be implausible and suspicious. [ERII 188 (Cao claimed that he "got scammed out of it"), 189 (Cao stated that "it was other people that took [the money]"), 189-91, 209-11.]; see Spangle, 626 F.3d at 497; cf. United States v. Rutledge, 28 F.3d 998, 1002 (9th Cir. 1994) (holding that while a defendant has the right to remain silent regarding relevant, uncharged conduct, once he relinquishes the right and falsely denies such conduct, the district court may weigh the false denial in considering a reduction for acceptance of responsibility).

In any event, whether Cao knew where the money was did not go towards calculating his sentence. Specifically, the district court indicated that any disclosure, if made, would be "to [Cao's] benefit"; "if [the money] goes back into the investors' account, then you're. . . going to get credit for that." [ERII 191 (emphasis added).] Such a disclosure would be properly factored into sentencing under

61

§ 3553(a)(1),(2),(7). Courts have recognized a distinction between considering a defendant's silence as an aggravating factor in sentencing and granting leniency in exchange for information. See, e.g., United States v. Gallego, 943 F. Supp. 343, 345 (S.D.N.Y. 1996) (recognizing, "there is a difference between considering a factor in determining the extent of a benefit that will be extended and considering it as an aggravating factor. Although the distinction seems somewhat semantic, it is well established.").

In this case, the presumption that Cao's argument that his silence as to the location of stolen money served as an aggravating factor in the district court's decision is entirely speculative and contrary to the record. This conjecture is not an entirely novel one and has been addressed by other courts. See. United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir. 2011), cert. denied, 132 S. Ct. 1066 (2012).

In Barrington, the defendant argued before the Eleventh Circuit that the district court imposed a harsher sentence because the defendant refused to answer the court's question. Id. However, the court considered the contention that the district court adversely considered the defendant's silence as entirely speculative:

> Nothing in the district court's comments evinced an intent to impose a more severe sentence based on Barrington's failure to respond to the district court's question. Barrington merely assumes that the district court relied on an adverse inference in view of the perceived harshness of his sentence. However, his low-end Guidelines sentence belies any such inference having been drawn by the district court. We find no plain error which affected Barrington's substantial rights.

62

Barrington, 648 F.3d at 1197. The defendant's argument in Barrington that the district court imposed a harsher sentence on the basis of the defendant's silence was belied by the fact the sentence was at the low end of the Guideline range. The same is true of Cao's argument. The Sentencing Guidelines advised that a term of 360 months to life be imposed for Cao's conviction. [ERII 208.] The Government and the probation officer requested a sentence of 480 months. [Id.; PSR 20.] However, the district court imposed a sentence at the low end of the Guideline range – a term of 360 months. [ERII 216.] Had Cao's silence served as an "aggravating" factor in the district court's decision, the sentence imposed would have presumably been an upward departure from the Guidelines. Or, at the very least, not the minimum amount called for by the Guidelines. This Court has employed similar reasoning, finding the defendant's contention that the district court procedurally erred without merit. United States v. Gomez, 426 Fed. Appx. 540 (9th Cir. 2011) (unpublished) (holding that "this argument lacks merit as there is no indication that the court's sentence was designed to punish him for exercising a constitutional right."); see also United States v. Curtin, 588 F.3d 993, 998 (9th Cir. 2009) (recognizing a low-end term as proof the district court did not issue an impermissibly "vindictive" sentence).

Cao relies on the Supreme Court's decision in Mitchell v. United States, 526 U.S. 314 (1999), contending that the district court placed an impermissible burden on him to waive his right to remain silent and then drew an adverse inference from Cao's refusal to disclose the location of the missing money. [AOB 64-67; ERII 177-80, 185-93, 196-98.] In Mitchell, the Supreme Court held that a defendant who has pleaded

63

guilty does not waive his right to remain silent at the sentencing hearing and that the sentencing judge may not draw an adverse inference from his silence. Mitchell, 526 U.S. at 329-30. That is not what happened here. In this case, the district court informed defense counsel that it wanted to know the location of the money transferred overseas by Cao. [ERII 177.] Before Cao responded, the district court acknowledged that Cao had a Fifth Amendment right to remain silent. [ERII 180, 186.] Cao consulted with his counsel before addressing the district court. [ERII 185.] After consultation, Cao made a knowing and voluntary decision to waive his Fifth Amendment right and respond to the district court's question about the missing money. [ERII 186-93.] The fact that Cao chose to address the district court's concerns was a tactical decision. Cao could have "declined all offers" as he had done at the sentencing hearing. [ERII 193, 219.] After consulting counsel and deciding to address the court, the district court engaged Cao in attempting to determine the location of the missing money. [ERII 186-93.] In this appeal, Cao suggests that this Court should draw from Mitchell the rule that the district court placed an impermissible burden on Cao. This Court has rejected a similar contention. United States v. Romero-Rendon, 220 F.3d 1159, 1163 & n.4 (9th Cir. 2000) (declining to to draw from Mitchell the rule that no consideration can be given to the fact that the defendant offered no evidence to challenge the accuracy of the PSR).

The district court's inquiry was meant to achieve the goal of providing restitution for the victims by uncovering the location of the missing money. See United States v. Rangel, -- F.3d. --, 2012 WL 2948544 (9th Cir. July 20, 2012)

(addressing the district court's consideration of defendant's ability to pay restitution). The district court did not commit any procedural error.

E.    THE DISTRICT COURT IMPOSED A SENTENCE THAT WAS SUBSTANTIVELY REASONABLE GIVEN ITS CAREFUL CONSIDERATION OF THE UNDISPUTED GUIDELINE CALCULATION, § 3553(a) FACTORS, AND ALL SENTENCING ARGUMENTS, INCLUDING THE EMPIRICAL EVIDENCE CONCERNING SENTENCES FOR WHITE-COLLAR CRIMINALS

1.    Introduction

Cao's final contention is that the district court imposed a substantively unreasonable sentence because it was based on empirically deficient assumptions concerning the sentences for white-collar criminals and failed to avoid unwarranted sentencing disparities. [AOB 68-77.] This argument lacks merit. The district court acknowledged it had carefully and repeatedly reviewed the sentencing arguments of counsel, which included the empirical evidence arguments. The district court, with those arguments in mind, explained its application of the § 3553(a) factors. Afterwards, the district court imposed a substantively reasonable sentence at the low-end of the uncontested advisory Guideline range. The sentence should be affirmed.

2.    Standard of Review

Once the Court concludes that the district court did not commit procedural error in applying the Guidelines, this Court reviews the sentence for reasonableness in light of all of the factors set forth in § 3553(a). Carty, 520 F.3d at 993; see also United States v. Mix, 457 F.3d 906, 911 (9th Cir. 2006) (citing United States v. Cantrell, 433 F.3d 1269, 1280 (9th Cir. 2006)). In determining substantive

65

reasonableness, the reviewing court considers "the totality of the circumstances, including the degree of variance for a sentence imposed outside the guideline range." Carty, 520 F.3d at 993; see also Mix, 457 F.3d at 911. "When the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." Carty, 520 F. 3d at 994 (quoting Rita v. United States, 551 U.S. 338, 351 (2007).

>     3.     The District Court Considered, but Rejected Within Its
>            Discretion, Cao's Arguments Concerning the Empirical
>            Evidence Concerning Sentences for White-Collar Criminals

As numerous courts have recognized, the Guidelines serve a particularly important purpose in the area of white-collar crime. For instance, the Supreme Court in Mistretta v. United States, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals." Accord United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes. . . ."); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses"). In United States v. Martin, the Eleventh Circuit provided the following explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as "particularly important in the area of white collar

66

crime." S. Rep. No. 98–225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, "[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." Id.

455 F.3d 1227, 1240 (11th Cir. 2006).

Although this Court does not automatically presume reasonableness for a within-Guidelines sentence, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." Carty, 520 F.3d at 994.

Cao's substantive reasonableness argument is premised on the claim that the district court did not give sufficient weight to his argument, namely the lack of empirical data to support the fraud guidelines, and therefore failed to avoid an unwarranted sentencing disparity. [AOB 68-77.] This is incorrect. The district court carefully considered the § 3553(a) factors and Cao's arguments concerning the impact of the empirical evidence on sentences of white-collar criminals. [ERII 171, 174, 212, 214.] "Although comparability is a legitimate sentencing factor, divergence from sentences imposed in similar cases is permissible so long as the court is attentive to relevant sentencing factors, as the district court was here." See United States v. Burgum, 633 F.3d 810, 813-14 (9th Cir. 2011) (citing United States v. Marcial–Santiago, 447 F.3d 715, 719 (9th Cir. 2006)). That is precisely what the district court did in this case.

There is no indication that the district court felt bound by the sentencing Guideline range or bound to treat the Guidelines as presumptively reasonable. See Carty, 520 F.3d at 996. There is also no indication that the district court refused to consider Cao's empirical evidence argument. In fact, the record is to the contrary – the district court did review and consider the empirical evidence arguments made by Cao. [ERII 71-77, 78-90, 171, 174, 212, 214.] In fact, the district court stated that it had "those [empirical evidence] objections in mind" when determining the reasonableness of the sentence to impose. [ERII 207 (district court repeated defense counsel's argument – "And as you said, make an argument that the Guidelines themselves are flawed because they are not based on empirical research, at least in this broad area.").]

Moreover, the district court repeatedly invited counsel to argue for the sentence that should be imposed. [ERII 174-97, 204-06.] However, counsel did not address any further empirical evidence arguments at the sentencing hearing. [Id.] The record clearly reflects that the district court considered all of the pertinent arguments made by counsel and the § 3553(a) factors. [ERII 171-220.] In imposing sentence, the district court provided an extensive and detailed explanation of reasons for imposing a low-end sentence. [ERII 207-19.]

Other district courts have also rejected the contention that the white-collar guidelines are not the product of careful empirical evidence and have given the argument little weight in their sentencing analysis. See, e.g., United States v. Snipes, 611 F.3d 855, 869-70 (11th Cir. 2010) (sentence was reasonable after district court

rejected the empirical evidence arguments concerning the tax guidelines); United States v. Petters, 663 F.3d 375, 386 (8th Cir. 2011) (sentence was reasonable after district court rejected the empirical evidence arguments concerning the fraud guidelines); United States v. Murray, 648 F.3d 251, 257-58 (5th Cir. 2011) (same), cert. denied 132 S. Ct. 1065 (2012); United States v. Rainey, 2012 WL 1850633 (6th Cir. May 21, 2012) (unpublished) (same).

Given the district court's findings regarding the seriousness of the offense, Cao's central role in the offense, and the need to deter recidivism and protect the public, the district court was well within its discretion in determining that the low end of the undisputed Guideline range was sufficient but not greater than necessary to achieve the goals of sentencing. In light of the totality of the circumstances, the district court imposed a substantively reasonable sentence.

## VI

## <u>CONCLUSION</u>

For the foregoing reasons, Cao's conviction and sentence should be affirmed.

Dated: July 30, 2012         Respectfully submitted,

LAURA E. DUFFY
United States Attorney

BRUCE R. CASTETTER
Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division

s/Joseph J.M. Orabona

JOSEPH J.M. ORABONA
Assistant U.S. Attorney

Attorneys for Plaintiff-Appellee
United States of America

C.A. No. 11-50200

## CERTIFICATE OF COMPLIANCE

I certify that:

Pursuant to Fed. R. App. P. 32(a)(7)( c ) and 9th Cir. R. 32-1, the attached answering brief is:

<u>X</u>     Proportionately spaced, has a typeface of 14 points or more and contains  18,300  words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words), or is:

\_\_\_\_     Monospaced, has 10.5 or fewer characters per inch and contains \_\_\_\_\_ words or \_\_\_\_\_ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).


<u>July 30, 2012</u>          <u>s/ Joseph J.M. Orabona     </u>
DATED                  JOSEPH J.M. ORABONA
                       Assistant U.S. Attorney

C.A. No. 11-50200

<u>STATEMENT OF RELATED CASES</u>

Counsel for the Government is not aware of any related cases which should be considered with this matter.